IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| KEVIN MILNES,<br><br>Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | ) | CIVIL NO. 02–00365 BMK<br><br>MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS AND FOR SUMMARY JUDGMENT |

MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION FOR PARTIAL SUMMARY JUDGMENT

## I. PRELIMINARY STATEMENT

Plaintiff claims in his First Amended Complaint that substandard health care provided by physicians at the Tripler Army Medical Center ("TAMC") caused him to sustain injuries. The bulk of Plaintiff's claims arise out of a gallbladder surgery that was performed at the TAMC on June 15, 1999 and his subsequent hospitalizations at the TAMC in June 1999 and July 1999.

These claims must be dismissed because Plaintiff has failed to either set forth proper expert testimony that the standard of care was breached or has failed to set forth the basis that an alleged breach of the standard of care caused Plaintiff's claimed injuries.

## II. STATEMENT OF FACTS

### A. Plaintiff's Hospitalizations

On June 14, 1999, at approximately 11:55 a.m., Plaintiff was admitted to the TAMC emergency department complaining of abdominal pain. At the time of his admission, Plaintiff was a long time smoker. Diagnostic testing confirmed an inflamed gallbladder and Plaintiff was transferred to the TAMC surgical ward during the early morning of June 15, 1999.

At approximately 9:20 a.m. on June 15, 1999, Plaintiff was intravenously administered a broad spectrum antibiotic, Zosyn. Plaintiff underwent an laporascopic procedure at approximately 1:00 p.m. which was converted to an open procedure due to the degree of gallbladder inflammation. At the conclusion of the procedure, Plaintiff's wound was closed with surgical staples. During the several days following the procedure, Plaintiff was administered Zosyn to prevent infections.

During the next several days, Plaintiff did not have any complaints and his wound appeared to be healing well. Prior to his June 19, 1999 discharge, Plaintiff was instructed by TAMC Staff Surgeon Paul Cirangle, M.D. to stop smoking as Plaintiff continued to smoke following the June 15, 1999 procedure, avoid strenuous activities, avoid driving and consume a healthy diet. Dr. Cirangle gave these instructions because smoking cigarettes

severely delays wound healing and strenuous activities would place pressure on the wound.

Plaintiff was examined by Dr. Cirangle on June 23, 1999 and his wound was noted to be clean and dry. Dr. Cirangle removed the surgical staples and applied steristrips. Dr. Cirangle warned Plaintiff, who admitted that he drove himself to TAMC, to avoid driving for the next several weeks.

On June 24, 1999, Plaintiff entered the TAMC emergency room. Plaintiff's wound was noted by Bradley Sakaguchi, M.D., to be dehisced (separated) but no evisceration (protrusion of the organs) was noted through the wound. Plaintiff's wound was packed and he was ordered to return to the surgical ward the following day.

On June 25, 1999, Plaintiff returned to the TAMC emergency department and he was reminded of Dr. Sakaguchi's instructions to report to the surgical ward. Upon his admission to the surgical ward on June 25, 1999, his wound was noted to be clean with no infection.

During the late morning of June 26, 1999, Plaintiff left the TAMC surgical ward against the advice of TAMC personnel who expressed concerns that Plaintiff's decision to leave the facility could affect the wound healing. Upon his return to the TAMC surgical ward, he underwent a surgical procedure in which the wound was irrigated and debrided and the sutures were

removed. Due to the lack of quality tissue, the wound was left open for secondary healing.

Dakin’s Solution, which contains sodium hypochlorite and has been used to treat problematic wounds that are either infected or colonized with bacteria, was applied to Plaintiff’s wound on July 1, 1999 and July 2, 1999. On July 2, 1999, the wound was once again cleaned with no infection noted. Plaintiff was discharged on July 2, 1999 with instructions to stop smoking, avoid strenuous activity and to use Dakin’s Solution when changing his dressings.

On July 6, 1999, Plaintiff returned to TAMC and admitted that he was smoking two packs of cigarettes per day. The skin around the wound appeared to be irritated in a distribution similar to the adhesive tape holding the dressing. Dr. Cirangle noted that Plaintiff’s wound was not healing properly and suggested the use of the Vacuum Assisted Closure (“VAC”) device as potential treatment.

Plaintiff was admitted to the TAMC on July 8, 1999 to utilize the VAC. By June 8, 1999, the edges of the wound contained mild redness which disappeared by July 12, 1999. On July 14, 1999, Plaintiff complained of a severe local reaction to the Dakin’s Solution which he described as deep burning pain with intense itching. During this hospitalization, Plaintiff disconnected himself from the VAC machine on numerous occasions and he continued to smoke against the orders of TAMC staff.

