IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| KEVIN MILNES, | ) CIVIL NO. 02-00365 BMK |
| | ) |
| Plaintiff, | ) DECLARATION OF PAUL CIRANGLE, |
| | ) M.D. |
| vs. | ) |
| | ) |
| UNITED STATES OF AMERCIA, | ) |
| | ) |
| Defendant. | ) |

DECLARATION OF PAUL CIRANGLE, M.D.

I, PAUL CIRANGLE, M.D., hereby declare that:

1. During the period from June 1999 to August 1999, I was a major in the U.S. Army and served as a Staff General Surgeon at the Tripler Army Medical Center ("TAMC").

2. I first encountered Kevin Milnes ("Milnes") in June 1999 when he was admitted to the TAMC complaining of abdominal pain.

3. Milnes presented to the TAMC emergency department during the early afternoon of June 14, 1999.

4. During his intake interview, Milnes described a past history of tobacco use.

5. During the early morning of the June 15, 1999, Milnes was admitted to the TAMC surgical ward from the emergency department.

6. Radiological evaluation, laboratory testing and my examination of Milnes led to a diagnosis of acute cholecystitis (inflammation/infection of the gallbladder).

7. During the morning of June 15, 1999, Milnes was scheduled for a laproscopic cholecystectomy (removal of the gallbladder). I ordered the antibiotic Zosyn be administered intravenously to Milnes prior to the above-referenced laproscopic procedure as part of standard treatment for this condition. Zosyn is a broad-spectrum antibiotic and was considered the treatment of choice at the time of his admission.

8. The surgical procedure (cholecystectomy) began at approximately 1:20 p.m. as a laparoscopic procedure and was converted to an open procedure after initial exploration revealed that severe inflammation was present around the gallbladder and his condition was best treated with this approach (to maximize his therapeutic regimen and minimize potential complication).

9. At the conclusion of his surgical procedure, his wound was closed in a standard manner and antibiotic powder was sprinkled into the subcutaneous space to minimize the chances of infection. The skin was closed with surgical staples. This procedure was concluded at approximately 5:53 p.m.

10. Following the procedure, Milnes was continued on intravenous Zosyn around the clock to continue treatment of his condition and to combat any potential wound infection.

11. By June 17, 1999, Milnes did not have any complaints and he had a good appetite. He had normal vital signs and had no evidence of fever.

12. Milnes was discharged from the TAMC on June 19, 1999. Prior to his discharge, I instructed Milnes not to smoke or use tobacco products, lift objects over ten pounds for six to eight weeks and not to drive an automobile or operate machinery for two weeks. I informed him that failure to follow instructions would affect the healing of his wound and potentially cause complications.

13. During his June 15, 1999 to June 19, 1999 hospitalization despite my instructions to the contrary and numerous warnings from TAMC personnel about the negative health effects of tobacco use, Milnes continued to smoke cigarettes.

14. On June 23, 1999 on routine postoperative follow-up, I examined Milnes at which time he had no specific complaints. His incision was clean and dry and appeared to be healing normally. I removed his skin staples and steristrips were applied to his wound. Milnes informed me that he drove to his appointment and I stressed to him the importance of avoiding driving and any strenuous physical activities.

15. Surgical standard of care dictates that when a patient presents to the hospital and a diagnosis of Acute

3

Cholecystitis is made, cholecystectomy be performed within 72 hours of admission.

16. On June 25, 1999, I learned that Milnes was examined in the TAMC emergency room the previous evening. I was informed by the on-call surgical resident that Milnes' wound had opened and several of the sutures had torn through the uppermost fascial layer of the abdominal muscle.

17. During the early afternoon of June 25, 1999, Milnes was seen in the TAMC outpatient surgical clinic. Examination revealed that his wound was open but showed no signs of active infection. It was noted to be clean and there was no evidence of evisceration of the underlying abdominal contents. He was admitted to the TAMC surgical ward for wound care.

18. During the early afternoon of June 26, 1999, Milnes informed TAMC staff and myself that he needed to leave the facility to return a moving truck that he had rented during the previous days. TAMC staff, including myself informed Milnes that leaving the facility would possibly cause infection or other complications and delay his wound healing. Despite these warnings Milnes left the facility and assured TAMC staff that he would return in two hours.

19. Milnes returned to the surgical clinic approximately three hours later.

20. During the early evening of June 26, 1999, I performed surgery on Milnes to address and repair his wound complication. I irrigated and debrided the incision and also removed the disrupted sutures. New sutures were inserted, antibiotic powder was once again placed in the wound and the wound was packed in preparation to perform a delayed-primary closure. The skin was left open to allow for secondary healing due to a lack of healthy tissue.

21. On July 2, 1999, I inspected Milnes' wound to evaluate for delayed primary closure. No active infection was noted however the wound was not closed because of inadequate granulation of the wound bed (poor healing).

22. Milnes was discharged from the TAMC on July 2, 1999 with instructions to continue daily wound care and dressing changes using dilute Dakin's solution. During his hospital stay, Milnes admitted that he continued to smoke cigarettes despite numerous warnings that smoking would affect the ability of the wound to heal. Upon his discharge on July 2, 1999, Milnes was not complaining of abdominal pain and had a normal temperature. He had no systemic signs of infection.

23. On July 6, 1999, I examined Milnes in the surgical clinic and he stated that he was still smoking 2 packs of cigarettes a day. His wound was not healing properly and I recommended that Milnes be admitted as an inpatient to be placed

on a Vacuum Assisted Closure (VAC) wound-healing device if his wound did not show improvement in one week.

24. During the July 6, 1999 examination, the skin around the wound appeared red and irritated. This irritated area was in the exact distribution of the tape used to hold the dressing over the wound in place. Milnes claimed that the irritation was caused by the Dakin's Solution but I told him that the irritation was caused by sensitivity from the adhesive tape.

25. Despite my feelings that the Dakin's Solution did not cause this skin irritation, on July 6, 1999, I ordered Milnes to use Normal saline solution in lieu of Dakin's Solution to address this complaint.

26. Milnes was admitted to TAMC on July 8, 1999 to place him on the VAC machine. On July 8, 1999, the wound was debrided and Milnes was connected to the VAC machine.

27. Upon admission, Milnes was informed that he needed to stay continuously connected to the VAC machine during his inpatient stay for the VAC to aid in the healing of the wound. Milnes was also ordered on numerous occasions to stop smoking because smoking retarded the healing of his wound.

28. On July 8, 1999, mild redness around the wound was observed. By July 12, 1999, the edges of the wound did not contain any redness.

29. Milnes was discharged from the TAMC on July 20, 1999.

30. During the July 8, 1999 to July 20, 1999 hospitalization, Milnes disconnected himself from the VAC machine on numerous occasions and he continued to smoke contrary to orders given to Milnes by myself and other TAMC personnel. In addition to disconnecting the VAC machine, he also left his room and the surgical floor. Milnes intentionally interfered with the VAC wound treatment by poking holes in the VAC tubing during this hospitalization.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 7th day of March 2006, at San Francisco, California.

                                                                  PAUL CIRANGLE, M.D.