GARY VICTOR DUBIN 3181
Dubin Law Offices
55 Merchant Street, Suite 3100
Honolulu, Hawaii 96813
Telephone: (808) 537-2300
Facsimile: (808) 523-7733
E-Mail: gdubin@dubinlaw.net

Attorney for Plaintiff
Kevin Milnes

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

APR 1 6 2007

at ___ o'clock and ___ min. ___ M
SUE BEITIA, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| KEVIN MILNES,<br><br>    Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>    Defendant. | CIVIL NO. 02-00365 BMK<br><br>PLAINTIFF KEVIN MILNES' **SEPARATE AND CONCISE COUNTER-STATEMENT OF MATERIAL FACTS**; DECLARATION OF KEVIN MILNES; EXHIBITS 1 THROUGH 8; DECLARATION OF GARY VICTOR DUBIN; EXHIBITS 9 THROUGH 12; CERTIFICATE OF SERVICE<br><br>DATE:    April 27, 2007<br>TIME:    2:00 p.m.<br>JUDGE:    Barry M. Kurren<br><br>Trial Date: September 24, 2007 |

**PLAINTIFF KEVIN MILNES' SEPARATE
AND CONCISE COUNTER-STATEMENT OF MATERIAL FACTS**

COMES NOW Plaintiff KEVIN MILNES, by and through his attorney, Gary Victor Dubin, pursuant to Local Rule 56.1, and in response to "Defendant's Concise Statement Of Material Facts In Support Of Defendant's Motion For Partial Summary Judgment," hereby submits his separate, concise counter-statement of material facts, as shown in chart form on the following pages.

DATED: Honolulu, Hawaii; April 16, 2007.

GARY VICTOR DUBIN
Attorney for Plaintiff

ORIGINAL

| PLAINTIFF'S RESPONSE TO DEFENDANT'S FACTS | DOCUMENTATION |
|---|---|
| 1. Kevin Milnes was admitted to the Tripler Army Medical Center ("TAMC") emergency department during the late morning of June 14, 1999 complaining of abdominal pain and he admitted a positive history of smoking (partially disputed). | Milnes Declaration, Paragraphs 3 and 31; Halford Report. |
| 2. In the morning of June 15, 1999, Milnes was admitted to the TAMC surgical ward and abdominal ultrasound confirmed the diagnosis of acute cholecystitis (gallbladder inflammation) (partially disputed). | Milnes Declaration, Paragraphs 6 and 11. |
| 3. At approximately 9:20 a.m., a broad spectrum antibiotic, Zosyn, was administered intravenously to Milnes (disputed). | Milnes Declaration, Paragraph 7; Exhibit 1. |
| 4. A laparoscopic procedure to remove Milnes' gallbladder commenced in the early afternoon of June 15, 1999 and was converted to an open procedure. Zosyn was administered to Milnes following the procedure (disputed). | Milnes Declaration, Paragraphs 6, 7, 11, and 16; Exhibits 1 and 2. |
| 5. During the next several days, slight swelling surrounded the surgical wound and Milnes had no complaints (disputed). | Milnes Declaration, Paragraph 20. |
| 6. Prior to his June 19, 1999 discharge, Milnes was ordered to avoid driving, smoking and strenuous activities (admitted). | But see Milnes Declaration, Paragraph 31; Halford Report. |
| 7. On June 23, 1999, Milnes' wound was noted to be clean and dry (disputed). | Milnes Declaration, Paragraphs 20 and 21. |
| 8. On June 24, 1999, in the TAMC emergency department, his wound was dehisced with no signs of evisceration. The wound was cleaned and Milnes was ordered to report to the surgical ward the following day (disputed). | Milnes Declaration, Paragraphs 20, 21, and 29; Halford Report. |
| 9. Milnes was admitted to the TAMC surgical ward on June 25, 1999 and no wound infection was noted (disputed). | Milnes Declaration, Paragraphs 20, 21, and 29; Halford Report. |
| 10. In the afternoon of June 26, 1999, Milnes, against the advice of TAMC personnel left TAMC for several hours (disputed). | Milnes Declaration, Paragraph 22. |
| 11. Upon his return to TAMC on June 26, 1999, Milnes underwent a procedure to clean and irrigate his wound with healing by secondary intent (admitted, although incomplete statement). | Milnes Declaration, Paragraphs 22 and 23. |
| 12. During the period from June 28, 1999 to July 1, 1999, Milnes' wound was healing well and clean. The edge of the | Milnes Declaration, Paragraph 23. |

