IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| KEVIN MILNES,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>　　　　Defendant. | ) CIVIL NO. 02-00365 BMK<br>)<br>) DECLARATION OF KEVIN MILNES<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF KEVIN MILNES

I, KEVIN MILNES, DECLARE:

1. I am the Plaintiff in this action, and I make the within statements based upon my own personal firsthand knowledge.

2. On Sunday afternoon, June 13, 1999, my wife and I returned to Honolulu from the Mainland, and about 1:00 a.m. the next morning I awoke, vomiting, with convulsions and fever.

3. That morning, Monday, June 14, 1999, I went to the VA clinic and was placed in ambulatory care and X-rayed.

4. Later that afternoon on June 14, 1999, I was transferred to the emergency room at Tripler ER by ambulance, where I was x-rayed and that evening was given a CT scan; the diagnosis was "gall bladder failure," after which they assured my wife nothing would happen overnight and she should go home; she left.

5. While at the emergency room, no antibiotics were administered to me, and I was given no ultrasound testing.

6. On the following day, Tuesday, June 15, 1999, at approximately 11:20 a.m., I was transferred to Ward 6B1 at Tripler; Dr. Lim showed up at approximately 1:20 p.m., had me sign a release form, told me they would perform surgery on me at about 3:00

p.m. that day and the laparoscopic procedure would be the primary option used to remove my gall bladder.

7. At that time, I requested pain medications, but was given ice cubes instead. I was given no antibiotics (*e.g.,* "Zosyn") on June 15, 1999, although the Tripler June 15, 1999, and June 16, 1999, "Order List" shows that Zosyn was ordered for me, then "CANCELLED" as shown in Exhibit 1, copied from the Government's own document production in this case, bate-stamped 00069 and 00074, as also shown in Exhibit 2, Ward 6B1's "Shift Care Report," also copied from the Government's own document production in this case, bate-stamped 00083 (Zosyn never even again ordered for me until the morning of June 16, 1999, as shown in Exhibit 2, at 00085).

8. At approximately 2:00 p.m. that day, June 15, 1999, the nurse came and catheterized me, and another nurse placed an IV port on me, but no fluid.

9. A few minutes later I was put in a rolling stretcher to be taken to surgery, but at approximately 3:30 p.m. I was left in the hallway; I began to ask the nurses if they had forgotten about me, and I was told by the nurses that the primary leader of the "Gold Team" was tied up with other surgeries; the Government's own document production in this case shows that

10. Finally, Dr. Lim, an intern, showed up and told the nurses to put me back to Ward 6B1 and that nothing would be done until a sonogram was first performed.

11. I asked Dr. Lim why the surgery was being delayed, because several physicians and the radiologist had already confirmed my inflamed gall bladder, and he replied that Dr. Cirangle was busy, and meanwhile ordered a sonogram, but the sonogram tech would not be back until 7 a.m. the next morning. Wednesday, June 16, 1999, whereupon I again asked for pain medications and was denied. Prior to June 16, 1999, I had had no ultrasound testing.

12. On that day, June 15, 1999, I was given no antibiotic either, only ice chips. I was unable to sleep due to the very severe pain.

13. I called my wife and advised her that no surgery would be done on June 15, 1999.

14. On Wednesday, June 16, 1999, at approximately 6:30 a.m., I reminded the nurse to take me down to the Radiology Department, which was done at approximately 7:00 a.m. on June 16, 1999, which according to the technician showed that I was even in worse shape since the initial CT scan taken on June 14, 1999, and that I was about to blow.

15. At approximately 9:00 a.m. on June 16, 1999, I was given and I signed a release form again with Dr. Lim, the intern, who informed me again about the laparoscopic procedure, and around 10:30 a.m. that morning the orderly came to transfer me to the operating room.

16. At approximately 11:30 a.m. that morning, June 16, 1999, they gave me for the first time pain medication. The surgery lasted for four hours, until approximately 4:00 p.m., after which I spend several hours in Intensive Care and was transferred back to Ward 6B1; the surgery took place the afternoon of June 16, 1999, by the "Gold Team" as memorialized in Ward 6B1's "Shift Care Report" set forth in Exhibit 2, copied from the Government's own document production in this case, bate-stamped 00089.

17. Dr. Cirangle "doctored" the medical records to make it appear that my surgery was done right away on June 15, 1999, to cover up his negligence, as shown when his "Operative Report" revised as of August 19, 1999, as shown in Exhibit 3, also copied from the Government's own document production in this case, bate-stamped 00050, is compared to the above-referenced entries found in Exhibits 1 and 2 above.

3

18. I was finally given antibiotics after the surgery, but my infection remained acute, lasting for three year (up until March 2002), and I was still in pain and my high fever and nausea still continued, as gangrene began to appear.

