**ATTACHMENT TO ADMISSION NO. 26**
(4 pages)

**MEDICAL RECORD**

**INTRAOPERATIVE DOCUMENT**
For use of this form, see AR 40-407, the proponent agency is the office of The Surgeon General.

| | |
|---|---|
| 1. PATIENT TRANSPORTED TO OPERATING ROOM VIA *Ambulatory* BY *DR Staff* | 2. PATIENT IDENTIFIED RECORD REVIEWED AND PROCEDURE VERIFIED BY *J Gloner / Anesthesia* |
| 3. DATE *15 Jun 99*    TIME PATIENT ARRIVED IN SUITE *1300* | 4. PATIENT IN ROOM TIME *1320*    NUMBER *3-2* |

**5. PREOPERATIVE EMOTIONAL STATUS**

☒ CALM ☐ ANXIOUS ☐ EXCITED ☐ CRYING ☐ ANGRY ☐ WITHDRAWN ☐ OTHER (Specify)

COMMENTS: NPO AFTER MIDNIGHT __ YES _√_ NO (EXPLAIN) *Pt. confirmes & verifies Procedure & Signatur*
ALLERGIES: _ NKDA _√_OTHER (SPECIFY) *Bleach (peelings)*

**6. NURSING PERSONNEL**

| ASSIGNED SCRUB | *Whartman CST* | RELIEF SCRUB | |
|---|---|---|---|
| ASSIGNED CIRCULATOR | *J Gloner RN* | RELIEF CIRCULATOR | *Witt (Sh.7 Relief)* |

**7. POSITION AND POSITIONAL AIDS (Specify)** *AESOP-E 6510*

☒ SUPINE ☐ LITHOTOMY ☐ JACKKNIFE ☐ PRONE ☐ KRASKE    LATERAL: ☐ LEFT SIDE UP ☐ RIGHT SIDE UP

COMMENTS: _√_ ALL PRESSURE POINTS CHECKED AND PADDED
_ ARMS ABDUCTED LESS THAN 90 DEGREES _√_ LEFT _√_ RIGHT __ BOTH ARM(S) TUCKED AND PADDED *eggcrate*

**8. SKIN PREPARATION**

| | |
|---|---|
| HAIR REMOVAL ☒ YES ☐ NO    SITE: *ABD* | PREP SOLUTION (Specify) *Beta/Beta* |
| DONE BY: ☐ OR ☒ NURSING UNIT    SITE: *ABD* | SITE: *ABD*    BY WHOM: *J. Gloner* |
| METHOD: ☐ DEPILATORY ☒ RAZOR | SITE: |
| ☐ CLIP    BY WHOM *Dr. Lim* | |
| COMMENTS: NICKS: __ YES _√_ NO __ N/A | COMMENTS: POOLING: __ YES _√_ NO |

**9. LOCATION OF EXTERNAL DEVICES**



*location length of Table*
*eggcrate*
*eggcrate*
*Towels*

TOURNIQUET NUMBER:

LEGEND    X Ground Pad    ~ Safety Strap    ⋀ Tourniquet    PRESSURE SETTING: ___ TOTAL TIME: ___

INITIAL COUNT DONE BY: *Whartman Gloner*

C = Correct    I = Incorrect

**10. COUNTS**

| | | Other | First Closing Count | Final Closing Count | SCRUB | CIRCULATOR |
|---|---|---|---|---|---|---|
| Sponge | ☒ Yes ☐ No | | C | C | *Whartman* | *Witt* |
| Needle Sharp | ☒ Yes ☐ No | | C | C | | |
| Instrument | ☒ Yes ☐ No | | | | | |
| Other | ☒ Yes ☐ No | | | | | |

| 11. PATIENT IDENTIFICATION (For typed or written entries give: Name, Last, first middle; Grade; Date; Hospital or Medical Facility;) | 12. ELECTROSURGERY DEVICE(S) (ESU) ☒ YES ☐ NO |
|---|---|
| | *AESOP-E 6510* |
| 0406535    20  50664-12-99 | ☒ ESU NO: *ESBT    E-2313* |
| MILNES, KEVIN J | GROUND PAD: BRAND *Valleylab Len Polytec* |
| VETERANS ADMIN BENEF | LOT NO: *3887*    EXP *2001-D* |
| TAMC HI 96859 ABXA 15JUN9, | ☐ ESU NO: |
| *Milnes, Kevin* | GROUND PAD: BRAND |
| *20/1299* | LOT NO: |
| | ☐ BIPOLAR NO: |
| | POWER SETTINGS: CUT: *10* COAG: *60* BIPOLAR: *4* |

| IRRIGATION/MEDICATIONS GIVEN IN OPERATING ROOM (NOT BY ANESTHESIA) | | | | | YES ☒ | NO ☐ |
|---|---|---|---|---|---|---|
| MEDICATIONS/SOLUTION | DOSAGE | TIME | METHOD | PREPARED BY | | GIVEN BY |
| Marcaine w/ 1:200,000 EPI | 40cc | Intra-op | Injection | ASRA/Wilt | Dr Lim | |
| Renografin | 5 | Intra-op | TXRVI | Manufacture | Dr Lim | |

☐ YES   IF YES NAME: ID NUMBER: MANUFACTURER

14.

MEDICATIONS/ORDERS

WOUND IRRIGATION  ☐ YES  ☐ NO  TYPE(S): _ .9% NACL _ LACTATED RINGERS _ SORBITAL _ OTHER (SPECIFY)

OTHER ORDERS
☑ FLOWTRONS _ BILATERAL _ RIGHT _ LEFT LOWER EXTREMITIES AT 40 MM HG

| | | TIME | CARRIED OUT BY |
|---|---|---|---|
| ☑ FOLEY  16 Fr to gravity  100cc yellow straw return | Intra / Intra | Lt. Wilt / Lt. Wilt |

PHYSICIAN'S SIGNATURE  Stelmo

15. X-RAY IN OPERATING ROOM   YES ☐  NO ☐  Abdomen   IF YES, SITE

16.                                    LABORATORY SPECIMENS

SPECIMEN (S) YES ☑ NO ☐  NAME (1) Gall Bladder (S) (2) Gall Bladder infadibular (S)  NAME
FROZEN SECTION (FS) YES ☐ NO ☑  NAME   NAME
CULTURE (C) YES ☐ NO ☑  NAME   NAME
NAME   NAME   NAME
NAME   NAME

17. TUBES, DRAINS/PACKING   YES ☑   NO ☐
TYPE/SIZE: 1. 16 Fr  2. 10 mm Blake  3.
SITE: 1. Bladder  2. Abdominal / Drain  3.

18. DRESSING/IMMOBILIZATION (Specify)
☒ DRESSING SPONGES  _ XEROFORM GUAZE  _ STERI STRIPS  _ FLUFFS  _ KERLIX  _ WEBRIL  _ ACE WRAP  _ KLING  _ TELFA  _ ABD  ☒ BACITRACIN OINTMENT  _ TAPE  _ BANDAIDS  ☐ OTHER (SPECIFY) Coverall

19. ADDITIONAL INFORMATION  ☑ DA FORM 5179 (CARE PLAN) REVIEWED AND IMPLEMENTED
GROUND PAD SITE CLEAR POSTOP ☑ YES ☐ NO (EXPLAIN)  Pt exhibited over-all reddness to abdomen and groin And site. Surgeons are aware of Redden area

SURGEONS: Dr. Cringle / Dr. Lim   ANESTHESIA CARE PROVIDERS: Shields MD  Otto- Relief MD  Bdamcine Brick CRN
20. OPERATION(S) PERFORMED  Laparscopy cholectomy c Open cholectomy

21. PATIENT TRANSFERRED TO  PACU/CICU   TIME SF 517   METHOD ☑ GUERNEY _ BED _ CRIB ☑ OXYGEN _ AMBU BAG _ MONITOR
22. REGISTERED NURSE/SIGNATURE

REVERSE OF DA FORM 5179-1, OCT 87

## PROGRESS NOTES

| DATE | |
|---|---|
| 19 July 99 0950 | Nursing note. Assumed care @ 0700. A/o x 3 afebrile. NPO for wound closure of abd today @ 1200. Lungs clear bil. ABD dressing CDI. Abd soft, large c active bowel sounds. C/o of pain @ 0830 12/10. Gave Toradol per schedule, 5 min later pt was amb off floor in NAD. Reinforced rationale for remaining NPO is pt is off floor and possibly tempted to drink. Explained OK to have sip of H₂O c Zantac only. Continue to monitor. J. M. Kanai RN |
| 19 July 99 1104 | Ready for OR — Voided 300cc clean amber. VSS. Showered c dry dressing over ABD. J. M. Kanai RN |
| 19 July 99 1440 | Nursing. From PACU a/o x 3. "I want a hamburger & a cigarette". Sat 92% on RA. Lungs clear. Inhaler used (Combivent). IV patent to (R) thumb @ PSa. Dressing to abd CDI. Rides of OS in bluet. Encouraged not to smoke. Lisa M. Lane RN |
| 19 July 99 1500 | Pt reportedly allergic to chlorox. Dr. Littlefield & Dr. Littlefield notified of Dakins solution containing chlorox. J. M. Kanai |
| 19 July 99 2200 | Nursing entry. D. Tolerating reg diet. IV fluids now TKO. Voiding qs. Dressings change @ 21°° — wound looks clean — small amt serousy drainage. Dakins solution wet to dry for wound care. Up ad lib. Miland McHargue RN |

C0151

## PROGRESS NOTES

| DATE | |
|---|---|

Nsg note

6/27/99
06W — Pt continued to have problem urinating & emptying his bladder. Foley Catheter inserted & 380 cc immediate output. Foley left in as per Dr.'s orders. — PCA Continues @ 1 - q 6 min D: ½ 20/100. Pt refusing to move around in bed, states he's in too much pain. Will continue to monitor closely. Will [____]

6/27/99    GSRS

c/o incisional pain

VSS AF

wound - fascia intact

No D/C

abd soft

up - fascial dehiscence

POD #1    S/p take back

adv diet

OOB chair / ambulate

T/D W→D dssg i̅ s̅ (allergic to Dakin's soln)

B CHASEN MD

00143

**ATTACHMENT TO ADMISSION NO. 29**
(30 pages)

03/03/05

# Couple says mistake at Tripler put their newborn son in coma

**BY JAMES GONSER**
*Advertiser Urban Honolulu Writer*

For the rest of his life, newborn Islam Yasim Ibn Siddiq will depend on machines to keep him alive.

According to a lawyer for his family, staff at Tripler Army Medical Center gave the baby carbon dioxide instead of oxygen immediately after his birth, sending him into a coma.

Born at 8:10 a.m. Jan. 14, the baby received the gas for 42 minutes before staff noticed what happened, said attorney Rick Fried.

The baby, whose Arabic name means "one who submits to the will of God," will need 24-hour care for as long as he lives.



Photo courtesy of Peterson family

Tripler hospital released a statement expressing "sorrow" for what happened to Dwight and Shalay Peterson's son Islam.

SEE TRIPLER, A2

# Tripler

CONTINUED FROM A1

But his parents, Dwight and Shalay Peterson, are committed to giving him the best life possible under the circumstances.

"It didn't have to happen, which is the worst part," said Dwight Peterson, an Army sergeant, at a news conference at Fried's office yesterday. "Our lives have been altered in a way that it can never be fixed."

Public affairs specialist Leslie Ozawa said hospital officials would make no comment on liability or fault. But the hospital did release a statement saying the staff offers the Peterson family its "heartfelt condolences."

"There is an enormous sense of sorrow among the staff, and our hearts go out to the family as we grieve with them," the statement read. "We are currently in the process of investigating the incident, and do not discuss ongoing investigations.

"We are gathering all the information and facts, and have taken immediate corrective action. Our focus at this time is to continue support for the family anyway we can. We are very sorry this happened."

The Petersons were high school sweethearts in Philadelphia. They married and already had three children, two boys, 15 and 9, and a girl, 10, when they decided to have one more child.

They tried in-vitro fertilization three times before they were successful.

Dwight Peterson, 31, was serving in Afghanistan when he called his wife in April and she gave him the good news.

"It was the first time we were having a baby where we were finally in a nice place and doing well," said Shalay Peterson, 30, who works as a medical assistant. "He is in the military, and I have a really good job I love. This was the new baby, the new life in our family."

Then her husband, who is assigned to the 325th Forward Support Battalion, was injured when a vehicle part fell and hit his shoulder, breaking a bone and tearing cartilage. He was flown to Tripler for surgery and could be home for the birth of his third son.

At first, everything went well with the birth, a scheduled Caesarean section. The proud father was even videotaping the birth when the couple learned something was going wrong.

Fried said staff had decided to give the baby oxygen to help him breathe after delivery.

"Everything was perfect. The delivery was perfect," Shalay Peterson said. "Right after birth, I remember lying there and the drape was up so I couldn't see what was going on and I just started hearing things. Working in a doctor's office, (I recognized) things that didn't sound normal. I knew something had gone wrong but I couldn't see because of the drape."

She said she "got a little bit hysterical" and was given a sedative. Her husband went to her



**RICHARD AMBO | The Honolulu Advertiser**

Shalay Peterson of Āliamanu says, "We pray and hope for a miracle" for her infant son, Islam, who remains in a coma.

side and let the doctors work on the child. Only when the hospital staff decided to hook up a fresh oxygen tank did they notice the mistake, Fried said.