At the time of Plaintiff's July 20, 1999 discharge, he exhibited redness near his wound.

B. Plaintiff's First Amended Complaint

In his First Amended Complaint, Plaintiff alleges that he was seeking damages

> "arising out of Tripler Army Medical Center (TAMC) substandard care, delayed operative surgery and negligent post-operative care for my gall bladder condition on and after June 14, 1999, including but not limited to error judgment on early staple removal wound dehiscence, non-readmittance by the Tripler ER upon first show with the dehisced wound, wound turning into gangrenous and infectious transforming the whole issue into a life-threatening situation, early second discharge, lack of lab reports regarding possible malignant complications, granulomatous disease as a possible background factor not diagnosed at TAMC, three year history (1999-2002) of infected stitches removal of an abcessed wound, continued pain up to date, intenstinal adhesions and bowel problems, due to multiple surgical clips/unskilled surgery, etc..."

See First Amended Complaint filed on November 13, 2002.

C. Plaintiff's Expert Opinions

Plaintiff has retained Peter Halford, M.D., a general surgeon as his expert in this matter. Plaintiff submitted Dr. Halford's written report dated May 25, 2005 to Defendant on or about May 30, 2005.[1]

[1]Plaintiff did not name any other expert prior to his April 24, 2006 deadline to identify expert witnesses and provide the expert witnesses' written report. Nor has Plaintiff identified any additional experts or provided any supplemental reports from Dr. Halford since April 24, 2006.

Dr. Halford gave the following opinions regarding the substandard care given to Plaintiff at the TAMC:

#1. The patient was admitted with signs and symptoms of acute cholecystitis. He had severe pain in the upper right quadrant of the abdomen as well as an elevated white blood count and CT scan findings showing inflammation of the gallbladder. He was admitted and appropriate orders were apparently entered, including an order for the antibiotic Zosyn. **In my review of the records, however, there was no documentation of the antibiotic being administered before the surgical procedure the following day. If this is true it is a breach of the standard, since antibiotics are essential to be administered in the pre-operative setting. The reason for this is to prevent to the best extent possible a post-operative wound infection.** As the patient's care evolved he indeed did return with a wound disruption that led to further operative procedures and his current situation with a disfiguring scar. It would be of help to obtain a copy of the medical administration record ("MAR) that is pertinent to this issue.

#2. It is the patient's perception that surgery was delayed for a prolonged length of time. **He believes that the definitive gallbladder surgery was postponed due to elective surgery procedures taking precedence**, and he is of the opinion that the medical records were altered to not reflect this. **I was not able to confirm this from my review of the records**, but should this be validated on further investigation, then this would represent an egregious breach of medical care standards.

#3. This patient presented with a diagnosis of acute cholecystitis and antibiotics were ordered. As the wound was closed, antibiotic powder was applied as well. He later returned with a wound disruption and other intravenous antibiotics were further prescribed over the course of his ensuing care. Yet throughout his entire illness, I was not able to locate any culture reports. There were no culture reports from the gallbladder at the time of surgery, nor were there reports from his wound despite ongoing repeated issues with the wound dehiscence and poor healing. In my opinion, it certainly is a standard of care to base the selection of the appropriate antibiotic upon the

identification of what bacteria one is attempting to eliminate to be certain your selection is correct. Without any culture identification one is led to believe that an inappropriate antibiotic may well have been selected and thus led to his subsequent problems. Again, if there are any microbiology reports available, they would important to evaluate.

#4. After his first operation, Mr. Milnes returned to the Emergency Department on June 24, 1999. According to the medical record, he had felt a "pop" and the incision opened up. The wound was noted to be largely dehisced including the anterior fascia, and the posterior fascia was intact. He was sent out for some reason and then readmitted the next day with eventual operative repair done on June 26th 1999. **In my opinion, this patient should have been admitted on the 24th especially with a dehiscence of this degree.** The delay allowed for increased bacteria colonization, added discomfort, and put him at increased risk for evisceration.

#5. This patient was allergic to bleach, and this was well documented in the record. Yet an order for Dakin's solution (a bleach containing fluid) was placed and this was applied to his open wound. This resulted in an intense reaction, and further delayed his wound healing let alone the side effects he had to put up with. A definite negligent action.