| | |
|---|---|
| wound was slightly red (disputed). | |
| 13. On July 2, 1999, Milnes underwent a procedure to clean his wound. He was discharged on July 2, 1999 and he was ordered to use Dakin's Solution when changing his dressing (admitted). | Milnes Declaration, Paragraph 30; Halford Report. |
| 14. Dakin's Solution was applied to Milnes' wound on July 1, 1999 and July 2, 1999 (admitted). | Milnes Declaration, Paragraph 30; Halford Report. |
| 15. On July 6, 1999, a nursing note on indicated that the patient had been using normal saline in changing his dressings while Milnes maintained that he had been using the Dakin's solution (disputed, as statement is confusing). | See Milnes Declaration, Paragraph 30; Halford Report. |
| 16. A skin irritation appeared on Milnes' skin in the distribution of the tape holding the dressing. Milnes was ordered to stop using Dakin's Solution (disputed). | Milnes Declaration, Paragraphs 30 and 31; Halford Report. |
| 17. Milnes was re-admitted to TAMC on July 8, 1999 and was instructed to remain attached to the Vacuum Assisted Closure ("VAC") device (admitted, although misleading statement as Milnes never tried to detach himself from the VAC). | Milnes Declaration, Paragraphs 22, 23, and 31; Halford Report. |
| 18. On July 8, 1999, redness near the wound was noted and this redness disappeared by July 12, 1999 (disputed). | Milnes Declaration, Paragraphs 23 and 24. |
| 19. Milnes complained of a reaction to the Dakin's Solution on July 14, 1999 (probably). | See Milnes Declaration, Paragraphs 30 and 31; Halford Report. |
| 20. Milnes was discharged on July 20, 1999. During this hospitalization, he disconnected himself from the VAC machine on numerous occasions against the instructions from TAMC personnel (disputed). | Milnes Declaration, Paragraphs 22 and 23. |
| 21. During the period from June 1999 to July 1999, Milnes smoking and obesity retarded the healing of his wound (disputed). | See Milnes Declaration, Paragraph 31; Halford Report. |
| 22. The timing of Milnes' June 15, 1999 procedure was within the standard of care as it occurred within 72 hours of his admission to TAMC (partially disputed, as incomplete statement; it occurred within 72 hours, but under the circumstances it was not timely, and an attempt is being made to cover-up the actual date of the surgery for that reason). | Milnes Declaration, Paragraphs 11, 16, 17, 27; Halford Report. |
| 23. The administration of Zosyn to Milnes prior to the June 16, 1999 procedure was within the standard of care (disputed and contradicts Paragraph 22 as to the date of | Milnes Declaration, Paragraphs 26, 27, and 28; Halford Report. |

| | |
|---|---|
| the surgery; Government's position is contradictory). | |
| 24. Dr. Sakaguchi's care of Milnes complied with the standard of care (disputed). | Milnes Declaration, Paragraph 29; Halford Report. |
| 25. Due to the absence of any wound infections during any of the hospitalizations, prolonged antibiotic therapy was not warranted (disputed). | Milnes Declaration, Paragraph 24; Exhibits 5 and 6. |
| 26. The skin irritation referenced by Milnes on July 6, 1999 was caused by adhesive tape holding the dressing (disputed). | Milnes Declaration, Paragraph 23. |
| 27. A reaction to the Dakin's Solution normally peaks four to five days after its application. However, the timing of redness to Milnes' wound indicated no reaction to Dakin's Solution (disputed). | Milnes Declaration, Paragraph 30; Halford Report. |
| 28. Reactions to sodium hypochlorite, a bleaching agent contained in Dakin's Solution, are highly unusual and studies show that it does not affect the rate of healing of surgical wounds versus the use of other dressings (disputed). | Milnes Declaration, Paragraph 30; Halford Report. |
| 29. The use of Dakin's Solution did not delay wound healing (disputed). | Milnes Declaration, Paragraphs 30; Halford Report. |
| *PLAINTIFF'S COUNTER-STATEMENT OF FACTS* | |
| 30. On Sunday afternoon, June 13, 1999, I ("Milnes") and my wife returned to Honolulu from the Mainland, and about 1:00 a.m. the next morning I awoke, vomiting, with convulsions and fever. | Milnes Declaration, Paragraph 2. |
| 31. That morning, Monday, June 14, 1999, I went to the VA clinic and was placed in ambulatory care and X-rayed. | Milnes Declaration, Paragraph 3. |
| 32. Later that afternoon on June 14, 1999, I was transferred to the emergency room at Tripler ER by ambulance, where I was x-rayed and that evening was given a CT scan; the diagnosis was "gall bladder failure," after which they assured my wife nothing would happen overnight and she should go home; she left. | Milnes Declaration, Paragraph 4. |
| 33. While at the emergency room, no antibiotics were administered to me, and I was given no ultrasound testing. | Milnes Declaration, Paragraph 5. |
| 34. On the following day, Tuesday, June 15, 1999, at approximately 11:20 a.m., I was transferred to Ward 6B1 at Tripler; Dr. Lim showed up at approximately 1:20 p.m., had me sign a release form, told me they would perform surgery on me at about 3:00 p.m. that day and the laparoscopic | Milnes Declaration, Paragraph 6. |