19. After the June 16, 1999, surgery, I was given no baths for four days and stunk, before being released despite my deteriorating condition.

20. A blow-up sensation inside me, no painkillers, no antibiotics, a gangrenous condition, the drainage bulb not working properly -- all of which logically led to the wound dehisce six days later, when I returned to the Emergency Room on June 24, 1999, with my intestines literally hanging out, yet was sent home again with no antibiotics or pain killers, as shown by the Emergency Room record, on which the date of my surgery was altered by hand to state "15 June 99," as shown in Exhibit 4, copied from the Government's document production in this case, bate-stamped 001112.

21. When Dr. Lim learned of my condition, he became so concerned that he called me at home at about 11:00 p.m. the evening of June 24, 1999, asking to report to Tripler the following day for further hospitalization, which I did.

22. After another hospitalization on June 25, 1999, and two more surgeries, I was discharged from Tripler for the second time with no antibiotics. I never left the hospital against the advice of Tripler personnel, nor did I ever disobey instructions from the hospital, and whatever I applied to my wound while at the hospital was at the instructions of hospital personnel.

23. The treatment given me at the hospital, however, did not work. Finally. Dr. Cordts intervened, replacing Dr. Cirangle, applying a Vacuum Assisted Closure ("VAC") machine to my gangrenous wound during my third hospitalization of July 8, 1999, to July 20,1999.

24. Unfortunately, it took another two and one-half years for the wound to close and 83 infected stitches to be removed (the last having been removed by Dr. Wang at

Queens in August 2006); set forth in Exhibits 5 and 6, respectively, are color photographs taken by my wife of my wound as of November 1999 and August 2001.

25. I still have problems even today with granulomous disease, lower intestinal discomfort, and hiatus hernia from the dehisce, and I have never been able to resume normal bowel movements, unable to leave home for long periods; the scar on my abdomen even scares me; I have no sex life; I have already spent almost $100,000 at Stanford, California, and at Omaha, Nebraska, trying unsuccessfully to get medical advice and help; I have been unable to work full-time, losing nearly $100.000 in wages per year for now six years.

26. On May 25, 2005, my attorney secured the expert report of Dr. Peter Halford, set forth in Exhibit 7, who confirmed in numbered paragraph 1 of his expert report that there was no documentation in the Tripler records we had at the time showing that the antibiotic Zosyn, ordered, had actually been administered before the surgical procedure the following day, which he affirms if true was "a breach of the standard" of care, and upon subsequently receiving the Government's document production in this case, as referenced in Paragraph 7 above, we now know that to be true.

27. Dr. Halford also concluded in numbered paragraph 2 of his expert report that if the Tripler medical records had been altered to make it appear that the surgery had actually taken place on June 15, 1999, when in fact the surgery took place on June 16, 2007, which we know from the Government's own document production, as referenced in Paragraph 16 above it in fact did take place on June 16, 1999, notwithstanding Dr. Cirangle's attempt to make it look like it took place the day before, as referenced in Paragraph 17 above, that would represent "an egregious breach of medical case standards" according to Dr. Halford.

28. Dr. Halford also found in numbered paragraph 3 of his expert report that in the absence of any culture reports being found in the Tripler records, that not having

5

attempted to identify "what bacteria one is attempting to eliminate to be certain your selection [of an certain antibiotic] is correct" would be another violation of the "standard of care" in this case, as Zosyn, for instance, as medically explained in Exhibit 8, is a "penicillin antibiotic" useful in combating only certain types of infections.

29. Dr. Halford, furthermore, found in numbered paragraph 4 of his expert report that according to the June 24, 1999, Emergency Room report set forth in Exhibit 4, since my "wound was largely dehisced," I should have been admitted on June 24, 1999, to the hospital, and not the next day, "especially with a dehiscence of this degree," the delay allowing "for increased bacteria colonization" and "increased risk of evisceration," another standard of care violation.

30. Dr. Halford additionally identified in his numbered paragraph 5 of his expert report yet another "definite negligent action" in the ordering of Dakin's solution for treating my wound, knowing that I was "allergic to bleach," well documented in my Tripler records, resulting "in an intense reaction," and further delaying my "wound healing let alone the side effects" that I had to put up with.

31. Finally, Dr. Halford found in his numbered paragraph 6 of his expert report evidence that there was an attempt at Tripler to place "entries in the medical record" attempting "to shift blame" to the patient "for all of his complications," which is "a breach of medical ethics and care standards" as well, concluding, for instance, that "it is hard for me to believe that someone could lift anything over 25 lbs in the first two weeks after a major abdominal incision."

I Declare Under Penalty Of Perjury Under The Laws Of The United States Of America That The Foregoing Is True And Correct. Executed At Honolulu, Hawaii, On April 16, 2007.

_____
KEVIN MILNES

6