When Shalay Peterson woke up, "Izzy" was in intensive care.

"I still did not realize what had happened or the severity," she said. "I still thought he was going to wake up and everything was going to be OK."

She said the doctors acknowledged what had happened right away and have given their baby the best of care following the accident, but that doesn't change anything.

"They said it won't happen again," she said fighting back tears. "That they are making changes in how oxygen is delivered, maybe from the wall instead of a tank.

Of course, I wouldn't want anybody else to go through ... what we went through. But it is too late for my baby."

The couple, who live at the Āliamanu Military Reservation, converted to Islam years ago. They say their faith and prayers are getting them through this difficult time.

"All we can do is pray," Shalay said. "There is nothing the doctors can do. We pray and hope for a miracle. It was a miracle that after 42 minutes of being suffocated, he is still here. It is only by the grace of God that he is still here."

The Food and Drug Administration keeps track of similar incidents, Fried said, and in the past four years seven people have been killed and 15 injured when they were given another gas that was thought to be oxygen.

Fried has filed a formal claim with the Army for damages, a necessary step before a lawsuit may be filed, and the government has six months to reject or accept the claim.

The major issue now is getting the proper care for the child for the rest of his life, he said. Costs could reach into the millions, he said.

"As far as we can tell, he is a totally normal little child that has been just devastated and will need around-the-clock care and could well live a very long time," Fried said.

*Reach James Gonser at 535-2431 or jgonser@honoluluadvertiser.com.*

SPECIAL REPORT | **TRIPLER ARMY MEDICAL CENTER**

# State investigating care in baby's case

## Doctor's role in case of brain-damaged child under scrutiny



Anita Baca

Carrying her brain-damaged son, Shalay Peterson is careful not to disturb the breathing and feeding tubes that keep him alive. The boy, Izzy, was mistakenly given carbon dioxide instead of oxygen after he was born last year at Tripler Army Medical Center.

**BY ROB PEREZ**
*Advertiser Staff Writer*

The state has begun an investigation into the role a Tripler Army Medical Center physician allegedly played in the case of a newborn baby who suffered severe brain damage last year after being mistakenly treated with a wrong gas.

The Department of Commerce and Consumer Affairs, which oversees the state board that licenses physicians, is looking into whether the care provided to Izzy Peterson by Dr. Danielle Bird constituted a licensing violation.

Izzy was injured from inhaling carbon dioxide instead of

### NO ANSWERS

Cost of military malpractice settlements not disclosed | **A2**

oxygen for more than 40 minutes after his birth. The baby's mother, Shalay Peterson, and the family's attorney, Rick Fried, told The Advertiser that Bird administered the carbon dioxide to Izzy, thinking it was oxygen, and treated him throughout the ordeal.

By the time the mistake was discovered, Izzy's brain was so damaged that he is expected to be dependent on medical devices the rest of his life for such basic functions as eating and breathing.

Izzy's parents have sued the federal government, alleging Tripler was negligent. Bird was not named as a defendant in the lawsuit. Federal law gives military doctors immunity from malpractice lawsuits.

In court documents, the government denied that Izzy's care was negligent, and the lawsuit is pending. Bird didn't respond to a detailed request for comment relayed through her mother.

The state's Regulated Industries Complaints Office,

**SEE TRIPLER, A2**

## MAIN STORIES IN THIS SERIES

**YESTERDAY:** Several tragic cases raise questions about Tripler's care and the cost to taxpayers

**TODAY:** The state investigates a Tripler doctor's role in a brain-damage case

**TOMORROW:** Military patients can't file malpractice claims against Tripler even if care is shoddy

**HONOLULUADVERTISER**.COM

Video of a Tripler case and in-depth information on the hospital's paid malpractice claims history

# Cost to taxpayers hard to determine

SPECIAL REPORT | TRIPLER ARMY MEDICAL CENTER

## Government won't answer questions about settlements

**BY ROB PEREZ**
*Advertiser Staff Writer*

Medical malpractice cases at Tripler Army Medical Center cost the federal government — and ultimately, taxpayers — millions of dollars.

Precisely how much is unclear, and the federal government has been unable or unwilling to clarify matters for The Advertiser, leaving the public largely in the dark about the overall cost.

The Army, responding to a

Freedom of Information Act request, provided data showing the total paid for administrative settlements of malpractice claims, but that amount — more than $14 million over the past 20 years — does not include what the government paid to resolve Tripler cases that went to court. Those lawsuits often involve the largest amounts.

Tripler officials didn't respond to a written request from The Advertiser about the lawsuit-related payments, and the Army Medical Command, the Mainland-based headquarters that oversees all Army hospitals, said in response to a FOIA request

that the information does not fall under its purview, nor does the command have "release authority" for the information.

A Washington, D.C., representative of the U.S. attorney's office, which defends the government in malpractice lawsuits involving military hospitals, said in response to a FOIA request that it didn't have the data.

Advertiser research came up with payments of about $61 million over the past two decades, but that understates the actual amount because an unknown number of out-of-court settlements, which sometimes are not publicly disclosed, were not in-

cluded.

The Advertiser asked the hospital to provide totals spent over the past 10 and 20 years to resolve malpractice lawsuits and claims, but Tripler officials didn't respond.

After answering several sets of questions over several months, Tripler officials in November said they would no longer respond to The Advertiser's questions, including those about malpractice costs, given that the government was involved in defending pending cases.

Tripler officials said the medical command determined that responding to The Advertiser's

questions at the time no longer would be in the best interests of Tripler or the federal government.

"That's a pretty incredible response," said Robert Stern, president of the Center for Governmental Studies in Los Angeles. "They're acting like a private company saying, 'It's none of your business.'"

Taxpayers, he said, "have every right to know" how much the overall malpractice problem is costing them.

Among the other questions that Tripler did not answer:

- How many malpractice claims per 100 physicians has

Tripler had for each of the past 10 years? That measure is a common one used in the medical industry.

- What organizations have fully accredited or certified Tripler services?

- Does Tripler conduct patient satisfaction surveys and, if so, how have those results changed over the past 10 years?

Tripler officials also have not responded to a FOIA request made by the newspaper in November seeking access to internal and external evaluations that Tripler says verify that the hospital is a first-class institution.



## Tripler

CONTINUED FROM A1

part of DCCA, began investigating the case after The Advertiser inquired about Bird's licensing status in December. The investigation is continuing, according to Jo Ann Uchida, RICO's complaints and enforcement officer. She declined to discuss details of the probe because it is ongoing.

Among the questions the state considers in licensing investigations is whether a doctor engaged in "hazardous negligence causing bodily injury to another."

If the state determines that a licensing violation occurred, the

### CHECKING ON YOUR DOCTOR

- If a physician is licensed in Hawai'i, here's the Web site for checking on any past complaints: pvlonline.ehawaii.gov/pvl /app

- Another source for physician information is the American Medical Association Web site. It requires selecting a state to do a search: web apps.ama-assn.org/doc torfinder/html/patient.html

was doing fine at that point and didn't need oxygen.

Once the decision was made, though, a tiny mask with a con-

Tripler officials, however, said they rarely have to report physicians to state licensing boards or the National Practitioner Data Bank, the government-run operation that keeps tabs on adverse actions against medical personnel. The officials said they do not keep statistics on such reports.

An Advertiser review of dozens of state disciplinary cases against medical personnel over the past five years found only two involving a military physician. It is difficult to know if there are more cases because some files don't say where a physician is employed.

One military case involved a doctor who was disciplined while working at a hospital on the Mainland. The physician

censing violation occurred, the board can impose a variety of sanctions, ranging from a fine to license revocation.

Bird's licensing record with the state is unblemished. As of Friday, it showed that no complaints have been lodged against her in the past, nor has any disciplinary action been taken against her by the state, according to DCCA officials.

Bird still works at Tripler.

If the Army had taken any adverse action affecting Bird's practicing privileges as a result of the Baby Izzy case, it would have been required to report that action to the state licensing board. As of Friday, DCCA had received no such notice.

The Army didn't respond to a written request for comment on whether Bird was sanctioned as a result of the gas mix-up.

Unlike civilian physicians, who must be licensed in the state where they practice, military doctors can be licensed in any U.S. state or territory. At Tripler, about 40 percent of the active-duty physicians are licensed in Hawai'i, according to the hospital. Bird is one of them.

## BEGAN WITH C-SECTION

On Jan. 14, 2005, Shalay Peterson underwent what a U.S. Defense Department document described as a routine cesarean section. It was a Friday morning. The scheduled C-section was the first of the day for operating room No. 10.

Army Sgt. Dwight Peterson, Izzy's father, even videotaped some of the procedure — until a problem became evident.

About a minute after Izzy was born at 8:10 a.m., a decision, now being questioned by the family, was made to give the infant oxygen to help him breathe. Fried, the family's attorney, said Izzy

... the newborn was intube, though, a tiny mask with a connecting tube was placed near Izzy's face.

But because of a mix-up involving portable carbon dioxide and oxygen tanks, the tubing was connected to the carbon dioxide tank, according to a March 22 DOD safety alert on the incident.

The mix-up happened even though the tanks were different colors and the content of each was clearly labeled, Fried said.

"What we had here was a system failure," he said. "A lot of people in the military dropped the ball."

Fried said he doesn't believe that Bird actually connected the tube to the incorrect tank but that she administered the gas, treated Izzy, and was the person primarily responsible for what happened to the infant.

If such a case had happened at a private hospital, the physician likely would be among the parties named as defendants, and a court would then decide whether the standard of care was breached, and which defendants shared in the liability, Fried said.

Had Bird or other medical personnel in the operating room been more attentive, the tragedy could have been prevented with a quick look at where the tubing was connected, Fried said.

"That's all it would've required — just a glance before they started it up. It would've taken a second," he said.

At the time of the incident, Bird was a pediatrician training to become a neonatologist (a physician who specializes in the treatment of newborns), according to Fried.

More than a year after the tragedy, Fried said she's surprised that Bird's state licensing record doesn't reflect her role in the incident.

"This was not something that



Anita Baca

Vocational nurse Tamikah Jones helps care for young Izzy Peterson, whose brain damage at birth kept him at Tripler last year until the family moved to Texas in mid-July. Because he was given the wrong gas, he depends on medical devices to keep him alive.

"While these issues have been addressed by the facility involved, it is essential that all military medical facilities take immediate steps to minimize the risk of similar events."

U.S. Department of Defense systemwide alert issued after the Baby Izzy case



Peterson family

Shalay Peterson celebrates the first birthday of her son, Izzy, last month at their Texas home.

took a great deal of time to determine what happened," he said.

The same day as the birth, the hospital acknowledged the mistake and apologized to the parents, according to Fried and Shalay Peterson. When the story hit the media in March, the hospital said publicly that immediate corrective action had been taken.

The government alerted its military hospitals through the March patient-safety notice, advising the institutions to take steps to prevent other gas mix-ups. The alert didn't mention Tripler by name, referring only to "one of our major military medical centers."

"The resultant assessment of the event found a number of

knowledge, technical and process issues," the alert said. "While these issues have been addressed by the facility involved, it is essential that all military medical facilities take immediate steps to minimize the risk of similar events."

Shalay Peterson said she recalled Tripler officials, including Bird, coming by her room to tell her what happened and to apologize.

"It's like this was something you see on television. I couldn't believe it was happening to me," she said.

Izzy remained at Tripler for about six months until the family moved to Texas in mid-July.

## STATE PROCEDURE

If DCCA gets a notice that a military doctor has been disciplined, the state agency checks whether it has jurisdiction over that doctor's license and, if so, whether the underlying violation that prompted the discipline also constitutes a violation of Hawai'i's licensing regulations.

If so, that generally is grounds for discipline, and the board can impose a sanction, Uchida said.

while working at a hospital on the Mainland. The physician didn't report that action on a timely basis, as required, to the Hawai'i board that issued his medical license. That physician's license was revoked in 2004.

The second case involved an Air Force physician who was disciplined by the military in October 2004 but failed to inform the Hawai'i board within the required 30 days. The records didn't indicate why the physician was disciplined. His case before the local board is pending.

Among the few Tripler doctors who have adverse reports with the national database, extenuating circumstances mitigate the reports, hospital officials said, without elaborating.

"Tripler validates every physician's training, unique experienced and currently competent to hold delineated privileges before granting them," the officials said in an October statement responding to Advertiser questions. "Every physician's practice is continuously monitored by a senior physician and formally reviewed no less than every other year."

When Tripler determines a physician should not be practicing for a specific reason, such as lack of skill or knowledge, privileges are suspended and a thorough review is undertaken.

"Unlike civilian practices that tend to fire physicians when trouble first arises, military rules prevent the physician from moving on until a final ruling is made," the officials said.

"Unsafe physicians are identified rarely, but if found are not quietly released from service to possibly become some other organization's problem."

Reach Rob Perez at 525-8054 or rperez@honoluluadvertiser.com.

**COURT LOSSES**

section. It was a Friday morning. The scheduled C-section was the first of the day for operating room No.10.

Army Sgt. Dwight Peterson, Izzy's father, even videotaped some of the procedure — until a problem became evident.

About a minute after Izzy was born at 8:30 a.m., a decision, now being questioned by the family, was made to give the infant oxygen to help him breathe, Fried, the family's attorney, said Izzy

they started it up. It wasn't taken a second," he said.

At the time of the incident, Bird was a pediatrician training to become a neonatologist (a physician who specializes in the treatment of newborns), according to Fried.