#6. Lastly there are a number of entries in the medical record that blame the patient for all of his complications. Mention is made of his non compliance, his weight, his smoking habit, and the fact that he lifted a heavy TV set that weighed 60 lbs. The patient states that this was not the case at all and denies lifting anything heavy. If indeed the medical staff fabricated this to shift blame, then there is no doubt that this is a breach of medical ethical and care standards It is hard for me to believe that someone could lift anything over 25 lbs in the first two weeks after a major abdominal incision.

<u>See</u> May 25, 2005 Report from Peter Halford attached to the Concise Statement of Facts as Exhibit “D” (emphasis added).

D. <u>Defendant’s Experts</u>

1. <u>Lawrence Eron, M.D., FACP, FIDSA</u>

Dr. Eron opined that the administration of antibiotics to Plaintiff before and after the gallbladder procedure met the standard of care (curiously, Plaintiff's expert ignores the portion of the medical record explicitly detailing the pre-procedure antibiotic application).

Dr. Eron also opined that based on medical studies, there is no evidence that the bleach content in Dakin's Solution, sodium hypochlorite, delays wound healing and that the timing of the redness to Plaintiff's wound made it unlikely that the redness or any claimed complication were caused by the application of Dakin's Solution. Further, the skin irritation which Plaintiff claimed several days after the application of Dakin's Solution was in the exact distribution of the adhesive tape used to hold the wound dressing.

2. Whitney Limm, M.D., FACS

Dr. Limm opined that the timing of the gallbladder procedure was within the standard of care - which requires that gallbladder surgery be performed within seventy-two hours after admission. Dr. Limm also opined that Dr. Sakaguchi's care of Plaintiff in the TAMC on June 24, 1999 was within the standard of care as partially opened wounds could be treated with dressings and healing by secondary intent. Dr. Limm also found that Dr. Sakaguchi's order that Plaintiff report to the TAMC surgical ward on the following day was within the standard of care as treatment

of partially opened wounds could be treated on an outpatient basis.

III. ARGUMENT

A. Legal Standards

Federal Rule of Civil Procedure 56(c) allows a district court to grant summary judgment “if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.”

In Brinson v. Linda Rose Joint Venture, 53 F.3d 1044, 1047 (9th Cir. 1995), the Ninth Circuit succinctly described the showing a party moving for summary judgment must make and the corresponding burden a party opposing summary judgment must carry to thwart the motion. A party seeking summary judgment must “identify those parts of the record that indicate the absence of a genuine issue of material fact.” Id. at 1048 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Anderson v. Liberty Lobby Inc., 477 U.S. 242 (1986); Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986)). Once the party seeking summary judgment meets its burden, the nonmoving party must “designate ‘specific facts showing that there is a genuine issue for trial.’” Id. (quoting Celotex, 477 U.S. at 324). The party opposing summary judgment “must do more than simply show

that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587. Further, if the evidence proffered by the party opposing the motion is "merely colorable, or is not significantly probative," summary judgment may appropriately be granted. Liberty Lobby, 477 U.S. at 249-50. "The possibility that the plaintiff may discredit the defendant's testimony at trial is not enough for the plaintiff to defeat a properly presented [summary judgment] motion." United Steelworkers of America v. Phelps Dodge, 865 F.2d 1539, 1542 (9th Cir. 1989) (en banc), cert. denied, 493 U.S. 809, 110 S.Ct. 51 (1989).

The party opposing summary judgment must demonstrate that the fact in contention is material, i.e., that it might affect the outcome of the suit under the governing law, Liberty Lobby, 477 U.S. at 248; T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Anderson, 477 U.S. at 248-49. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 322.

B. Rule 26 Precludes Plaintiff From Asserting Any Expert Opinions Outside Dr. Halford's May 25, 2005 Report

In pertinent part, Rule 26(a)(2)(B) reads as follows:

> Except as otherwise stipulated or directed by the court, this disclosure shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony, be accompanied by a written report prepared and signed by the witness. <u>The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions</u>

Fed. R. Civ. P. 26(a)(2)(B)(emphasis added).