| | |
|---|---|
| procedure would be the primary option used to remove my gall bladder. | |
| 35. At that time, I requested pain medications, but was given ice cubes instead. I was given no antibiotics (*e.g.,* "Zosyn") on June 15, 1999, although the Tripler June 15, 1999, and June 16, 1999, "Order List" shows that Zosyn was ordered for me, then "CANCELLED;" Zosyn never again was ordered for me until the morning of June 16, 1999. | Milnes Declaration, Paragraph 7; Exhibits 1 and 2. |
| 36. At approximately 2:00 p.m. that day, June 15, 1999, the nurse came and catheterized me, and another nurse placed an IV port on me, but no fluid. | Milnes Declaration, Paragraph 8. |
| 37. A few minutes later I was put in a rolling stretcher to be taken to surgery, but at approximately 3:30 p.m. I was left in the hallway; I began to ask the nurses if they had forgotten about me, and I was told by the nurses that the primary leader of the "Gold Team" was tied up with other surgeries; the Government's own document production in this case shows that the surgery took place on June 16, 1999. | Milnes Declaration, Paragraph 9; Exhibit 2. |
| 38. Finally, Dr. Lim, an intern, showed up and told the nurses to put me back to Ward 6B1 and that nothing would be done until a sonogram was first performed. | Milnes Declaration, Paragraph 10. |
| 39. I asked Dr. Lim why the surgery was being delayed, because several physicians and the radiologist had already confirmed my inflamed gall bladder, and he replied that Dr. Cirangle was busy, and meanwhile ordered a sonogram, but the sonogram tech would not be back until 7 a.m. the next morning. Wednesday, June 16, 1999, whereupon I again asked for pain medications and was denied. Prior to June 16, 1999, I had had no ultrasound testing. | Milnes Declaration, Paragraph 11. |
| 40. On that day, June 15, 1999, I was given no antibiotic either, only ice chips. I was unable to sleep due to the very severe pain. | Milnes Declaration, Paragraph 12. |
| 41. I called my wife and advised her that no surgery would be done on June 15, 1999. | Milnes Declaration, Paragraph 13. |
| 42. On Wednesday, June 16, 1999, at approximately 6:30 a.m., I reminded the nurse to take me down to the Radiology Department, which was done at approximately 7:00 a.m. on June 16, 1999, which according to the technician showed that I was even in worse shape since the initial CT scan taken on June 14, 1999, and that I was about to blow. | Milnes Declaration, Paragraph 14. |
| 43. At approximately 9:00 a.m. on June 16, 1999, I was given and I signed a release form again with Dr. Lim, the intern, | Milnes Declaration, Paragraph 15. |

| | |
|---|---|
| who informed me again about the laparoscopic procedure, and around 10:30 a.m. that morning the orderly came to transfer me to the operating room. | |
| 44. At approximately 11:30 a.m. that morning, June 16, 1999, they gave me for the first time pain medication. The surgery lasted for four hours, until approximately 4:00 p.m., after which I spend several hours in Intensive Care and was transferred back to Ward 6B1; the surgery took place the afternoon of June 16, 1999, by the "Gold Team" as memorialized in Ward 6B1's "Shift Care Report" supra. | Milnes Declaration, Paragraph 16; Exhibit 2. |
| 45. Dr. Cirangle "doctored" the medical records to make it appear that my surgery was done right away on June 15, 1999, to cover up his negligence, as shown when his "Operative Report" revised as of August 19, 1999, is compared to the above-referenced "Order List" and "Shift Care Report". | Milnes Declaration, Paragraph 17; Exhibits 1 and 2. |
| 46. I was finally given antibiotics after the surgery, but my infection remained acute, lasting for three year (up until March 2002), and I was still in pain and my high fever and nausea still continued, as gangrene began to appear. | Milnes Declaration, Paragraph 18. |
| 47. After the June 16, 1999, surgery, I was given no baths for four days and stunk, before being released despite my deteriorating condition. | Milnes Declaration, Paragraph 19. |
| 48. A blow-up sensation inside me, no painkillers, no antibiotics, a gangrenous condition, the drainage bulb not working properly -- all of which logically led to the wound dehisce six days later, when I returned to the Emergency Room on June 24, 1999, with my intestines literally hanging out, yet was sent home again with no antibiotics or pain killers, as shown by the Emergency Room record, on which the date of my surgery was altered by hand to state "15 June 99." | Milnes Declaration, Paragraph 20; Exhibit 4. |
| 49. When Dr. Lim learned of my condition, he became so concerned that he called me at home at about 11:00 p.m. the evening of June 24, 1999, asking to report to Tripler the following day for further hospitalization, which I did. | Milnes Declaration, Paragraph 21. |
| 50. After another hospitalization on June 25, 1999, and two more surgeries, I was discharged from Tripler for the second time with no antibiotics. I never left the hospital against the advice of Tripler personnel, nor did I ever disobey instructions from the hospital, and whatever I applied to my wound while at the hospital was at the instructions of hospital personnel. | Milnes Declaration, Paragraph 22. |
| 51. The treatment given me at the hospital, however, did not | Milnes Declaration, |