More than a year after the tragedy, Fried said he's surprised that Bird's state licensing record doesn't reflect her role in the incident.

"This was not something that

said publicly that immediate corrective action had been taken.

The government alerted its military hospitals through the March patient-safety notice, advising the institutions to take steps to prevent other gas mixups. The alert didn't mention Tripler by name, referring only to "one of our major military medical centers."

"The resultant assessment of the event found a number of

the risk of similar events."

No other details were given about the issues uncovered. Tripler officials have declined to discuss the case because of the pending litigation.

Shalay Peterson said she recalled Tripler officials, including Bird, coming by her room to tell her what happened and to apologize.

"It's like this was something you see on television. I couldn't

If DCCA gets a notice that a military doctor has been disciplined, the state agency checks whether it has jurisdiction over that doctor's license and, if so, whether the underlying violation that prompted the discipline also constitutes a violation of Hawai'i's licensing regulations.

If so, that generally is grounds for discipline, and the board can impose a sanction, Uchida said.

trouble first arises, military rules prevent the physician from moving on until a final ruling is made," the officials said.

"Unsafe physicians are identified rarely, but if found are not quietly released from service to possibly become some other organization's problem."

Reach Rob Perez at 525-8054 or rperez@honoluluadvertiser.com.

The Honolulu Advertiser

## COURT LOSSES

Over the past two decades, the U.S. government lost 14 of 23 trials involving allegations of negligent care at Tripler Army Medical Center. Here are the 14 losses:

| PLAINTIFFS | JUDGMENT DATE | JUDGMENT TOTAL | TYPE OF CASE | COURT FINDINGS |
|---|---|---|---|---|
| Pearl Harbor couple | 8/17/05 | $906,000 | Licensed practical nurse sexually assaults patient | Intensive care unit failed patient; physician and supervising nurse paid little heed to her |
| James, Quinton and Cheryl | 7/10/01 | 1,440,925 | 6-month-old baby suffers brain damage | Delayed diagnosis a substantial factor in causing brain damage |
| Wimbush, Linda | 12/3/99 | 79,422 | Premature infant dies a month after birth | Baby taken off monitor without doctor's orders, contributing to death |
| Pineda, Eddy and Elizabeth | 7/11/97 | 11,323,808* | Infant's heart stops, resulting in brain damage | If care had been sufficient, infant would have been resuscitated without injury |
| Severn, Alyson | 5/30/95 | 425,270 | Woman becomes infertile, develops other problems | Substandard care caused infertility, other problems |
| Villaflor, Aniceta | 4/20/93 | 844,394 | Baby suffers blindness in one eye, hearing loss, other problems | Delayed diagnosis of meningitis was a contributing factor |
| Wade, Larry and Vicky | 5/21/91 | 551,126 | Woman's pregnancy ends with still birth of twins | Defendant failed to perform needed procedure, leading to pregnancy complications |
| Chenault, Edward and Jeanette | 4/3/90 | 8,135,769** | Baby suffers brain damage, left a quadriplegic | Tripler failed to adequately detect and treat patient's respiratory, cardiac problems |
| Little, Dell and Elizabeth | 10/12/89 | 5,478,529 | Lack of oxygen damages teenager's brain | Hospital failed to properly treat patient injured in car accident |
| Holtheus, Alice Ann | 5/25/89 | 275,000 | Man dies of cancer four years after getting tested | Government breached duty in explaining test results or following up on physician referral |
| Owens, Robert | 2/27/89 | 490,639 | Woman dies of cancer three years after getting tested | Schofield Barracks clinic radiologist failed to consult treating physician when x rays first taken |
| Moreno, Jason and Regina | 11/30/87 | 8,939,352 | Baby's brain is damaged at birth, causing cerebral palsy | Doctors failed to properly use vacuum extractor |
| Bowen, Leilani and others | 8/24/87 | 631,524 | Man dies of cancer more than a year after getting tested | Doctors' negligence in following up on initial tests was proximate cause of death |
| Inigo, Fernando and Lourdes | 5/8/85 | 1,752,846 | Baby's brain is damaged at birth, causing physical, mental problems | Tripler did not meet standard of care |
| TOTAL | | $41,274,404 | | |

*Including interest, the government paid $12,584,835

**After judgment was issued, parties settled for $7 million

Source: Personal Injury Judgments Hawaii, newspaper accounts

*February 11 06*

# Tripler malpractice cases cost more than $32M in last decade

## 20-year tab $74M, not counting cases settled out of court

**BY ROB PEREZ**
*Advertiser Staff Writer*

The cost to the federal government to resolve medical malpractice cases involving Tripler Army Medical Center over the past decade totaled more than $32 million.

The new information from the U.S. attorney's office in Washington responding to The Honolulu Advertiser's Freedom of Information Act request, amounts to far more than what the newspaper calculated as part of its recent series on the O'ahu hospital.

The Advertiser found roughly $19 million in court judgments, out-of-court settlements and resolution of administrative claims from January 1995 through July 2005. When added to what the newspaper found for the preceding 10 years, the two-decade total topped $61 million. But as the series noted, that calculation understated the cost because it didn't include out-of-court settlements, which sometimes are not disclosed publicly.

The latest numbers, while still

**SEE TRIPLER, A10**

# Tripler

CONTINUED FROM A1

not providing a full picture, brings the cost of Tripler malpractice cases based on available numbers to at least $74 million over the past two decades.

What's still missing from that amount is the cost to resolve an undetermined number of out-of-court settlements between 1985 and 1995. The Advertiser previously asked Tripler for such totals, but the hospital didn't respond to the request.

The U.S. attorney's office released the latest numbers after The Advertiser's Tripler series began running this week. The information shows that the tab to resolve malpractice cases that went to court over the past decade totaled roughly $30 million. When the $2.8 million in administrative payments for Tripler cases for that same period was added — a total obtained from the Army through an FOIA

request — the overall cost climbed to nearly $33 million.

Prior to publication of the series, a representative from the U.S. attorney's office twice told the newspaper that it didn't have records indicating how much was paid to resolve the court cases over the past 10 years. She could not be reached for comment yesterday to explain the discrepancy.

Over the past 10 years, 34 cases were settled out of court, costing the government more than $15 million, according to the U.S. attorney's office, which defends the federal government in such cases. The Advertiser had found only two cases totaling $1 million in that period.

*Reach Rob Perez at 525-8054 or at rperez@honoluluadvertiser .com.*

# Med students urged to get more sleep

*A certification panel worries that tired doctors-in-training can cause fatal mistakes*

"It's important to have limitations. No one can function competently if they don't get sufficient sleep and rest."

**Arlene Jouxson-Meyers**
*Hawaii Coalition for Health president, lauding the new limits*

Star-Bulletin staff and news reports

NEW HAVEN, Conn. >> Hoping to reduce the risk of dangerous errors by sleep-deprived doctors-in-training, an accreditation group for the nation's teaching hospitals announced new limits yesterday on how many hours medical residents can work.

The rules approved by the Accreditation Council for Graduate Medical Education are the first national limits ever put on the total number of hours that medical residents in any specialty can be on duty.

Residents' work weeks will be limited to 80 hours, and they must get at least 10 hours of rest between shifts. Also, they will not be allowed to be on duty for more than 24 hours straight. The new standards can be exceeded by as much as eight hours for approved educational reasons.

The council retained standards set in the 1980s that say residents should get one day in seven off and should not be on call more often than one day out of three. The new rules take effect in July 2003.

Edwin Cadman, dean of the University of Hawaii's John A. Burns School of Medicine, said, "I think it's a wonderful change."

Cadman said staff members will be evaluating the residents' work schedules in all programs such as family practice, geriatrics and internal medicine. About 250 residents are enrolled at the School of Medicine at the University of Hawaii.

Arlene Jouxson-Meyers, president of Hawaii Coalition for Health, a patient advocacy group, said: "It's important to have limitations. No one can function competently if they don't get sufficient sleep and rest."

Jouxson-Meyers, a Wahiawa pediatrician, described her days spent in resident training as "an absolutely exhausting experience."

*Please see **Doctors**, A11*

## Doctors: Panel sets hourly limits for med students

*Continued From A1*

Jouxson-Meyers said she is delighted that the accreditation group has set hourly limits, but she believes the change would not fare well with hospitals. It may end up costing more for additional staff, said Jouxson-Meyers.

At hospitals around the country, there are often no limits on the total number of hours most medical residents can work in a week, though some specialties already impose 80-hour limits. Some doctors-in-training complain that they routinely toil more than 100 hours a week and are on call every other night.

Hospitals and doctors wondered how residents will be able to get all the training they need. They also said the rules could cost teaching hospitals millions of dollars to hire more doctors.

Grueling hours have been part of doctors' training for generations, and many older doctors believe such trial-by-fire training teaches physicians to make hard decisions when they are fatigued and under pressure.

In decades past, most residents followed a grueling schedule of 36 hours on and 12

The accreditation council said the new rules are a response to changes in medicine that are putting more demands on doctors. Doctors are putting patients through batteries of tests that did not exist decades ago. At the same time, hospitals have cut back on nurses and support staff, so residents often end up doing paperwork and other mundane tasks.

The council said it would act more quickly to sanction violators. The council can punish teaching hospitals by withdrawing their accreditation, a move that can cost the institutions students and millions of dollars in federal funding.

The Association of American Medical Colleges endorsed the new rules and said it would urge hospitals to comply.

New York state already limits medical residents to 80 hours a week and no more than 24 hours at a stretch — restrictions prompted by the 1984 death in New York City of a patient named Libby Zion.

Zion died at New York Hospital-Cornell Medical Center after being admitted with a high fever. A grand jury determined that long hours worked by unsupervised residents and interns contributed to her death.

*Star-Bulletin reporter Rosemarie Bernardo and the Associated Press contributed to this report.*

HONOLULU STAR-BULLETIN / THURSDAY, JUNE 6 2002 ●

A18

529-4763 / NEWSDESK@STARBULLETIN.COM

## NATION

# Some VA hospitals could face closure

*The administration is shifting its attention to outpatient services*

Associated Press

WASHINGTON » » Veterans hospitals in cities across the country could be closed as the Department of Veterans Affairs shifts its focus to outpatient care and works to bring services closer to people who need them.

The massive restructuring, being announced today, would touch every community where the VA operates, though decisions about specific cities and hospitals will not be made for

more than a year. In some cities, hospitals are likely to be closed or operations scaled back; in others, new services will be added.

"This is not about the closure of facilities. It's about continuing the change in VA health care and changing it for the better," Deputy Secretary of Veterans Affairs Dr. Leo S. Mackay Jr. said in an interview.

Decisions about where to cut and where to add will be made after analyses of demographics and services available at 163 hospitals and more than 1,000 clinics, nursing homes and other health care facilities.

An independent nine-member commission is to make recom-

mendations to the VA secretary in August 2003. As with recommendations on military base closings, the secretary must accept or reject the plan as a whole — an attempt to minimize the politics surrounding the closure of sometimes cherished institutions.

Some veterans are concerned that the VA may be dismantling an infrastructure that is part of the national homeland security plan. And they worry that some vets will lose access to care.

"While they keep saying they're improving services, they are drastically cutting services," said Bruce Parry, 55, of Veterans for Unification, a Chicago advocacy group. "The

result will be the VA serves fewer veterans, and as people find it less attractive, they will have further excuses for shutting more down in the future."

The overhaul, recommended by government auditors in 1999, is aimed at shifting dollars away from aging, inefficient facilities in communities where the number of veterans is shrinking in order to provide modern medicine closer to where vets of the future will live.

The 1999 audit, by the General Accounting Office, predicted that without change, the VA would wind up spending billions of dollars to operate unneeded buildings — with as much as one of every four VA

health care dollars devoted to the maintenance and operation of facilities.

It is easier said than done. In a pilot program in one region, the VA opted to cut inpatient service from a downtown Chicago hospital and expand services at other facilities. Veterans groups were outraged, and VA officials are pledging to consider their opinions up front as the market analyses begin across the country.

The GAO suggested that the greatest potential for savings was in 40 cities where there is more than one VA hospital. These hospitals have a significant number of empty beds and compete with one another to serve "rapidly declining veteran

populations," auditors said.

VA officials declined to speculate as to which hospitals might close and said their goal is not to cut services, but to redeploy them to areas where they are needed more. They emphasized that hospital beds are not needed for the VA's new emphasis on outpatient care, which follows a national shift spurred by better drugs and more outpatient surgeries.

"We're looking to allocate our resources more efficiently," Mackay said.

The plan is years overdue but will be challenging to implement, said Cynthia Bascetta, who oversees veterans health care issues for the GAO.

# Nursing shortage can be fatal

**By Lindsey Tanner**
ASSOCIATED PRESS

CHICAGO — The nation's nursing shortage has had significant consequences during the past five years, even contributing to patient injuries and deaths, a hospital regulatory agency says.

Inadequate nurse staffing has been a factor in 24 percent of the 1,609 cases involving death, injury or permanent loss of function reported since 1997 to the Joint Commission on Accreditation of Healthcare Organizations (www.jcaho.org). A commission report on the nursing shortage to be released today doesn't detail the cases in which a lack of nurses played a role.

The report says there are 126,000 nursing positions unfilled in hospitals nationwide. Ninety percent of long-term-care facilities lack sufficient nurses "to provide even the most basic care" and some home-healthcare agencies are being forced to refuse new patients, according to the report.

With the aging of baby boomers and the nurses themselves, it is estimated that by 2020 "there will be at least 400,000 fewer nurses available to provide care than will be needed," the report says.