The Rule, utilizing the word "shall", does not permit substitution of its clearly required specificity by submittal of something so vague as Gill's "preliminary letter." Quite to the contrary, the Rule's Advisory Committee Notes (1993 Amendments) state that paragraph 2 imposes a duty to disclose information regarding expert testimony sufficiently in advance of trial to permit preparation for effective cross-examination and, if necessary, arrange for expert testimony from other witnesses. More specifically, the Committee makes clear that Paragraph (2)(B) requires the preparation of a "<u>detailed and complete written report stating the testimony the witness is expected to present during direct examination, together with the reasons</u>

therefor."[2] The Advisory Committee clarifies that disclosure under the former rule requiring only the "substance" of expert testimony was frequently so sketchy and vague that it rarely dispensed with the need to depose an expert and often was of little help in preparing for a deposition of an expert. The Advisory Committee goes on to state that the revised Rule 37(c)(1) provides an incentive for full disclosure, namely, that a party will not ordinarily be permitted to a direct examination of any expert testimony not so disclosed. An expert's report, according to the Commentary is to set forth the substance of the direct examination, and to be written in a manner that reflects the testimony to be given by the witness. Since depositions of experts deemed necessary in response to an expert's written report may be taken only after the report has been served, according to the Commentary, the length of the deposition of such an expert should be reduced and in many cases the report may wholly eliminate the need for a deposition.

Thus, it is clear from the plain language of Rul3 26, FRCP, that Plaintiff may not present any additional opinions to supplement Dr. Halford's May 25, 2005 report.

---

[2] "Expert reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions." Salgado by Salgado v. General Motors Corp., 150 F.3d 735, 742 n.6 (7th Cir. 1998) (citing Reed v. Binder, 165 F.R.D. 424, 429 (D.N.J. 1996)).

C. Hawaii Malpractice Law Requires Expert Testimony To Establish Negligence Claims

The State of Hawaii generally follows the common law of torts. Rodrigues v. State, 52 Haw. 156 (1970), Figueroa v. State, 61 Haw. 369 (1979). Under Hawaii case law, a physician practicing medicine must meet the standard of care usually found in the medical community. McBride v. United States, 462 F.2d 72 (9th Cir. 1972). Under Hawaii law, the elements of a typical negligence claim are: (1) existence of a duty or obligation, recognized by law, requiring a defendant to conform to a certain standard of conduct for the protection of others against unreasonable risks; (2) a failure by the defendant to conform to the required standard, or a breach of the duty; (3) actual loss or injury resulting to the interests of another; and (4) a reasonably close causal connection between the conduct and the resulting injury. Knodle v. Waikiki Gateway Hotel, Inc., 69 Haw. 376, 384-85, 742 P.2d 377, 383 (1987).

In Hawaii, in a medical malpractice suit, the question of negligence must be decided by reference to relevant medical standards of care for which a plaintiff carries the burden of proving through expert medical testimony and the plaintiff must also produce medical expert testimony showing that the applicable standard of care was breached. Craft v. Peebles, 78 Haw. 287, 298-299, 893 P.2d 138, 149-150 (1995), Carr v. Strode, 79 Haw. 475, 904 P.2d 489 (1995).

D. Plaintiff Has Failed To Set Forth Sufficient Expert Testimony To Sustain His Negligence Claims

1. No Evidentiary Basis Exists For Plaintiff's Claims That He Was Not Administered Antibiotics Prior To The GallBladder Procedure

There is no dispute that the standard of care requires the use of antibiotics prior to a gallbladder surgery. Nor is a dispute that antibiotics were administered to Plaintiff approximately four hours prior to the June 16, 1999 gallbladder procedure. See Declaration of Juan J. Sanchez-Martinez at ¶¶7-8, Exhibit "A". Not only did the nurse who administered Zosyn to Plaintiff give a sworn statement on this subject but the TAMC records clearly set forth the administration of Zosyn.

Plaintiff's expert's claim of a breach of a standard of care regarding the lack of administration of antibiotics prior to the June 16, 1999 surgery is clearly flawed. This opinion was based on the assumption that an antibiotic was not administered to Plaintiff prior to the June 16, 1999 gallbladder procedure. This assumption is completely incorrect.

Accordingly, Defendant's expert, Dr. Eron, found that, within a reasonable degree of medical probability that the pre-operative antibiotic treatment received by Plaintiff was within the standard of care. Because there is no genuine issue of material of fact, Plaintiff's claim that Defendant breached the standard of care regarding the pre-gallbladder surgery administration of Zosyn must be dismissed.

### 2. The Timing Of the Gallbladder Procedure Was Within The Standard Of Care

Plaintiff' claim that the timing of the gallbladder surgery breached the standard of care must be dismissed because Dr. Halford's expert testimony is insufficient regarding this issue. First, he has failed to set forth the applicable standard of care as to the timing of the gallbladder procedure. Rather, he simply bases his opinion that the timing of the gallbladder procedure violated the standard of care on Plaintiff's perception that surgery was delayed for a prolonged length of time" and his belief that the gallbladder surgery "was postponed due to elective surgery procedures taking precedence." See Exhibit "D".