| | |
|---|---|
| work. Finally. Dr. Cordts intervened, replacing Dr. Cirangle, applying a Vacuum Assisted Closure ("VAC") machine to my gangrenous wound during my third hospitalization of July 8, 1999, to July 20,1999. | Paragraph 23. |
| 52. Unfortunately, it took another two and one-half years for the wound to close and 83 infected stitches to be removed (the last having been removed by Dr. Wang at Queens in August 2006). | Milnes Declaration, Paragraph 24; Exhibits 5 and 6. |
| 53. I still have problems even today with granulomous disease, lower intestinal discomfort, and hiatus hernia from the dehisce, and I have never been able to resume normal bowel movements, unable to leave home for long periods; the scar on my abdomen even scares me; I have no sex life; I have already spent almost $100,000 at Stanford, California, and at Omaha, Nebraska, trying unsuccessfully to get medical advice and help; I have been unable to work full-time, losing nearly $100.000 in wages per year for now six years. | Milnes Declaration, Paragraph 25. |
| 54. On May 25, 2005, my attorney secured the expert report of Dr. Peter Halford, who confirmed in numbered paragraph 1 of his expert report that there was no documentation in the Tripler records we had at the time showing that the antibiotic Zosyn, ordered, had actually been administered before the surgical procedure the following day, which he affirms if true was "a breach of the standard" of care, and upon subsequently receiving the Government's document production in this case, as referenced in Paragraph 35 above, we now know that to be true. | Milnes Declaration, Paragraph 26; Halford Report, Exhibit 7. |
| 55. Dr. Halford also concluded in numbered paragraph 2 of his expert report that if the Tripler medical records had been altered to make it appear that the surgery had actually taken place on June 15, 1999, when in fact the surgery took place on June 16, 2007, which we know from the Government's own document production, as referenced in Paragraph 16 above it in fact did take place on June 16, 1999, notwithstanding Dr. Cirangle's attempt to make it look like it took place the day before, as referenced in Paragraph 45 above, that would represent "an egregious breach of medical case standards" according to Dr. Halford. | Milnes Declaration, Paragraph 27; Halford Report, Exhibit 7. |
| 56. Dr. Halford also found in numbered paragraph 3 of his expert report that in the absence of any culture reports being found in the Tripler records, that not having attempted to identify "what bacteria one is attempting to eliminate to be certain your selection [of an certain antibiotic] is correct" would be another violation of the "standard of care" in this case, as Zosyn, for instance, is a "penicillin antibiotic" useful | Milnes Declaration, Paragraph 28; Halford Report, Exhibit 7; Exhibit 8. |

| | |
|---|---|
| in combating only certain types of infections. | |
| 57. Dr. Halford, furthermore, found in numbered paragraph 4 of his expert report that according to the June 24, 1999, Emergency Room report, supra, since my "wound was largely dehisced," I should have been admitted on June 24, 1999, to the hospital, and not the next day, "especially with a dehiscence of this degree," the delay allowing "for increased bacteria colonization" and "increased risk of evisceration," another standard of care violation. | Milnes Declaration, Paragraph 29; Halford Report, Exhibit 7. |
| 58. Dr. Halford additionally identified in his numbered paragraph 5 of his expert report yet another "definite negligent action" in the ordering of Dakin's solution for treating my wound, knowing that I was "allergic to bleach," well documented in my Tripler records, resulting "in an intense reaction," and further delaying my "wound healing let alone the side effects" that I had to put up with. | Milnes Declaration, Paragraph 30; Halford Report, Exhibit 7. |
| 59. Finally, Dr. Halford found in his numbered paragraph 6 of his expert report evidence that there was an attempt at Tripler to place "entries in the medical record" attempting "to shift blame" to the patient "for all of his complications," which is "a breach of medical ethics and care standards" as well, concluding, for instance, that "it is hard for me to believe that someone could lift anything over 25 lbs in the first two weeks after a major abdominal incision." | Milnes Declaration, Paragraph 31; Halford Report, Exhibit 7. |