More optimistically, the report cites 50 hospitals nationwide that are considered nursing "magnets" and have avoided or overcome shortages. More federal money and improvements in the work environment for nurses can help other hospitals follow suit, the report says.

The report was issued less than a week after President Bush signed a bill to create government nursing scholarships for students who agree to work at least two years in a healthcare facility with a critical shortage after they graduate.

HA 08/07/02

*Honolulu Star Bulletin*

THURSDAY, SEPTEMBER 19, 2002

**TO YOUR F**



# CAN WE WIN THE WAR ON BUGS?

## Infection-causing germs prove increasingly resistant to drugs

**By Helen Altonn**
haltonn@starbulletin.com

HAWAII DOCTORS and patients are being enlisted in a war against enemies closer to home than Osama bin Laden, al-Qaida or Saddam Hussein.

They are germs that fight back against drugs and multiply, creating the potential for untreatable illnesses.

Resistance of infection-causing bacteria to antibiotics is increasing at an alarming rate, warn infectious-disease specialists, calling it a national public health emergency.

Hawaii is worse off than many mainland areas for spreading bacteria because the organisms thrive in the hot, moist climate, water and beaches, the doctors point out.

"This is a form of biological warfare we are waging against microbes," said Dr. Alan Tice, associate professor at the University of Hawaii medical school and consultant in infectious diseases at Queen Emma Clinics. "The bacteria seem to be winning an escalating battle."

Dr. Thomas Hooton, infectious-disease specialist at the University of Washington School of Medicine, said some experts predict that "we may be entering a post-antibiotic era where we have limited ability to treat some of these infections."

Used correctly, antibiotics are powerful, lifesaving drugs, but overuse of the "miracle drugs" has led to multiple, drug-resistant bacteria, the doctors say. Already difficult to treat with antibiotics are tuberculosis, gonorrhea, malaria and childhood ear infections.

About 30 island health leaders and infectious-disease specialists, including Dr. Paul Effler, state epidemiologist and chief of the Health Department's Communicable Disease Division, recently alerted island doctors and health-care administrators to the "urgent health issue." They asked for help in increasing public awareness of the situation.

Of greatest concern, they said, is the increase of penicillin-resistant Streptococcus pneumoniae bacteria, which cause pneumonia, inflation of the ear, meningitis and other invasive infections. The greatest impact is in young children, they said.

Recent reports of infections caused by resistant strains of Staphylococcus aureus also are a critical concern. Once largely confined to hospitals, Staph aureus has spread throughout communities, the doctors said.

"It is a terrible human pathogen, probably the worst," Tice said, predicting "more and more resistance" to antibiotics. "We may have to hospitalize more patients or give them Zyvox (a new antibiotic) at $100 a day (for two pills).

"We're investing billions of dollars in systems to try to defend ourselves from biological agents like anthrax," Tice said. "How many died from anthrax so far? Five. How many die every day of MRSA (Staphylococcus aureus)? A hell of a lot more than that."

As bacteria once easily treatable become antibiotic-resistant, infections begin occurring that "you need to pull out big guns on," Effler said. "That involves potential side effects."

Patients often are part of the problem because they demand antibiotics that may do no good and could be harmful, the doctors said.

"When a person is ill, they want something that's going to make them feel better," Effler said. "If the doctor says it's only a virus that will get better on its own ... the patient's perception a lot of times is, the doctor doesn't know what he's doing ... so there is a lot of pressure on doctors to make sure the patient is happy and well treated.

"It's a big job educating the public that antibiotics may not be the best thing for you."

Patients should know that antibiotics do not work for viral illnesses, such as a common cold, flu (influenza) or mononucleosis. They are only effective for bacterial infections, such as suspected pneumonia, strep throat and a prolonged cough that may suggest a specific illness like sinusitis.

But viral symptoms can resemble those caused by bacteria, so doctors often are confronted with a "gray zone" in diagnosing an illness, the specialists say.

There is no swab test to distinguish between viral and bacterial infections, "and we'll probably never have one because we're all colonized with bacteria," Hooton said.

What is the difference between viruses and bacteria?

Viruses are genetic material in a capsule that have to live inside a cell of the body, Effler explained. "They have to use the cell's machinery to replicate themselves. They can create lots of copies of themselves and spread one to another."

Bacteria, on the other hand, are "free-living organisms" that use their own machinery to make copies, which is why antibiotics can work on them, he said. "We can design things to disrupt their growth processes."

The Hawaii Medical Service Association sponsored a two-day seminar for doctors last week with Tice and Hooton discussing "Appropriate Antibiotic Use."

Hawaii is a gateway for resistant organisms from Asia, where antibiotics are sold over the counter and resistance is much higher, said Dr. John Berthiaume, medical director of HMSA's Health Plan Hawaii.

"There is a concern that pharmaceutical companies won't be able to keep up with new antibiotics to stay ahead of bacteria," he said.

Tice said HMSA showed "remarkable foresight" with a 1998 project collecting data on respiratory infections among 600,000 members.

It showed antibiotics were given in 10,336 cases out of 29,020 office visits for what were theoretically nonbacterial problems, he said. HMSA followed with information to doctors in 1999-2000 about appropriate use of antibiotics.

The Health Department has a variety of free educational material about antibiotics to doctors and health-care providers. For further information, call Effler at 586-4586 or e-mail epi1@mail.health.state.hi.us.

HA 10/26/02

# Soap, water no longer required in hospitals

**By Daniel Q. Haney**
ASSOCIATED PRESS

CHICAGO — The government issued guidelines yesterday urging doctors and nurses to abandon the ritual of washing their hands with soap and water between patients and instead rub on fast-drying alcohol gels to kill more germs.

The goal: reduce the hospital spread of viruses and bacteria that infect an estimated 2 million people in the United States each year and kill about 90,000.

Many hospitals, anticipating the new guidelines from the Centers for Disease Control and Prevention, have already made the change, and studies show this can cut their infection rates in half.

Soap and water have been the standard for generations. But washing up properly between each patient can take a full minute and is often skipped to save time, especially in busy intensive care units where the risk of spreading germs is greatest.

While the alcohol-based gels and solutions kill more microbes, the main advantage is they are easier to use. With vials clipped to their uniforms, nurses can quickly swish their hands while on the move without stopping at a sink. The CDC estimates this saves an hour in an eight-hour shift.

"We've learned that using alcohol-based products improves adherence to hand hygiene," said Dr. Julie Gerberding, the CDC's director. "We will end up with more people doing the right thing and cleaning their hands."

She released the guidelines at a meeting of the Infectious Disease Society of America.

Many brands of the solutions are available in grocery stores. They vary in how they look, feel and smell. But all contain 60 percent to 90 percent ethanol or isopropanol, and they are considered equally effective at killing germs.

The new guidelines apply only to hospitals and clinics, where there are many particularly dangerous microbes, along with sick people who are susceptible to them.

At home, where such dangerous bugs are far less common, experts say ordinary soap and water are probably all people routinely need. But the alcohol gels can make sense in situations where water is not easily available, such as at picnics, in portable toilets or on airplanes.

10/26/02

**A2**

HONOLULU STAR-BULLETIN

# DAILY BREA[

[HEALTH WATCH]

# Study says regular soap good enough for hygiene

**By Lee Bowman**
Scripps Howard News Service

A just-released study says "anti-microbial" soaps don't kill any more germs than regular soap, and new federal guidelines call for health-care workers to leave water out of the hand-washing routine altogether.

The developments were announced yesterday during the annual meeting of the Infectious Diseases Society of North America in Chicago.

The soap study, done by researchers at the Columbia University School of Nursing, found that people who regularly washed with anti-microbial soaps for a year had no fewer microbes on their hands than those who regularly washed with soap that didn't have any special anti-microbial ingredient.

"There was no added value over plain soap," said Elaine Larson, principal investigator of the study, which was funded by the National Institute of Nursing Research.

Meanwhile, the federal Centers for Disease Control and Prevention's new guidelines advise health-care workers to use alcohol-based gels or foams to clean their hands.

"Hand-washing saves lives. But health-care settings are different from the kitchen or bathroom in the household," said CDC Director Julie Gerberding. "In health-care settings, workers pick up pathogens and can easily pass them on to vulnerable patients."

Gerberding stressed that the alcohol rubs should not be a substitute for other infection-control measures.

"If health-care workers' hands are soiled, they should be washed with soap and water, and sterile gloves need to be worn when exposed to blood or other body fluids or in the presence of a known infection," she said.

The advantage of waterless products is that they can be used easily and often, without stopping at a sink and taking time to dry hands. Many hospitals already have containers of the cleaner mounted by doors of every room where workers come into contact with patients.

Studies have shown that doctors, nurses and other health workers don't always take time to wash their hands as often as recommended. But making the hand rubs available substantially boosts compliance.

"We want to make it easier to get more people doing the right thing," Gerberding said.

"The hand rubs take less time to use and cause less skin irrita-

tion and dryness than other soaps," said Dr. Steven Solomon of the CDC's health-care quality promotion division.

Gerberding said the guidelines encourage use of the rubs in non-hospital settings as well. "In nursing homes, physician offices, dialysis centers, anywhere you have a lot of sick people, we think these products will make a difference in those settings."

Scientists say germs are unlikely to develop resistance to



"Hand-washing saves lives. But health-care settings are different from the kitchen or bathroom in the household."

**Julie Gerberding**
*Centers for Disease Control director*

alcohol. Some scientists are concerned that widespread use of triclosan, the antibacterial agent commonly found in such soaps, might contribute to antibiotic resistance.

In the home, "if you've got a newborn or preschooler with a cold, you might consider using an alcohol-based product for a little extra protection," Larson said. "But for daily hygiene, hand washing with regular soap is fine. Just be sure to wash all the surfaces — it's not the amount of time that's important, but covering all the surfaces, as well as applying friction."

# Parents sue doctors for malpractice

## Girl contracted rare flesh-eating infection in 2000

**By Curtis Lum**
ADVERTISER STAFF WRITER

The parents of a girl who contracted a serious flesh-eating infection two years ago yesterday filed a medical malpractice lawsuit against two Honolulu doctors who treated her.

The lawsuit was filed in Circuit Court by Anthony and Annette Shimizu, parents of Alyshia Shimizu. Named as defendants were Drs. Walton Shim and Raul



**ALYSHIA SHIMIZU**

Rudoy, and Children's Surgery Ltd. Neither Shim nor Rudoy could be reached for comment yesterday. Shim is a pediatric surgeon and chief of staff at Kapi'olani Medical Center for Women and Children.

In June 2000, Alyshia Shimizu fell at her home and cut her knee. She was taken to Kapi'olani Medical Center where she was treated by Shim and Rudoy, the lawsuit said. Two weeks later the then 5-year-old

Alyshia was diagnosed with necrotizing fasciitis, a rare flesh-eating bacteria. She was sent to a California hospital where she underwent a series of skin grafts and other medical procedures.

The lawsuit alleges that Shim and Rudoy "carelessly and negligently" examined, monitored, diagnosed and treated Alyshia, which resulted in multi-organ failure, disfigurement and other disabilities. As a result, the lawsuit said, Alyshia suffered and will continue to suffer "great physical pain" and her parents "serious mental anguish and emotional distress." The lawsuit seeks an undetermined amount in damages.

# Patients can suffer medical mistakes after hospital stay

Associated Press

PHILADELPHIA >> Patients are often harmed by inadequate care and outright medical mistakes in the days after they are sent home from the hospital, according to research.

The study, conducted at one large hospital, found that nearly one in five patients had "adverse events" after they go home — new or worsening symptoms resulting from the treatment they received, not from their underlying disease. Most problems could have been prevented or eased with better care.

The researchers said the problems often occur because hospitals fail to communicate effectively with patients and their primary-care physicians after discharge, and neglect to follow up to identify symptoms and complications before they become more serious.

Many studies have looked at patient safety inside hospitals, including a review by the Institute of Medicine that blamed medical mistakes for the deaths of 44,000 to 98,000 hospitalized each year. The latest report, in today's Annals of Internal Medicine, is the first to assess how often discharged patients become sick due to treatment.

Researchers at the University of Ottawa and Harvard Medical School contacted 400 patients who were hospitalized at an unidentified teaching hospital.

They found 76 patients had adverse events after they were sent home. Of those, 23 were deemed preventable, and 24 would have been less severe with better care.

Two-thirds of the problems resulted from drug side effects. An asthmatic patient who had a heart attack was prescribed a beta blocker, a drug that slows the heart rate but can cause asthma attacks. The patient developed wheezing and a cough. A patient with an inflamed pancreas was sent home after his X-ray was misread. He was readmitted four days later with worsening symptoms.

**MAINLAND**

## 112 deaths linked to surgical staplers

BOSTON >> A review by the Food and Drug Administration has linked 112 deaths and 2,180 injuries to surgical staplers, the same device implicated in the death of a Lawrence, Mass., woman after gastric bypass surgery last month at Brigham and Women's Hospital in Boston.

In many cases the staples failed to close around the patient's tissue, the apparent problem in the Brigham case, or the stapler failed to release the staples. Among the patients who died, the stapled tissue typically had begun leaking fluid or blood, leading to infection, an FDA official said.

The FDA plans to launch a Web site early next year to alert surgeons to the problems and ask for more complete reporting.