Second, notwithstanding this baseless allegation, it is undisputed that the timing of the surgery, approximately twenty-six hours after Plaintiff's admission into TAMC, was well within the standard of care to perform a gallbladder procedure. As noted above, the standard of care is to perform the gallbladder removal within seventy-two hours of the patient's admission. See Declaration of Whitney Limm, M.D. at ¶ 19.

Thus, the relevant inquiry should not be whether elective procedures were performed prior to Plaintiff's gallbladder procedure but whether the gallbladder procedure was performed within seventy-two hours of Plaintiff's admission. Since it is undisputed that Plaintiff's gallbladder procedure occurred approximately twenty-six hours after his admission into

TAMC, the timing of the gallbladder procedure was within the standard of care.

3. Plaintiff Has Failed To Set Forth Expert Testimony Regarding The Incorrect Use Of Antibiotics

Plaintiff's claim that incorrect antibiotics may have been administered to Plaintiff following the gallbladder procedure must also be dismissed because Plaintiff's expert's testimony is insufficient. First, Plaintiff's expert has failed to identify the antibiotic that was incorrectly administered to Plaintiff and the reasons why the unspecified antibiotic was inappropriate.

Second, it is undisputed that no evidence of any infection existed following the June 16, 1999 procedure. See Declaration of Lawrence Eron, M.D., FACS, FIDSA ("Eron Declaration") at ¶ 24. Accordingly, there was no need for prolonged antibacterial treatment. Id.

Due to Plaintiff's failure to set forth the relevant standard of care and the specific breach by Defendant, this issue must be resolved in favor of Defendant.

4. Dr. Sakaguchi's Care Of Plaintiff Was Within The Standard Of Care

Plaintiff's claim that Plaintiff should have been admitted as an inpatient at TAMC on June 24, 1999 must also be dismissed as, once again, he has no expert testimony to support this claim. In Plaintiff's expert report, he does not set forth

the applicable standard of care and how this standard was breached.

Rather, Plaintiff's states that "in his opinion, this patient should have been admitted on the 24th especially with a dehiscence of this degree." This opinion is irrelevant. What must be examined is whether Plaintiff has set forth an opinion that a breach of the standard of care exited.

On the other hand, Dr. Limm has clearly set forth the standard of care and that Dr. Sakaguchi's actions were within the standard of care. As noted above, Dr. Sakaguchi's decision to pack the partially open wound was solely within the standard of care as was his order to Plaintiff to report to the TAMC surgical ward the following day. See Declaration of Whitney Limm, M.D., FACS at ¶ 22.

5. Plaintiff Has Not Established Competent Expert Testimony That The Dakin's Solution Caused Plaintiff's Injuries

Plaintiff's claims that he was injured as a result of the application of Dakin's Solution must also be disregarded. First, there is no evidence, other than Plaintiff's self-serving statements, that he is allergic to the Dakin's Solution. Second, even if he was allergic to Dakin's Solution, there is no evidence that any of Plaintiff's injuries were caused by the application of Dakin's Solution.

Third, Plaintiff's expert has failed set forth a basis for his opinion that Plaintiff experienced an "intense reaction" from the Dakin's Solution and that the Dakin's Solution delayed the healing of his wound. Rather Plaintiff's experts opinion are clearly conclusory and not supported by any evidence.

To the contrary, Dr. Eron has opined, based on the disclosed medical publications, that testing of the bleach-like substance in Dakin's Solution, sodium hypochlorite, fails to show any difference in the rate of healing of surgical wounds between sodium hypochlorite and either regular dressing, silastic foam dressing or calcium alginate dressings. See Eron Declaration at §§ 25-27.

Fourth, the redness near the wound disappeared by July 12, 1999. Since sodium hypochlorite normally causes peak reaction four to five days following its application, it is unlikely that the skin condition first raised by Plaintiff on July 6, 1999 was caused by the Dakin's Solution. Id. at §27-28.

//

//

//

//

//

//

//

IV. CONCLUSION

Based on the foregoing, Defendant requests that Plaintiff's claims against TAMC be dismissed.

DATED: April 26, 2006, at Honolulu, Hawaii.

EDWARD H. KUBO, JR.
United States Attorney
District of Hawaii

/s/ Edric M. Ching
By_____________________________
EDRIC M. CHING
Assistant U.S. Attorney

Attorneys for Defendant