HONOLULU STAR-BULLETIN / THURSDAY, OCTOBER 28, 2004

# Long shifts spur medical errors

*Sleep-deprived interns made more serious mistakes, a study finds*

**By Janet McConnaughey**
Associated Press

From prescribing overdoses to sticking a tube in the wrong vein, doctors-in-training made one-third more serious mistakes during typically long shifts than they did during "short" 16-hour ones, a Harvard study found.

At the same time, those first-year interns were wired up with electrodes to measure how often their sleepy eyes rolled, and they ended up nodding off more than five times a night during long shifts.

Together, the findings suggest that recently imposed limits on how many hours new doctors can work do not go far enough, the researchers said.

The studies were the first to measure the real-life toll that sleep deprivation takes on interns' medical judgment. The results were reported today in the New England Journal of Medicine.

"There are currently more than 100,000 physicians-in-training in the United States, most of whom work these kinds of 30-hour shifts on a regular basis," said Dr. Christopher Landrigan, who led the study on medical errors.

Since July 2003, interns at U.S. hospitals have been limited to a four-week average of 80 hours a week. Also, they cannot work with patients for more than 24 hours straight, though six hours can be tacked on at the end for paperwork and classes.

## Sleep deprivation linked to mistakes

*U.S. medical interns are limited to a four-week average of 80 hours weekly but are permitted to work 30 consecutive hours on a regular basis. A Harvard study finds that shortening this long shift reduces errors.*

### Rate of errors by interns per 1,000 patient days

| | Preventable adverse events | Intercepted serious errors | Serious errors not intercepted |
|---|---|---|---|
| During a short shift | 16.5 | 55 | 28.6 |
| During a long shift | 20.9 | 70.3 | 44.8 |

Source: New England Journal of Medicine

ASSOCIATED PRESS

"There are currently more than 100,000 physicians-in-training in the United States, most of whom work these kinds of 30-hour shifts on a regular basis."

**Dr. Christopher Landrigan**
*Lead researcher on study*

"These long shifts are perhaps more hazardous than the number of hours in the workweek," Landrigan said.

The two studies involved 20 interns and were conducted in the cardiac and medical intensive care units at Harvard-affiliated Brigham and Women's Hospital in the year before the new limits took effect.

Each intern spent three weeks in one unit, working at least 24 hours on every other shift, and three weeks in the other unit, with no more than 16 hours per shift. Doctors were hired from the outside to watch them work and note any mistakes.

During the longer shifts, the interns made five times as many diagnostic errors, such as missing the bull's-eye rash that showed that Lyme disease was causing a patient's heart problem. They made 36 percent more significant medical errors of all kinds.

There was no difference in the number of patient deaths and the average length of hospital stays, largely because other staffers often found and corrected the mistakes, the researchers said.

"This is testimony to the system of checks and balances we have in place already," said Dr. Anthony Whittemore, the hospital's chief medical officer.

Nurses noticed when one intern ordered 10 times the correct dose of a drug to raise blood pressure, and when another miscalculated a patient's fluid intake and missed symptoms of fluid retention.

But a tranquilizer overdose was not noticed until it caused dangerously low heartbeat and blood pressure. And one patient's lung collapsed because a tube being inserted into an artery punched a hole in the space around the lung,

letting in air.

The interns also wore sleep monitors on and off duty, with electrodes attached to their heads. They nodded off about 5.5 times a night on long shifts, compared with 2.6 times overnight during the short ones. They got almost six more hours of sleep a week between short shifts, said Dr. Charles Czeisler, who led that study.

Because of the findings, Brigham and Women's has cut interns' hours to 12 in surgery and 18 in medicine, and plans more changes, Whittemore said.

Changes so far have cost the hospital $500,000, on top of nearly $1.9 million for those ordered by the Accreditation Council for Graduate Medical Education, which set the new rules.

Dr. Jordan Cohen, president of the Association of American Medical Colleges, said the current limits are "very much a work in progress" and that further cutbacks in ICUs might be needed.

One of the interns who participated in the studies, Dr. Aaron Kesselheim of Cherry Hill, N.J., said he could not remember any specific errors he might have made. "A lot of intern year is a blur because everything is so crazy," he said.

Kesselheim said there was a downside to shorter shifts: He could not attend some teaching sessions in the hospital and he had fewer chances to do procedures he needed to learn. Also, he could not see patients' full response to his treatment.

"Those first 24 hours are very important, seeing how patients respond to different management, trying to make a diagnosis," he said.

# Hospitals

CONTINUED FROM A1

SUNDAY | August 28, 2005

# Survey: Hawai'i hospitals lacking

## Heart, pneumonia treatment failures in U.S. 'alarming'

BY ROB PEREZ
*Advertiser Staff Writer*

A federal survey shows that Hawai'i hospitals failed to provide adequate levels of treatment that is basic, yet critical, for heart attacks, heart failure and pneumonia.

Some of the care was as simple as giving patients aspirin or a vaccina-tion.

**INSIDE**

Hawai'i's hospitals graded | A3

The na-tional sur-vey meas-ured the rates in which hos-pitals during the first half of last year provided widely accepted treatments for three of the most common causes of death.

In 10 of the 17 measures, Hawai'i hospitals collectively fell below the national aver-age, including in eight of the 12 heart-care categories. The heart-care categories. The group achieved the desired compliance rate of 100 percent in only one area, testing blood

also fell well short of the 100 per-cent goal in multiple categories, a finding that experts called alarming because the care is con-sidered crucial and sometimes even lifesaving.

Officials from several local hospitals said the Department of Health and Human Services sur-vey, which was released in April, reflects treatment information more than a year old. If another survey were taken today, they said, their numbers would be sig-nificantly improved, largely be-cause the hospitals are paying greater attention to quality of care issues. That, in turn, is ben-efiting patients, they said.

The federal survey for the first time provides the public a rela-tively easy way to compare, al-beit on a limited basis, quality of care at more than 3,500 hospi-tals nationwide, including 17 in Hawai'i. The institutions also can be compared with state and na-tional averages.

The survey shows what per-centage of a hospital's patients who should have received recom-mended care actually got it, based on the hospital's records. Patients who suffered heart at-tacks, for instance, generally have a reduced risk of death if they are given an ACE inhibitor, med-ication for treating poor heart function, within 24 hours of the attack. Yet only 67 percent of the Hawai'i heart-attack patients on average were given the medication, ac-cording to the survey.

Another example: Patients who receive pneumococcal vaccines are believed to have lower risks of pneumonia complications caused by bacteria, and the vac-cines may prevent future infec-

patients received the vaccine, the survey showed.

Health experts said Hawai'i residents should be concerned about the state's poor numbers.

"It's concerning because we're talking about simple, basic things that doctors and hospitals should be able to do very consistently," said Dr. Ashish Jha, a Harvard University assistant professor of health policy and management who published a study last month based on the federal data.

"The fact is too many hospitals have not put the systems in place that are necessary to ensure con-sistently high-quality care," he said.

Local hospital officials say pa-tients in some cases received the basic treatment, but it wasn't suf-ficiently documented, leaving the inaccurate impression of a break-down in care.

In other cases, physicians opt-ed not to give the treatment for legitimate medical reasons, but sometimes those reasons weren't documented, again creating an inaccurate impression, officials said.

They acknowledged, howev-er, that in some cases the care wasn't given because of short-comings in a hospital's opera-tions. A doctor may have been so busy that he or she forgot to order the treatment, or it was or-dered but not delivered. Some-times the patient simply refused the treatment

"If it's bad care, we need to know that. We can't hide it," said Dr. Todd Seto, director of a qual-ity-enhancement program at Queen's Medical Center, Hawai'i's largest hospital.

Queen's, which as the state's only trauma center receives Hawai'i's most critically ill or in-jured patients, had among the poorest ratings of the large hos-pitals. It scored below the na-tional average in eight of the 15 categories in which it was rated. The low numbers were due

than failure to deliver appropri-ate care, Seto said. But the records problem nonetheless re-flects a quality-of-care issue, he added.

Queen's typically treats 1,500 to 2,000 patients annually for heart attacks, heart failure and pneu-monia.

Like other institutions, Queen's has stepped up efforts to boost quality levels, and it has since improved its scores in all the sur-vey categories except one, which already was at 100 percent, Seto said.

"The goal is to keep improv-ing," he said. "We just want to do good care."

Executives at other institutions said the survey numbers reflect-ed a more even split between record-keeping and care issues.

"It's not just documentation," said Kevin Roberts, president of Castle Medical Center.

O'ahu consumers who have used local hospitals said local hospitals having publicly avail-able data to compare institutions will pressure some to improve their care.

"I think it's a good idea," said John Zimmer-man, 58, a retired merchant ma-rine who suffered a stroke more than a year ago. "But take the (information) with a grain of salt. Don't just depend on one source."

Ian Rand, 57, a loan processor from Makiki, also liked the idea but cautioned against drawing conclusions from the initial sur-vey. "If the federal government is doing it, it may need to be tweaked a couple more times."

The government intends to build on the Hospital Compare survey, including other measures of care, as a way to provide con-sumers with more information on selecting a hospital. Histori-cally, hospitals have been reluc-tant to provide performance data to the public, but that is changing as more attention is focused on quality issues. Hospitals volun-

tarily report data for the Hospi-tal Compare survey, but they get a bonus on Medicare payments in exchange.

The 17 measures surveyed have been backed by scientific studies and are widely accepted as effective treatments.

Industry experts noted that the survey results can differ sub-stantially from hospital to hos-pital and therefore cautioned against using the state averages to draw conclusions about an in-dividual institution.

Straub Clinic & Hospital, for instance, exceeded the national average in 11 of 12 categories in which it was rated, one of the best showings among local hos-pitals. Straub officials attributed the results partly to an organi-zational structure — almost all the physicians there work for the same company — that is more conducive to coordination of care and a team approach.

Michael McInerney, director of analytic services for Moun-tain-Pacific Quality Health Foun-dation, which tracks quality-of-care issues in Hawai'i and two other western states, said he be-lieves the quality in Hawai'i hos-pitals is comparable to the U.S. average, "but that isn't good enough."

McInerney said all hospitals should strive for 100 percent compliance to the Hospital Com-pare measures. "Why do even rare (of patients) fall between the cracks? To me, that's fairly alarming," he said.

Some hospital executives said the survey results are not a pre-cise measure of quality, only a guide that consumers can track to determine whether an institution is making progress.

"It's a wonderful tool for im-proving healthcare," said Cas-tle's Roberts.

*Reach Rob Perez at 525-8054 or at rperez@honoluluadvertiser.com*

# MEASURING QUALITY OF CARE IN MAJOR HAWAI'I HOSPITALS

Hawai'i hospitals collectively scored below the national average in 10 of 17 measures of basic care for patients suffering from heart attack, heart failure or pneumonia. The goal is to attain 100 percent in each category. The data was from the first half of 2004 and in some cases varied significantly from hospital to hospital. A blank space generally indicated the sample size was too small to record a result or the care wasn't available.

| | CASTLE | HILO | KAISER | KAPI'OLANI AT PALI MOMI | KUAKINI | MAUI MEMORIAL | QUEEN'S | ST. FRANCIS | ST. FRANCIS/WEST | STRAUB | WILCOX | HAWAI'I AVERAGE | U.S. AVERAGE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **HEART ATTACK CARE – % of patients given:** | | | | | | | | | | | | | |
| ACE inhibitor to treat poor heart function | | 53 | | | | | 72 | | | 69 | | 67 | 75 |
| Smoking cessation advice | | | | | | | 79 | | | | | 76 | 75 |
| Aspirin at arrival | 98 | 80 | 98 | 91 | 96 | 93 | 92 | 97 | 98 | 93 | 84 | 92 | 91 |
| Aspirin at discharge | 82 | 87 | 98 | | | 93 | 91 | 95 | | 96 | | 88 | 86 |
| Beta blocker* at arrival | 82 | 78 | 92 | 65 | 86 | 90 | 80 | 88 | 71 | 88 | 58 | 78 | 83 |
| Beta blocker* at discharge | 72 | 85 | 97 | | 84 | 44 | 83 | 97 | | 90 | | 79 | 84 |
| An angioplasty** within 90 minutes | | | | | | | | | | | | 26 | 37 |
| Thrombolytic medicine*** within 30 minutes | | | | | | | | | | | | 16 | 37 |
| **HEART FAILURE CARE – % of patients given:** | | | | | | | | | | | | | |
| ACE inhibitor | 77 | 70 | 85 | 74 | 62 | 66 | 71 | | 85 | 83 | 76 | 70 | 74 |
| Smoking cessation advice | | | | | | | 53 | | | | | | |
| Test to measure heart function | 79 | 44 | 93 | 66 | 92 | 86 | 83 | 95 | 84 | 97 | 72 | 81 | 78 |
| Discharge instructions | 37 | 71 | 30 | 17 | 0 | 2 | 22 | 2 | 0 | 68 | | 26 | 45 |
| **PNEUMONIA CARE – % of patients given:** | | | | | | | | | | | | | |
| Smoking cessation advice | | | | | | | 56 | | | | | 53 | 61 |
| Blood-culture test before antibiotics started | 74 | 89 | 80 | 81 | 76 | 93 | 85 | 81 | 76 | 85 | 96 | 84 | 82 |
| Antibiotics within 4 hours of arrival | 84 | 62 | 78 | 83 | 65 | 79 | 59 | 73 | 69 | 74 | 79 | 75 | 72 |
| Measurements for blood oxygen | 99 | 100 | 100 | 100 | 100 | 98 | 100 | 100 | 97 | 100 | 100 | 100 | 98 |
| Pneumococcal vaccination | 9 | 4 | 87 | 39 | 53 | 37 | 68 | 30 | 38 | 51 | 65 | 38 | 43 |

* lowers blood pressure and helps the heart relax; ** procedure that opens blocked blood vessels; *** helps dissolve blood clots

Source: U.S. Department of Health and Human Services

The Honolulu Advertiser

# Hospitals

CONTINUED FROM A1

also fell well short of the 100 percent goal in multiple categories, a finding that experts called alarming because the care is considered crucial and sometimes even lifesaving.

Officials from several local hospitals said the Department of Health and Human Services survey, which was released in April, reflects treatment information more than a year old. If another survey were taken today, they said, their numbers would be significantly improved, largely because the hospitals are paying greater attention to quality of care issues. That, in turn, is benefiting patients, they said.

The federal survey for the first time provides the public a relatively easy way to compare, albeit on a limited basis, quality of care at more than 3,500 hospitals nationwide, including 17 in

patients received the vaccine, the survey showed.

Health experts said Hawai'i residents should be concerned about the state's poor numbers.

"It's concerning because we're talking about simple, basic things that doctors and hospitals should be able to do very consistently," said Dr. Ashish Jha, a Harvard University assistant professor of health policy and management who published a study last month based on the federal data.

"The fact is too many hospitals have not put the systems in place that are necessary to ensure consistently high-quality care," he said.

Local hospital officials say patients in some cases received the basic treatment, but it wasn't sufficiently documented, leaving the inaccurate impression of a breakdown in care.

In other cases, physicians opted not to give the treatment for legitimate medical reasons, but sometimes those reasons weren't documented, again creating an inaccurate impression, officials said.

than failure to deliver appropriate care, Seto said. But the records problem nonetheless reflects a quality-of-care issue, he added.

Queen's typically treats 1,500 to 2,000 patients annually for heart attacks, heart failure and pneumonia.

Like other institutions, Queen's has stepped up efforts to boost quality levels, and it has since improved its scores in all the survey categories except one, which already was at 100 percent, Seto said.

"The goal is to keep improving," he said. "We just want to do good care."

Executives at other institutions said the survey numbers reflected a more even split between record-keeping and care issues.

"It's not just documentation," said Kevin Roberts, president of Castle Medical Center.

O'ahu consumers who have used local hospitals said they believe having publicly available data to compare institutions will pressure some to improve their

tarily report data for the Hospital Compare survey, but they get a bonus on Medicare payments in exchange.

The 17 measures surveyed have been backed by scientific studies and are widely accepted as effective treatments.

Industry experts noted that the survey results can differ substantially from hospital to hospital and therefore cautioned against using the state averages to draw conclusions about an individual institution.

Straub Clinic & Hospital, for instance, exceeded the national average in 11 of 12 categories in which it was rated, one of the best showings among local hospitals. Straub officials attributed the results partly to an organizational structure — almost all physicians there work for the same company — that is more conducive to coordination of care and a team approach.

Michael McInerney, director of analytic services for Mountain-Pacific Quality Health Foundation, which tracks quality-of-

# SCIENCE C9

# Doctors, nurses ignore errors

*A study finds most remain silent when they see co-workers make lethal mistakes*

**By Lee Bowman**
Scripps Howard News Service

WASHINGTON >> Doctors, nurses and other health-care workers seldom challenge a colleague when they see mistakes being made in patient care, according to a new study.

Researchers spent more than 10,000 hours observing and interviewing more than 2,000 health workers at 19 hospitals around the country.

Among the stories they heard were of a nurse who gave up reminding a colleague to put up safety rails on a child's bed; a pharmacist who dispensed an inadequate prescription for pain medicine to a patient from a doctor who's a "jerk" and gives the pharmacy a hard time if challenged; and a nurse who watched a colon-surgery patient die after failing to convince a doctor who intimidated her that the man was in trouble.

None of the health workers or hospitals were identified by name.

The study was co-sponsored by the American Association of Critical-Care Nurses and VitalSmarts, a California firm that consults on leadership and organizational performance.

"People working in health centers see things every day that endanger patients, but only a small percentage of them talk with their colleagues about what they've seen," said Joseph Grenny, president of VitalSmarts. "What really surprised us was that not only are nurses reluctant to confront doctors and other nurses, but that doctors almost never speak up, even about problems with nurses."

Among the findings in the report, titled "Silence Kills: The Seven Crucial Conversations for Healthcare":

>> Eighty-four percent of physicians and 62 percent of nurses and other care providers have seen co-workers repeatedly taking shortcuts that could endanger patients.

>> Eighty-eight percent of physicians and 48 percent of nurses and other providers work with people who show poor clinical judgment, although the problems seem concentrated among a small percentage of colleagues — about 10 percent.

>> Fewer than 10 percent of doctors, nurses and other caregivers said they directly confront colleagues about their concerns. And a fifth of the doctors said they have seen harm come to patients as a result of the behavior of those colleagues.

Overall, researchers found that health workers were reluctant to talk with colleagues about matters concerning competence, broken rules, mistakes, teamwork, lack of support, disrespect and micromanagement from doctors or supervisors.

Yet the minority of health-care workers who did raise concerns said that speaking out resulted in better patient care and that they were more satisfied and committed to their jobs because of their candor.

One nurse administrator told researchers: "Finally, I told her, 'If I ever see you tear the finger out of another glove,' I will write you up for a willful violation." Now she follows the rules." The administrator was describing how a technician repeatedly tore the tip off an index finger of her gloves while drawing blood from newborns that were supposed to be kept in the most sterile conditions.

Health workers gave various reasons for why they do not speak up — such as a lack of confidence in their abilities, doubts that saying anything would do any good and fear of retaliation.

"This environment of poor communication and collaboration validates what our members have been telling us is the No. 1 barrier hindering optimal care for patients," said Kathy McCauley, president of the nurses association.

"Everything that's been learned about reducing mistakes says that people must be able to share information freely."

The association issued a new set of national standards aimed at promoting communication and collaboration among hospital employees.

**On the Net**

>> *www.rxforbettercare.org*
>> *www.aacn.org*

①

HA , O2/07/O6

SPECIAL REPORT | TRIPLER ARMY MEDICAL CENTER

# Active-duty military can't sue for malpractice

## Prohibition known as Feres Doctrine comes under fire

### BY ROB PEREZ
Advertiser Staff Writer

Nearly five years ago, Army Staff Sgt. Michael McClaran had laproscopic surgery at Tripler Army Medical Center to fix his indigestion and acid reflux.

The operation partly corrected the problem — and created more, according to his wife.

Although McClaran didn't know it at the time, the surgeon mistakenly severed two nerves, one of which left half of McClaran's diaphragm paralyzed, Sheila McClaran said.

The severed nerves affected Michael McClaran's respiratory and digestive systems. As a re-

sult, he has trouble digesting food and experiences shortness of breath if he eats even moderate amounts or does moderate exercise.

If what happened to McClaran had happened to his wife, one of their four children or any non-active-duty patient, the injured party could pursue a medical malpractice claim against the U.S. government.

But because McClaran is active duty — he's been in the military for 20 years — he's out of luck. He declined to discuss his case for publication, but his wife spoke freely about it.

"You serve all this time; you give all this service to your country," she said. "There should be something that service members can get back

**SEE TRIPLER, A2**



JEFF WIDENER | The Honolulu Advertiser

Army Staff Sgt. Michael McClaran, whose surgery allegedly left half of his diaphragm paralyzed, can't sue Tripler. If it happened to wife Sheila, she could.

HA, 02/07/06

# Tripler

CONTINUED FROM A1

(when malpractice occurs)."

Over the past year, Michael McClaran's problems have worsened, complicated by failings of the 2001 surgery, his wife said. The pain from gas buildup after a meal can become so severe that he has been hospitalized twice, Sheila McClaran said. They rarely go out to eat anymore, and he does not go far from a bathroom, though recent surgery on the Mainland has improved that situation.

Michael McClaran, 45, also no longer plays the French horn because of his breathing problem. That puts him in a difficult spot. He's a French horn player for the Army based on Oahu.

Until this past summer, McClaran's doctors at Tripler were unable to tell him what was causing his breathing and digestive troubles, his wife said. But after his case was taken over by other Tripler physicians and more tests were done in conjunction with gallbladder surgery last year, McClaran was informed in June that his problems were created when the two nerves mistakenly were cut in 2001, Sheila McClaran said.

The Army didn't respond to a written request for comment.

## BARRED FROM SUING

Under the Federal Tort Claims Act and a U.S. Supreme Court ruling from 1950, active-duty military personnel are barred from suing the U.S. government for injuries "incident to service," even if gross negligence was the cause.

The courts have broadly interpreted that prohibition, called the Feres Doctrine, to apply to virtually any kind of injury re-

---

volving Tripler, that were dismissed because of Feres include:

- An Army woman whose baby was delivered stillborn at Tripler in 1982.
- Twice during her pregnancy, she went to the hospital complaining of blurred vision, hypertension, dizziness and other symptoms commonly associated with preeclampsia, an ailment that can be life-threatening to a mother and her fetus. On a third occasion, the woman was hospitalized and her baby later was delivered stillborn. She claimed that negligent treatment led to the death.
- A 22-year-old sailor who was admitted to a Navy hospital for minor surgery to remove a cyst from his arm. He ended up a quadriplegic with brain damage.

Similar cases at civilian hospitals resulted in multimillion-dollar verdicts for the plaintiffs.

The sailor got $1,500 in monthly disability benefits — not enough to cover his bills — not enough according to testimony submitted to Congress about his case.

- An Army man who allegedly suffered permanent injury after a military physician in Virginia left a 30-inch-long towel in his abdomen during a gallbladder operation. It was discovered eight months later during another operation.

"The Feres Doctrine has become truly grotesque," said George Washington University law professor Jonathan Turley, who cited the three court cases and others in a 2003 law journal article criticizing the doctrine.

"It's almost impossible to capture how hurtful Feres is.

"In reality, it is cheaper to injure or kill members of the Armed Services than it is to injure or kill civilians."

## NON-COMBAT CLAIMS

Even though the 1946 federal law governing tort claims speci-

---

## BACKGROUND ON THE FERES DOCTRINE

Military personnel have been barred from suing the U.S. government for injuries "incident" to their military service since a 1950 U.S. Supreme Court decision. Here are some key dates in the history of what is known as the Feres Doctrine:

**1946:** The Federal Tort Claims Act is passed establishing the rules under which people can sue the U.S. government for injuries caused by the negligence of government workers. The law removed the authority that the government previously had to claim immunity from lawsuits in such cases. But it carved out specific exemptions, including cases involving military personnel suffering combat-related injuries.

**1950:** The Supreme Court renders a decision that barred several servicemen or their representatives in separate cases from suing the federal government for injuries that the servicemen allegedly suffered due to government negligence. Among other things, the court ruled that under the federal tort law, active-duty personnel cannot pursue claims for injuries "incident to their military service. It interpreted that to include injuries not related to combat. The prohibition became known as the Feres Doctrine, named after the plaintiff in one of the cases.



ADVERTISER LIBRARY PHOTO

Supreme Court Justice Antonin Scalia has criticized the rationale behind the Feres Doctrine.

**1987:** In a 5-4 ruling, the Supreme Court cites the Feres Doctrine in barring a widow, Frieda Johnson, from suing the government after her husband, a Coast Guard pilot in Hawai'i, was killed along with two colleagues when their military helicopter crashed into the side of a Moloka'i mountain during a search-and-rescue operation. Johnson had alleged that a

---

the government for injuries caused by improper medical care. It dies in the Senate. Similar legislation by Frank is passed in the House in 1988 and 1989 but each time the Senate takes no action.

**1996:** The 9th U.S. Circuit Court of Appeals rules that Joyce Atkinson, an Army woman in Hawai'i, can sue the government for alleged medical malpractice. Atkinson claimed that Tripler Army Medical Center was negligent in treating her pregnancy in 1982, resulting in the stillborn birth of her child

---

Advocates of changing or abolishing the Feres Doctrine have lobbied Congress over the years, but they so far have little to show for their efforts.

The House several times has passed legislation by Rep. Barney Frank, D-Mass., allowing military personnel to pursue lawsuits for injuries caused by improper medical care, but each time it died in the Senate. The bill last passed the House in 1989.

More recently, Cragnotti's advocacy group in 2002 submitted to a Senate committee more than 150 cases in which military personnel or their families were unable to pursue claims because of Feres.

One of them involved Cragnotti's military son, who suffered brain damage in 2000 after his pneumonia went untreated by a Navy doctor, Cragnotti said.

A $30 bottle of antibiotics would have stopped my son's pneumonia, she said.

## DELEGATION'S VIEWS

Hawaii's four Washington delegates are divided on the Feres issue.

Jennifer Sabas, a spokeswoman for Sen. Daniel K. Inouye, said the senator believes that allowing service members to pursue tort claims would undermine the stability of the military discipline system.

But Rep. Neil Abercrombie said depriving military personnel of the same rights afforded other U.S. citizens hurts morale.

"I have had a belief my whole legislative life in the notion that the government should be able to be sued," Abercrombie said.

Rep. Ed Case said he likely could support a bill that would allow tort claims for non-combat-related injuries resulting from clear negligence. Case feels that the current prohibition casts too wide a net.

---

of us think it eventually will be overturned," said Turley, the George Washington law professor.

## MANY TURNED DOWN

Attorneys Rick Fried and Mark Davis, whose Honolulu law firm have handled many Tripler malpractice cases, say they have received numerous calls over the years from military people inquiring about possible claims. Fried estimated his office has received hundreds of calls in the past decade. The callers typically are told they have no recourse because of Feres.

One recent call came from the wife of a service member who said her husband had surgery at Tripler after being diagnosed with prostate cancer. During surgery, the woman told Fried's office, her husband's colon was perforated, and he had to undergo a colostomy, requiring him to wear a pouch to dispose of his body's waste.

Fried's firm didn't take the case, citing Feres.

Many high-service members are barred from suing the government for their injuries, they sometimes are still denied the ability or veterans' benefits.

But Sheila McClaran, who received disability payments for 12 years while she was dealing with kidney failure and a transplant, said such benefits are not enough to live on — a sentiment echoed by others.

She said her husband has had several operations at Tripler and, with the exception of what happened in 2001, generally has been pleased with the care he received. He is particularly satisfied with the physicians currently assigned to his case, she said, because they were candid about the mistakes made in 2001 and what had to be done.

Besides being upset about the

written request for comment.

## BARRED FROM SUING

Under the Federal Tort Claims Act and a U.S. Supreme Court ruling from 1950, active-duty military personnel are barred from suing the U.S. government for injuries "incident to service," even if gross negligence was the cause.

The courts have broadly interpreted that prohibition, called the Feres Doctrine, to apply to virtually any kind of injury related to military service, even if the injury occurred off the job or wasn't caused by military personnel.

"In reality, it is cheaper to injure or kill members of the Armed Services than it is to injure or kill civilians."

A court, for instance, tossed out a lawsuit by the widow of a military policeman who was off-duty and off-base when he was killed by a driver who was drinking at a military club. The court cited the Feres Doctrine.

The doctrine was named for the 1950 high court decision in Feres v. United States in which a widow of a military man alleged that her husband's death in a barracks fire was due to government negligence. The court unanimously ruled that the woman had no right to sue under the federal tort law.

Some judges since then have harshly criticized the doctrine, even calling it unconstitutional, while saying they had no choice but to dismiss lawsuits because of Feres.

"It screams, it screams, it screams... It's not fair," a Michigan judge ranted in 2003 when dismissing a lawsuit by the family of a Marine recruit who died during boot camp from meningitis. An internal military investigation criticized the medical care the recruit received, according to published reports.

Other cases, including one in-

George Washington University law professor Jonathan Turley, who cited the three court cases and others in a 2003 law journal article criticizing the doctrine. "It's almost impossible to capture how hurtful Feres is.

## NON-COMBAT CLAIMS

Even though the 1946 federal law governing tort claims specifies only that military members cannot sue for combat-related injuries, the high court has broadened the application to include non-combat claims.

The justification for banning lawsuits over combat-related injuries makes sense, people on both sides of the issue say.

In wartime, officers shouldn't have to worry about whether they'll be sued if, for instance, they send troops into combat and someone gets injured or killed.

But the rationale for banning lawsuits for non-combat-related injuries strips the service member of basic legal rights afforded other citizens, the law's critics say. They say it also means the government isn't accountable if a service member is hurt or killed because of government negligence.

"All we're looking for is accountability," said Barb Cragnotti, legislative coordinator for Veterans Equal Rights Protection Advocacy Inc., a nonprofit seeking the abolishment of Feres. "Because of that doctrine, there is no accountability."

The U.S. Department of Defense did not respond to repeated requests seeking comment for this story. But at congressional hearings, officials have said that allowing service members to

combat. The prohibition became known as the Feres Doctrine, named after the plaintiff in one of the cases.

**1987:** In a 5-4 ruling, the Supreme Court cites the Feres Doctrine in barring a widow, Frieda Johnson, from suing the government after her husband, a Coast Guard pilot in Hawai'i, was killed along with two colleagues when their military helicopter crashed into the side of a Moloka'i mountain during a search-and-rescue operation. Johnson had alleged that a civilian air traffic controller for the Federal Aviation Administration was negligent, causing the helicopter to crash. In the dissenting opinion, Justice Antonin Scalia criticized the rationale behind the Feres Doctrine.

**1987:** The 9th U.S. Circuit reverses the earlier ruling in the Atkinson case, citing the Supreme Court's 5-4 decision in the Johnson case.

Sources: Federal court, congressional records



ADVERTISER LIBRARY PHOTO | May 4, 2004
Rep. Barney Frank, D-Mass., has been unsuccessful in relaxing the Feres Doctrine.

**1985:** The U.S. House passes a bill introduced by Rep. Barney Frank, D-Mass., that would allow military members to sue

bring tort claims would undermine the discipline system that is fundamental to the military's command structure.

That same rationale has been noted by the Supreme Court in upholding the Feres Doctrine over the years.

Even if negligence isn't specifically alleged, the court said in a 1987 ruling, "military discipline may be impermissibly affected by the (lawsuit) since the judgments and decisions underlying the military mission are necessarily implicated, and the duty and loyalty that service members owe to their services and that country may be undermined."

It also noted that civilian courts would then be required to second-guess military decisions.

Yet even the justices themselves were divided when they upheld the doctrine in their 1987 ruling, which dealt with a lawsuit filed over a Coast Guard helicopter crash on Moloka'i in 1982.

"Feres was wrongly decided and heartily deserves the widespread, almost universal criticism it has received," Associate Justice Antonin Scalia wrote in a dissenting opinion, joined by John Paul Stevens, William Brennan Jr. and Thurgood Marshall. Scalia and Stevens still are on the court.

But Rep. Neil Abercrombie said depriving military personnel of the same rights afforded other U.S. citizens hurts morale.

"I have had a belief my whole legislative life in the notion that the commoner should be able to sue the king," Abercrombie said.

Rep. Ed Case said he likely could support a bill that would allow tort claims for non-combat-related injuries resulting from clear negligence. Case feels that the current prohibition casts too wide a net.

He cautioned, however, against defining Feres exceptions too broadly.

"It's one of those issues that's a little more complicated the deeper you get into it," Case said.

Sen. Daniel Akaka said any change to the statute also would require careful analysis.

"The Feres Doctrine is not just about federal tort law and providing a cause of action for military members and their families who have suffered tragedy," Akaka said in a statement. "It is also about military readiness. We must work hard to find the right balance to ensure that our military members and their families are provided with the best medical care available."

Even if a bill passes the House again, it still would have problems in the Senate, legislative observers and others say. In today's political climate, they say, lawmakers are looking for ways to rein in tort litigation, not allow new lawsuits.

Another possible venue for action is the U.S. Supreme Court. The newly constituted court could revisit the doctrine if a case arose, and with the retirement of Associate Justice Sandra Day O'Connor, a key Feres backer, support could change.

"The Feres Doctrine is so ridiculous on its face that many

said such benefits are not enough to live on — a sentiment echoed by others.

She said her husband has had several operations at Tripler and, with the exception of what happened in 2001, generally has been pleased with the care he received. He is particularly satisfied with the physicians currently assigned to his case, she said, because they were candid about the mistakes made in 2001 and what had to be done.

Besides being upset about the 2001 errors, Michael McClaran was surprised to learn later that the surgeon who saw him before the surgery and told him he had done several hundred of the operations without any problems didn't actually do the procedure, his wife said. A resident surgeon performed the operation, which portion of McClaran's stomach around his esophagus to prevent stomach acids from backing up, she said.

McClaran in late December had surgery at an Oregon hospital — his Tripler physicians recommended that he see a specialist there — in hopes of getting his problems under control. The federal government picked up the tab.

He still is recovering from the operation, but his wife said the surgery went well. It will be months before they know how effective the procedure was.

Sheila McClaran said her husband is hopeful his problems can be corrected enough so he can play the French horn again, enjoy meals at restaurants and return to a more normal lifestyle.

"It's quality of life is really bad," she said before the operation. "It's just no fun anymore."

*Reach Rob Perez at 525-8054 or rperez@honoluluadvertiser.com.*

A2 | Tuesday, February 7, 2006    The Honolulu Advertiser

SPECIAL REPORT | TRIPLER ARMY MEDICAL CENTER

# Accountability of military doctors debated

**BY ROB PEREZ**
*Advertiser Staff Writer*

To Barb Cragnotti, the military healthcare system has two glaring shortcomings.

Its doctors can't be sued for malpractice.

And active-duty personnel, a big chunk of the patient pool at military hospitals, are prohibited from bringing malpractice claims against the federal government.

Both factors remove much of the accountability from the system, according to Cragnotti, an Oregon resident whose son suffered brain damage in 2000 at a Navy hospital on the Mainland. She now is with a nonprofit group seeking changes in the system.

Others share similar sentiments.

"I think the military's protective of their people," said Honolulu plaintiff attorney Mark Davis, who also faults the system for making information on sanctioned physicians difficult for the public to get.

Navy Capt. Kevin Berry, deputy commander for clinical services at Tripler, has a much different take.

He says the military system is

more accountable and open than the civilian one.

Unlike civilian hospitals, Tripler can't keep malpractice cases confidential, Berry said in a June interview. "They have cloaking devices that we don't have access to," Berry added, mentioning confidentiality clauses that are common in settlement agreements in the civilian sector.

He also cited the way the two systems handle problem doctors.

At civilian hospitals, officials typically will find administrative or economic reasons to prompt a physician to "drift away," Berry said, and it is possible for the doctor to go from hospital to hospital without being reported to the national databank that compiles malpractice information on individual practitioners.

At Tripler, a doctor suspected of malpractice would be dealt with in a way that affords due process if it provides appropriate sanctions if a breach in the standard of care occurs, Berry said.

"We nail them in place administratively," Berry said, so "they're not going to 'leave' to become another institution's problem.

**"The medical practice in the military is good, but it's not perfect. And I don't think people in the military ought to have less rights than civilians."**

U.S. Rep. Barney Frank, D-Mass.

Berry said the vast majority of Tripler physicians have no reported incidents to the databank.

Tripler officials also noted that disciplinary actions against physicians must be reported to the state boards where they are licensed, and most boards have procedures for citizens to inquire about the records of individual practitioners.

But to check on a military doctor's disciplinary history, a consumer must know where the physician is licensed — information that is not always readily available to the public. Unlike civilians doctors, who must be licensed in the state where they practice, military ones can be licensed in any U.S. state or terri-

tory. About 40 percent of Tripler's active-duty physicians have Hawai'i licenses.

"The doctor kind of gets lost in the equation," attorney Davis said. "It's like they're immune (to accountability)."

Prohibiting military personnel from pursuing claims and giving doctors immunity from malpractice lawsuits create an environment that is more conducive to sloppy medical practices, according to the system's critics, including George Washington University law professor Jonathan Turley.

"There is simply no effective deterrent to medical malpractice," Turley said.

Yet the Army on one of its Web sites points out that Army patients file malpractice claims at a lesser rate than patients in the civilian system, even after adjustments are made to account for the ban that applies to active-duty personnel.

Between nine and 12 claims per 100 physicians were filed by Army patients in recent years, according to the Web site for Walter Reed Army Medical Center. By contrast, St. Paul Marine

and Fire Insurance, a major civilian malpractice insurer, receives 13 to 15 claims per 100 physicians annually, the Army said.

Another indicator reflecting the military hospitals' high quality of care is their accreditation track record, proponents say.

All but one of the Department of Defense's 142 hospitals and clinics are fully accredited, meaning they meet the same standards that apply to civilian hospitals, according to Mark Forstneger of the Joint Commission on Accreditation of Healthcare Organizations, the industry's main accrediting body.

Only an Army clinic in Alabama has a provisional accreditation.

Despite such data, critics continue to push for the elimination of the so-called Feres Doctrine, which applies not just to malpractice cases but to most personal-injury claims linked to military service.

A cadet who is raped at a military school, for instance, can't sue the government for damages related to the rape, critics say.

Cragnotti's nonprofit group, Veterans Equal Rights Protec-

tion Advocacy Inc., is seeking to abolish Feres and has been gathering signatures in an online petition to support efforts, so far unsuccessful, to get Congress to take such action.

A bill by U.S. Rep. Barney Frank, D-Mass., that would allow military members to pursue lawsuits for injuries caused by improper medical care has passed the House several times. But each time the legislation died in the Senate. Frank last proposed the legislation in 2003.

Frank told The Advertiser that he has stopped introducing the bill because the chances of passage, given the current legislative climate, are slim.

But Frank, who chose to use a military hospital when he had major heart surgery in 1999, still believes that the legislation is needed.

"The medical practice in the military is good, but it's not perfect," he said. "And I don't think people in the military ought to have less rights than civilians (if malpractice occurs)."

Reach Rob Perez at 525-8054 or rperez@honoluluadvertiser.com.

Advocates of changing or abol-    of us think it eventually will be

# A16 HAWAII

# Survey shows isles at 40th in nation for rate of disciplining doctors

**By Sally Apgar**
sapgar@starbulletin.com

Hawaii's state Medical Board rates among the 10 worst in the nation for disciplining doctors, according to a national survey published yesterday by Public Citizen, a Washington, D.C.-based consumer watchdog group founded by Ralph Nader.

For the survey period 2003-2005, Hawaii ranked 40th for the rate of "serious disciplinary actions" (license revocations, sur-

renders, suspensions and probation/restrictions) taken per 1,000 physicians in a state.

Public Citizen conducts its survey based on state data compiled by the Federation of State Medical Boards.

The survey reported that Hawaii, along with Wisconsin, Minnesota and Delaware, has been in the bottom-ranking 15 states for the past 10 survey periods.

This year, Mississippi ranked worst with 1.62 serious disci-

plinary actions and probationary actions per 1,000 physicians, compared with Hawaii's 2.19. Kentucky topped the survey with 9.08 serious actions per 1,000.

"I think we are doing a crummy job disciplining our physicians. And when they do discipline them, they want secrecy," said Honolulu attorney Richard Fried, who has won high-profile medical malpractice cases.

"It should be emphasized that it is a small number of doctors

that have the malpractice cases. But we need better discipline to take care of those habitual offenders," he said.

But Dr. Patricia Blanchette, president of the Hawaii Medical Association, defended the board's disciplinary standards and said, "Luckily, we don't require many disciplinary actions. And we have a very strict board."

Blanchette, who served on the medical review board from 1996 until 2004, said several factors

skew the results, making it appear that Hawaii is less vigilant than it is.

First, she noted that there are many doctors registered to practice in Hawaii who practice in another state or are retired, meaning they would count among the state's physicians but would never come before the board for discipline.

She also said that if a physician is disciplined, only the most stringent action, usually revocation, is counted and reported to

the federation. She said other states often levy multiple actions on the same physician for the same infraction, skewing the number of actions per 1,000 physicians.

Blanchette noted that Hawaii is strict in screening who can practice here. She also noted that the vast majority of doctors who are disciplined are not trained here.

"We have very good doctors here," said Blanchette, chairwoman of the Department of Geriatric Medicine at the John A. Burns School of Medicine at the University of Hawaii-Manoa.

# Appeals court allows lawsuit against Navy

## Pilot's rating was leaked to author

**By Christopher Newton**
ASSOCIATED PRESS

WASHINGTON — Members of the armed forces can sue the military for violating their privacy, a federal appeals court ruled yesterday in a case brought by a Navy pilot whose flight evaluation was leaked to an author.

The decision contradicted long-standing precedent under which the military has enjoyed virtual immunity from lawsuits by service members.

A three-judge panel of the U.S. Court of Appeals for the District of Columbia voted 2-1 to overturn a lower court ruling that former pilot Mary Louise "Missy" Cummings had no right to sue the military. Cummings sued after her flight evaluation was leaked to an author of a book about Navy pilots in which her ability was called into question.

Writing for the court majority, Judge Karen LeCraft Henderson said "whether members of the armed forces may sue the military for damages under the Privacy Act is a question of first impression. We answer in the affirmative."

The Navy and Cummings' attorney, David Sheldon, did not immediately return calls late yesterday seeking comment.

Cummings was assigned to a squadron in Florida in 1994 for training on the F/A-18 Hornet strike fighter. A confidential performance evaluation the next year recommended that she lose her wings because of poor flying ability. The report was leaked to author Robert L. Gandt.

Cummings contended that the information was released by an unknown member or members of her squadron seeking to discredit her and female pilots in general. Gandt said in a deposition that an unknown source mailed him the report unsolicited.

Gandt's 1997 book, "Bogeys and Bandits: The Making of a Fighter Pilot," quoted from the evaluation report, though it assigned Cummings a pseudonym.

Cummings, who left the Navy in 1999, claims in her lawsuit that her career prospects have been severely damaged and she has suffered mental distress, embarrassment and humiliation because of the book. She is seeking unspecified damages.

In a ruling Sept. 6, U.S. District Judge Joyce Hens Green said that the Navy was protected from the lawsuit because of a Supreme Court decision that members of the armed forces are barred from suing the military over matters resulting from their service.

But yesterday, the appeals court said the Supreme Court ruling speaks primarily to injuries connected to duty — not privacy issues.

The court also found no legal support for the government's stance that a service member can't seek damages in some cases.

Judges also argued that the Privacy Act of 1974, which protects government workers from having personal information released, did not mention any exceptions for the military.

HA    04/27/02

HONOLULU STAR-BULLETIN / WEDNESDAY, MAY 26, 2004

# Lawsuit claims sex assault by nurse

**By Debra Barayuga**
dbarayuga@starbulletin.com

A military spouse claims in a lawsuit she was sexually assaulted and molested by a nurse while a patient at Tripler Army Medical Center more than three years ago.

The victim and her husband filed a lawsuit in U.S. District Court yesterday against the federal government, alleging that Tripler should have known that nurse Tyrone Fellers had previously engaged in sex with another patient and posed a danger to other patients.

The suit, which also alleges medical negligence, seeks damages to be proven at trial.

Tripler officials and Fellers could not be reached for comment.

The victim allegedly collapsed for unknown reasons while with friends on March 11, 2001, and was taken unconscious to the Tripler emergency room just before 3 a.m. Although her father confirmed she had no prior history of seizures, drug use or mental illness, Tripler staff "misdiagnosed" her as an "alcohol abuser," causing her treatment to fall below the standard of care for critically ill patients with her symptoms, the suit said.

She was transferred to the intensive care unit, where her condition worsened and she was having seizures and trouble breathing. A tube was placed in her trachea and her wrists were restrained to prevent her from dislodging the tube.

Fellers was assigned to provide care during the night of March 11. According to the suit, Fellers added ankle restraints early in his shift and later failed to remove them although the breathing tube was discontinued later that night.

The victim's level of consciousness improved that night, but she was still incapacitated. The suit contends Fellers entered her private room that night and sexually assaulted and repeatedly molested her. She managed to tell her husband what happened the next morning when he visited, and he reported the matter to the head nurse and asked for an investigation.

The head nurse denied it was possible for the events to have occurred, according to the suit. After learning of the incident, Tripler staff washed the victim, and changed her hospital gown and bed linens, destroying any key evidence of the attack before it could be investigated.

When confronted by the allegations, Fellers confessed and was subsequently indicted for sexual abuse and two counts of abusive sexual contact.

Fellers also admitted to "prior acts" with other Tripler patients. He later pleaded guilty to assaulting and sexually molesting the victim.

# Former nurse sentenced for raping patient

*The 38-year-old civilian drugged and assaulted a military dependent*

**By Debra Barayuga**

dbarayuga@starbulletin.com

A former civilian nurse at Tripler Army Medical Center was sentenced yesterday to six years and six months in federal prison for sexually abusing a patient under his care.

Tyrone Fellers, 38, pleaded guilty Feb. 8 just before trial was to start to one count of sexual abuse in U.S. District Court stemming from a March 2001 incident.

The victim, in her 20s, was a military dependent and was at the military hospital for a two-to three-day stay. She was administered medication and was incapacitated to some degree and unable to resist when Fellers sexually assaulted her,

said Assistant U.S. Attorney Wes Porter.

The woman reported the incident to other hospital staff.

Fellers faced between 63 and 78 months' imprisonment under federal sentencing guidelines.

"The sentence, on the top end of the guidelines, was completely and entirely appropriate given his actions," Porter said.

Not only did Fellers abuse his position of trust, but he also took advantage of the fact that she could not defend herself and stop the assault, prosecutors said.

Chief U.S. District Judge David Ezra agreed. "What was done here was inexcusable and inexplicable," he said.

Not only must the victim deal with the emotional damage, but so must her family, he said. She is married with two children.

According to a letter the woman submitted to the court, she no longer feels she can trust hospital staff. She suffers from bad dreams. She has panic attacks in public and could not leave her house alone for months after the assault.

"I don't want him to ever have a chance to hurt anybody again," she wrote. "He has given me a lifetime sentence."

Ezra noted that this was an isolated case and that Tripler provides good care to most patients.

Fellers apologized for his actions and told Ezra he would accept his decision.

"I am very remorseful and regretful for what has happened," Fellers said. "I'm pretty much angry with myself and about what I put the family through and everybody else."

Fellers is married and has three children.

His attorney, federal public defender William Domingo, said Fellers sought counseling here and recently began counseling in Missouri, to where he moved after the incident.

Fellers had worked at Tripler for a couple of years before the assault and had worked there previously while still in the Army. After the incident, Fellers voluntarily resigned from Tripler and has since lost his nursing license, Porter said.

Domingo said he does not believe Fellers will ever return to nursing.

06/15/03

# A16 **ISLAND** N

[ FOR YOUR
BENEFIT ]

# VA has policy to prevent errors during surgery

**Question:** What is the Department of Veterans Affairs doing about ensuring that its doctors do not perform wrong-site surgeries?

**Answer:** On Jan. 1, the VA started a five-step process to ensure surgeries are performed on the correct site and the correct patient. Incorrect surgeries can range from performing the surgery on the wrong patient, to performing the wrong surgery, to performing the right surgery on the wrong site on the body.

The five-step VA directive calls for the surgical team to get patient consent, mark the correct surgical site, have the patient state their name and site of the procedure, confirm all information right before surgery, and confirm the surgical site with imaging data.

According to the VA's National Center for Patient Safety, in 2001 the rate for incorrect surgical procedures was about one in 25,000 to one in 30,000. More information about the VA surgery directive is available online at www.patientsafety.gov/CorrectSurg.html, or contact the VA Medical Center at 433-0600.

**Q:** I am a Gulf War Veteran. What happens if doctors at the Honolulu VA cannot diagnose my symptoms from my service in the Gulf?

**A:** While most veterans can be diagnosed and treated at our local VA medical center, some veterans from the first Gulf War have conditions that are unusual and difficult to diagnose and this may be the case for returning Gulf veterans from the second Gulf War.

Sometimes this requires continued testing and observation by a team of specialists. The local VA physician may refer these veterans to a special VA Gulf War referral center. At these four national centers, veterans undergo more extensive medical evaluations that require approximately one to two weeks.

Additional laboratory studies may be done, as well as consultations with other specialists. The medical work-up and treatment recommendations are individualized for each veteran depending on his or her medical condition.

The decision to transfer a veteran to a referral center is made by the veteran's VA physician in consultation with a referral center physician director. Veterans interested in a referral should talk to their local VA physician.

For more information on Gulf War symptoms and treatment, call the VA at 433-0600. The VA's Web site www.va.gov/hawaii also contains information concerning Gulf War Registry.

*If you have questions about your benefits as a veteran, call Fred Ballard at the Veterans Affairs at 433-0049 or visit the VA Web site at www.va.gov/hawaii or the Star-Bulletin at 529-4747.*

# Bill creates system to address medical errors

**BY RICARDO ALONSO-ZALDIVAR**
*Los Angeles Times*

WASHINGTON — The House yesterday overwhelmingly approved legislation that would create the first national network for reporting, analyzing and correcting medical errors, which are estimated to cause 40,000 to 98,000 preventable deaths each year.

The Senate has approved an identical measure; yesterday's 428-3 House vote means the bill now will go to President Bush, who is expected to sign it.

Backers called the patient safety legislation a step toward encouraging doctors and other healthcare providers to report mistakes and hazards. Common medical errors include giving patients the wrong medication and lax sanitary practices that can lead to infections in hospitals and nursing homes.

Such problems had received relatively little national level attention until recently, despite the considerable toll from medical errors.

By comparison, highway accidents claimed 42,800 lives last year.

The bill would guarantee confidentiality to healthcare providers who report problems, and would bar the actual reports from being used in malpractice suits and workplace and professional disciplinary proceedings. It would not block patients and their families from using other medical records as evidence in a lawsuit.

Under the bill, the Department of Health and Human Services would certify patient safety organizations to collect reports and analyze them for patterns of problems. Analysts would try to pinpoint critical initial events that prompt mistakes to cascade. These reports — minus details that could identify individuals and institutions — would be collected in a national database.

The safety organizations could be government agencies or private professional groups. Their analysts would be able to contact hospitals where a staff member had reported a problem and seek corrective action. The organizations could also put out safety alerts to the broader medical community.

Such concerted efforts have shown results for anesthesiologists. Facing rising malpractice premiums, and stung by media coverage of anesthesia accidents, the medical specialty created its own safety foundation in 1984.

That led to improved monitoring of patients under anesthesia, standard equipment in operating rooms, clearer guidelines for doctors and better training. The death rate from anesthesia accidents has dropped markedly. Malpractice premiums have also declined, after adjusting for inflation.

# Battle lines drawn in plan to limit lawsuits

**BY MARK SILVA**
*Chicago Tribune*

COLLINSVILLE, Ill. — Surrounded by physicians in a community known for lawsuits, President Bush yesterday launched a campaign for limits on the money people can win in court.

"The United States Congress needs to pass real medical liability reform this year," he said, appearing on stage in a notoriously litigious community in Southern Illinois.

The president has the backing of the business community, which complains that the cost of litigation drains $233 billion a year from the economy. And he has the support of the medical community, which maintains that the cost of insuring doctors against malpractice claims is forcing many to stop practicing.

Yet consumer-oriented groups, allied with trial lawyers who make their living pressing cases against negligent doctors and manufacturers of dangerous or defective products, insist the limits Bush is seeking hurt victims of malpractice and hazardous products.

"The business community has had this as a priority for a long time," said Rachel Weintraub of the Consumer Federation of America. "With a Republican House and a Republican Senate, all forces are coming together to try to pass something like this. Unfortunately, it is consumers and the public at large that is going to suffer."

Bush hopes to limit jury awards for "non-economic damages" such as pain and suffering to $250,000, and save punitive damages for "egregious cases where they are justified."

He proposes limiting the scope of class-action lawsuits that corral huge groups of people into claims against companies and restrict payments for lawsuits over asbestos-filled products.