EDWARD H. KUBO, JR. #2499
United States Attorney
District of Hawaii

EDRIC M. CHING #6697
Assistant U.S. Attorney
Room 6-100, PJKK Federal Building
300 Ala Moana Blvd.
Honolulu, Hawaii  96850
Telephone: (808) 541-2850
Facsimile: (808) 541-3752
E-mail: edric.ching@usdoj.gov

Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| KEVIN MILNES, | ) | CIVIL NO. 02—00365 BMK |
| | ) | |
| Plaintiff, | ) | SUPPLEMENTAL MEMORANDUM IN |
| | ) | SUPPORT OF DEFENDANT'S MOTION |
| vs. | ) | FOR PARTIAL SUMMARY JUDGMENT |
| | ) | FILED ON APRIL 26, 2006; TABLE |
| UNITED STATES OF AMERICA, | ) | OF CONTENTS; TABLE OF |
| | ) | AUTHORITIES; SUPPLEMENTAL |
| Defendant. | ) | DECLARATION OF LAWRENCE J. |
| | ) | ERON, M.D., FACS, FIDSA; |
| | ) | SUPPLEMENTAL DECLARATION OF |
| | ) | WHITNEY M.L. LIMM, M.D., FACS; |
| | ) | DECLARATION OF EDRIC M. CHING; |
| | ) | EXHIBITS "E"-"F"; CERTIFICATE |
| | ) | OF SERVICE |
| | ) | |
| _____ | ) | |

SUPPLEMENTAL MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR
<u>PARTIAL SUMMARY JUDGMENT FILED ON APRIL 26, 2006</u>

Defendant UNITED STATES OF AMERICA, by and through its

attorneys, the United States Attorney for the District of Hawaii

and Assistant United States Attorney Edric M. Ching, and hereby

submits the following memorandum in support of Defendant's Motion

For Partial Summary Judgment filed on April 26, 2006 ("Motion").

I.    <u>ARGUMENT</u>

    A.    It Is Undisputed That Zosyn Was Administered Prior To
<u>The June 15, 1999 Gallbladder Procedure.</u>

During his deposition, Dr. Halford admitted that the Tripler

Army Medical Center ("TAMC") records contained an entry that

indicated that an antibiotic, Zosyn, was given prior to the June

15, 1999 gallbladder procedure and he had to no reason to dispute

the administration of this dosage of Zosyn.

    Q:    Now, I think you earlier stated that you reviewed
        the inpatient records from Tripler Army Medical
        Center with regard the gallbladder surgery?

    A:    Correct.  Not only the inpatient but emergency
        room, and there was a visit I think to the VA
        clinic before admitted officially to the hospital.

    Q:    And in you review of these records, you found no
        mention of antibiotics and more specifically with
        Zosyn being given to Mr. Milnes prior to his
        gallbladder surgery?

    A:    Initially I did not.  But on further perusal,
        there is a note in the progress notes about a
        Zosyn dose being given.

    Q:    Okay.  And was that by Sanchez Martinez?

    A:    Yes.

<u>See</u> Exhibit "E" at 14:9-14:24.

Q:    In this Declaration, isn't it correct that Mr.
      Sanchez-Martinez indicates that at 9:20 a.m., he
      hung a bag of Zosyn and connected it to the line
      leading in to Milnes's body?

A:    Correct.

Q:    Do you have any reason to dispute that this did
      not occur?

A:    No.

<u>See</u> Deposition Transcript of Peter Halford, M.D. taken on
June 21, 2007, a true and correct copy of which is attached
hereto as Exhibit "E" at 18:1-18:8.

Curiously, despite having reviewed information that directly

contradicted his May 25, 2005 expert report, Dr. Halford made no

effort to amend his expert report nor did Plaintiff inform the

Court that one of the defenses to the Motion was no longer valid.

Based on the foregoing, it is undisputed that an antibiotic was

administered prior to the June 15, 1999 gallbladder procedure.

B.    The New Opinion Set Forth By Dr. Halford Made Three
      Months After The Court Imposed Deadline And Two Years
      <u>After Submitting His Initial Report Must Be Stricken.</u>

After Dr. Halford, during his deposition, admitted that the

TAMC records contained a reference to the 9:20 a.m.

administration of Zosyn, he set forth a totally new opinion.

Q:    Dr. Halford, do you have any other - strike that.
      With regard to paragraph 1 other than what we
      discussed, do you have any other opinions
      regarding whether antibitoics were given or not?

A:    Yes.  In fact, concerning the topic of
      preoperative antibiotics, I believe that even if
      he was administered the dose at the time frame
      that was stated, is still below the standard of
      care for a man of his condition.  And my opinion

2

is that it should have been started immediately
once he was admitted to the hospital since that is
the standard for treatment of acute cholecystitis.

Id. at 19:5-19:16.

    Q:   Okay.  As soon as they have -- as soon as that's a
potential diagnosis, they should provide the
antibiotics?

    A:   If that's your suspected diagnosis, yes.

    Q:   So in this case, what time do you opine that the
antibiotics should have been administered?

    A:   At least certainly 1:00 or 2:00 in the morning.  I
mean, he was in the emergency room in the late
afternoon.  The CT scan confirmed a thickened
gallbladder at this time.  So I can give a few
hours until he got to the hospital.
Preferentially you'd want to give it in the
emergency room before you move him even into the
hospital.  But on or about midnight when he got to
the floor, I would have assumed antibiotics would
have been started since the diagnosis at that time
was clearly acute cholecystitis.

Id. at 22:6-22:22.

This new opinion[1] was given approximately three months after
his deadline to submit expert reports and more than two years
after submitting his original report.  Plaintiff failed to
supplement Dr. Halford's expert report pursuant to Rule 26 and
waited until Dr. Halford's deposition to reveal this new opinion.

    1.   The Late Disclosure Was Neither Justified Nor
Harmless.

---

[1]  This new opinion was based on Dr. Halford's challenge to
TAMC's interpretation of the June 14, 1999 CT scan.  Up to this
point, the interpretation of this CT scan was not relevant to Dr.
Halford's opinions.

Rule 37(c)(1) of The Federal Rules of Civil Procedure provides, in relevant part:

> A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed.

Under the plain text of the rule, generally an untimely expert opinion will be excluded. "Rule 37(c)(1) gives teeth to these requirements [of timely production under Rule 26(a)(2)(B)] by forbidding the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed." Yeti by Molly v. Deckers Outdoor Corporation, 259 F.3d 1101, 1105 (9th Cir. 2001). The Ninth Circuit explained that the Rule 37 was amended to provide stronger discouragement of late disclosures:

> This particular subsection, implemented in the 1993 amendments to the Rules, is a recognized broadening of the sanctioning power. Klonoski v. Mahlab, 156 F.3d 255, 269 (1st Cir. 1998) ("[T]he new rule clearly contemplates stricter adherence to discovery requirements, and harsher sanctions for breaches of this rule...."). The Advisory Committee Notes describe it as a "self-executing," "automatic" sanction to "provide[ ] a strong inducement for disclosure of material...."

> Id. at 1106, citing Fed.R.Civ.P. 37 Advisory Committee's Note (1993) (brackets in original).

The Yeti by Molly court also discussed the narrow exceptions to the requirement of exclusion of late disclosures:

> "Two express exceptions ameliorate the harshness of Rule 37(c)(1): The information may be introduced if the

4

parties' failure to disclose the required information
is substantially justified or harmless."

Id. at 1106.

The burden is on the party seeking admission of the late
evidence by showing the failure to comply was either justified or
harmless.  Id. at 1107, quoting Wilson v. Bradlees of New
England, Inc., 250 F.3d 10, 21 (1st Cir. 2001).  The party
seeking to invoke automatic exclusion need not show bad faith on
the part of the other party.  Id. at 1105.

    2.  The Late Disclosure Is Not Justified.

The proper course of action for a party who seeks to
introduce an untimely expert opinion is to face the issue head-on
with a timely request to modify the court's scheduling order.
See Quevedo v. Trans-Pac. Shipping, Inc., 143 F.3d 1255, 1258
(9th Cir. 1998); James v. United States, Civ. No. 99-00700 BMK
(D. Haw. April 25, 2001), at 5-6.  In this case, the late
disclosure is totally unjustified.  Plaintiff made no effort to
request an extension of the Court's scheduling order or to
supplement Dr. Halford's expert report.  Rather, Plaintiff waited
until Dr. Halford's deposition to disclose this opinion.

    3.  The Late Disclosure Is Not Harmless.

The 1993 Advisory Committee Notes to Rule 37 offer a list of
examples in which evidence should not be excluded because the
late disclosure is harmless or substantially justified:

    "[T]he inadvertent omission from a Rule 26(a)(1)(A)

5

disclosure of the name of a potential witness known to all parties; the failure to list as a trial witness a person so listed by another party; or the lack of knowledge of a pro se litigant of the requirement to make disclosures."

The list demonstrates that the threshold for a finding of harm is quite low, that a late disclosure is "harmless" only where the evidence is already essentially known to the other side and requires little or no extra trial preparation.

This late disclosure is clearly not harmless.  If the Court does not strike this opinion, Defendant would have to re-depose Dr. Halford[2] and prepare to question him at trial.  Given Dr. Halford's challenge to TAMC's interpretation of the June 14, 1999 CT scan, Defendant would have to locate, provide records to, prepare and either depose or bring to Hawaii for trial (or both) the physician who interpreted the June 14, 1999 CT scan and also retain an expert radiologist to review the June 14, 1999 CT scan and Dr. Halford's opinion regarding the June 14, 1999 CT scan (the deadline for Defendant to submit his expert report has long passed and Defendant is unsure if it could retain an expert radiologist prior to the September 25, 2007 trial).  Given the length of time since the interpretation and the probability that most of the personnel are either out of the military or at another duty station, this would be a formidable task.  Defendant

---

[2]  If Defendant re-deposes Dr. Halford, it will request that Plaintiff bear the cost of re-deposing Dr. Halford.

would also have to locate and provide records to and prepare for the deposition and trial testimony of its own expert radiologist. Moreover, the scores of hours and thousands of dollars the government has expended to date on experts to refute Plaintiff's original theory would be wasted.

As great as the harm to defendant's interests is, the harm to the interests of the court and justice would be even greater. A number of decisions have emphasized the importance of a court's interests in requiring adherence to its scheduling rules, and in discouraging gamesmanship with disclosures:

> [T]he Lummi contend that they should've been allowed to present Dr. Onat [their new expert witness] because the Tulalips [opposing party] suffered no prejudice. This rationale would allow parties to frustrate the salutary purposes of pretrial conferences and excuse parties who disregard court orders.

U.S. v. Lummi Indian Tribe, 841 F.2d 317, 321 (9th Cir. Wash. 1991).

Allowing Plaintiff's late expert disclosure would encourage disregard of the court's deadlines.  For all these reasons, Plaintiff cannot show that the late disclosure would be harmless or was justified and this late opinion must be stricken.

> C.    It Is Undisputed That The Gallbladder Procedure
>       Occurred On June 15, 1999.

During his deposition, Dr. Halford admitted that the standard of care was not violated if the gallbladder surgery occurred on June 15, 1999.  See Exhibit "E" at 28:5-28:16.

> Q:   Are you testifying today that the surgery did not
>      occur on June 15?
>
> A:   No.
>
> Q:   And as you stated earlier -  and I'm sorry for
>      repeating - is that the standard of care for
>      performing a gallbladder surgery is 48 to 72 hours
>      after admission?
>
> A:   Not after admission but after the onset of
>      symptoms.  So, if he had it on the 15th, I am fine
>      with it.

Id. at 28:24-29:8.

It is clear that Plaintiff is attempting to create a genuine issue of material fact by claiming that the gallbladder procedure occurred on June 16, 1999.  As noted in the Motion and Reply Memo, Plaintiff made two statements within six weeks of the procedure, one of which was made under oath, that the gallbladder surgery occurred on June 15, 1999.  See Reply Memo at 2 to 4.

Plaintiff also made admissions that the gallbladder procedure occurred on June 15, 1999.

> Admission 15:  Admit that Plaintiff only applied
> Dakin's Solution to his wound from the June 15, 1999
> cholecystectomy procedure his from July 1, 1999 to July
> 6, 1999.
>
>          Admit  __X__          Deny _____
>
> Admission 16:  Admit that Plaintiff did not use the
> Dakin's Solution on his wound from the June 15, 1999
> cholecystectomy procedure following his meeting with
> Dr. Cirangle on July 6, 1999.
>
>          Admit  __X__          Deny _____

See Exhibit 10.

8

Based on the lack of any evidence that the gallbladder procedure occurred on a date other than June 15, 1999 other than the inconsistent self-serving statements made by Plaintiff, summary judgment should be granted on this issue.

> D.   It Is Undisputed That Plaintiff Did Not Experience An Infection After The Gallbladder Procedure.

During his deposition, Dr. Halford testified that the failure to provide Plaintiff with the proper amount of pre-operative antibiotics and the failure to take cultures when the gallbladder was removed and when examined on June 24 by Dr. Sakaguchi[3] caused Plaintiff to develop an infection. Id. at 24:20-25:4. Dr. Halford then testified that the infection was a cause (60%) of the wound dehiscence along with his smoking (20%) and coughing due to his chronic lung problem (20%). Id. at 31:14-31:20.

It is clear that any infection that Plaintiff may have experienced prior to the June 15, 1999 gallbladder procedure was cleared up shortly thereafter. Plaintiff's white blood cell count, a clear indication of infection, was elevated prior to and

---

[3] Defendant does not concede that the standard of care was violated when cultures were not taken during the above-referenced periods. With regard to the taking a culture at the time of the gallbladder procedure, a weak correlation exists between bacteria obtained from bile and bacteria causing postoperative infections and Zosyn covers the majority of bacteria. See Supplemental Declaration of Lawrence J. Eron, M.D., FACS, FICS ("Supp. Eron Declaration") at paragraphs 8 to 9. Further, the absence of any objective evidence of infection on June 24, 1999 would have obviated the need for Dr. Sakaguchi to culture Plaintiff's wound.

shortly after the gallbladder procedure but quickly decreased. See Supp. Eron Declaration at paragraphs 3 to 6. Plaintiff's white blood cell counts during his first hospital stay is as follows (the normal range is approximately 3.9-10.6):

| Date of Collection | WBC Count |
|---|---|
| 6/14 | 17.6 |
| 6/15 (5:24 a.m. - pre-op) | 13.6 |
| 6/16 | 15.6 |
| 6/17 | 9.8 |
| 6/18 | 6.7 |
| 6/19 | 6.3 |

Id. at paragraph 6.

The physical findings were also consistent with no infection being present. More specifically, there was no evidence of pus, purulent drainage or red streaking associated with infected wounds. On June 17, 1999, one to two centimeters of erythema, normal for a healing wound, was noted around the surgical wound was noted and Plaintiff did not have a fever. See Eron Declaration at paragraphs 7 and 8 and Cirangle Declaration at paragraph 11. At the time of his June 19, 1999 discharge, no drainage was noted from his wound.

When examined by Dr. Cirangle on June 23, 1999, the wound was noted to be clean and dry and appeared to be healing normally. See Cirangle Dec. at paragraph 14. When examined on June 24, 1999, after his wound had dehisced, no purulent drainage was observed. See Sakaguchi Dec. at paragraph 5. Nor was there of the above-referenced symptoms of infection observed during

10

Plaintiff's second and third hospital stays and the treating physicians all noted no signs of obvious infection.  <u>See</u> Eron Dec. at paragraphs 11 to 25.

Contrary to the objective evidence, Dr. Halford makes a conclusory statement as to the existence of an infection.

> Q:    Now with regard to Dr. Sakaguchi, that would be on the 24th of June in the Tripler emergency department, correct?
>
> A:    Yes.
>
> Q:    At that point, in your review of the records, were there any indications of an infection at that point?
>
> A:    Yes, the wound had fallen apart, and there was a lot of drainage reported.

<u>See</u> Exhibit "E" at 30:22-31:5.

> Q:    So the medical records with regard to Dr. Sakaguchi's examination indicated that the wound was infected?
>
> A:    They indicated the wound was dehisced.
>
> Q:    So just by being dehisced means it was infected?
>
> A:    No.  Dehiscence means the wound has opened up, fallen apart.  And with a lot of drainage preceding that and the surgery he had for an infected gallbladder, my opinion is that this dehiscence was more likely caused by an infection that wasn't treated properly rather than smoking or lifting something.

<u>Id.</u> at 32:24-33:11.

Dr. Halford's analysis is flawed and is not based on good science.  First, the existence of drainage itself would not indicate the existence of an infection.  It is clear that there

11

is some drainage which occurs when a wound is dehisced in the form of a clear liquid, See Supplemental Declaration of Whitney M.L. Limm, M.D. FACS ("Supp. Limm Declaration") at paragraph 3. Thus, the relevant question is whether any purulent drainage existed.  As noted above, there was no evidence of purulent drainage.

Second, there was no objective evidence of "a lot" of drainage from Plaintiff's wound prior to the dehiscence.  In fact, when Dr. Cirangle examined Plaintiff's wound less than twenty-fours prior to the dehiscence, the wound was noted to be clean and dry.  See Cirangle Declaration at paragraph 14.  When Dr. Sakaguchi examined Plaintiff on June 24, 1999, there was no evidence of purulent drainage.  See Sakaguchi Declaration at paragraph 5.  It defies logic that if "a lot" of purulent drainage was derived from Plaintiff's wound prior to Dr. Sakaguchi's examination of June 24, 1999, that there would have been no evidence of the purulent damage during these examinations within twenty-four hours prior to and after the wound dehiscence.

Third, Dr. Halford's claim that the infected gallbladder was a cause of the wound infection lacks merit.  See Exhibit "E" at 31:4-31:8.  There were no signs of infection following the gallbladder procedure and Zosyn would have taken care of the majority of the organisms in the bile in the infected gallbladder.  When asked to identify which organisms would not be

covered by the Zosyn, Dr. Halford referred to Enterobacter, pseudomonas and "some of the e.colis". Id. at 30:9-30:13. Dr. Halford ignores the effectiveness of Zosyn as it covers 99% of e.coli, 93% of Enterobacter and 97% of Pseudomonas gram negative bacteria. See Supp. Eron Declaration at paragraph 8.

Fourth, Dr. Halford has failed to cite any treatise or any other article containing scientifically sound theories to support his opinion that an infection could cause a wound dehiscence but not exhibit any other symptoms of an infection. To the contrary, Dr. Eron has cited studies indicating that obesity and coughing are considered major causes of wound dehiscence while wound infection, anemia and hypoproteinemia are minor causes of wound dehiscence. See Supp. Eron Declaration at paragraph 11. Some studies also do not include infection as a cause of wound dehiscence. Id. at paragraph 12.

Fifth, Dr. Halford's claim that the use of antibiotic powder indicated the presence of an infection is baseless. It is clear that the antibiotic powder was used as prophylaxis and a normal procedure in surgery, especially in a slow healing wound. See Eron Declaration at paragraph 15.

Based on the absence of any objective evidence of infection, Dr. Halford's failure to rely on sound scientific data in making his opinions, the bacteria coverage of Zosyn and the speculative nature of Dr. Halford's opinion, Plaintiff failed to show that

13

the above-referenced actions resulted in injury.

E.    It Is Undisputed That The Dakin's Solution Did Not Delay Wound Healing.

Plaintiff has failed to raise a genuine issue of material fact that applying Dakin's Solution was not a breach of the standard of care.  During his deposition, Dr. Halford opined that applying Dakin's Solution delayed wound healing.  See Exhibit "E" at 46:17 - 46:22.  More specifically, Dr. Halford cites an article, ACS, Principles and Practices, to state that .5% Dakin's Solution should "never be applied" in a wound or on a wound.  Id. at 45:7-46:1.  However, the study cited by Dr. Halford involved tests conducted on cells in tissue culture which are extraordinarily sensitive to any substance, much more that tests involving cells in vivo (used in the articles cited by Dr. Eron).  See Supp. Eron Declaration at paragraphs 13 to 16.  Curiously, in coming to his conclusion, Dr. Halford did not take the time to review the article cited by Dr. Eron but only noted that the title of the report did not indicate that Dakin's Solution was used in the study.  See Exhibit "E" at 46:23-47:6.

Dr. Halford's attempt to discredit Dakin's Solution as a tool to assist in wound healing must be disregarded.  Physicians performing surgical procedures at the Queen's Medical Center (where Dr. Halford currently serves as the Chief of the Department of Surgery) have the option to order Dakin's Solution to utilize during the surgery.  See Supplemental Limm Declaration

14

at paragraph 6.  Further, in certain situations, Dakin's Solution can be effective in assisting in wound healing and in treating wounds colonized by bacteria (which does not signify the presence of a wound infection).  See Eron Declaration at paragraph 26.

Plaintiff has continued to fail to set forth any admissible evidence from health care providers that he is indeed allergic to bleach.  The only statements supporting his claim are the statements he made to TAMC personnel.

Dr. Halford also testified that the delay in wound healing was caused by other factors.  During his deposition, Dr. Halford testified that the use of Dakin's Solution delayed the healing of his wound.  See Exhibit "E" at 45:7-46:1.  However, at the conclusion of the deposition, when asked to apportion the causes of the delay of the healing of Plaintiff's wound, Dr. Halford made the following apportionment: infection (60%), smoking (20%), weight (10%), coughing (5%) and suture technique (5%) (Dr. Halford did not give an opinion as to whether the suturing techniques used by TAMC violated the standard of care).  Id. at 54:8-54:16; 58:15-58:24.

Thus, based on the foregoing, summary judgment must be granted on this issue.

F.    There Is No Evidence That Plaintiff Experienced A
      Reaction To The Dakin's Solution.

During his deposition, Dr. Halford claimed that any reaction to the Dakin's Solution would have been immediate.  Id. at 49:5-

15

49:12.  In his expert report, Dr. Halford noted that Plaintiff experienced an immediate burning sensation when applying the Dakin's Solution to his wound.  Id. at 47:15-48:8.  Plaintiff failed to submit admissible evidence that he experienced an immediate burning sensation after having Dakin's Solution applied to his wound.

In his Declaration attached the Memo. In Opp., Plaintiff did not make any assertions that he experienced immediate burning sensation upon application of the Dakin's Solution to his wound. See Milnes Declaration.  The only reference to an "intense reaction" in his Declaration was a quote of Dr. Halford's expert report describing the intense reaction.  Id. at paragraph 30.

In Plaintiff's response to Defendant's Second Request For Answers To Interrogatories, attached hereto as Exhibit "F", Plaintiff did not state that he experienced "burning" sensations nor did he claim that the reaction was immediate.

> "At that point, I was really upset.  I immediately realized what had happened, and why the towels were turning white, and why I was **bloating and itching**, and what damage it caused to my body and prevented the healing process."

The objective evidence also confirms that Plaintiff did not experience a reaction to the Dakin's Solution.  The only irritation noted near the wound during the July 6, 1999 examination was an area in an exact distribution of the tape used

16

to hold the dressing of the wound.[4]  <u>See</u> Cirangle Dec. at
paragraph 24.  By July 8, 1999, only mild redness was noted near
the wound and by July 12, 1999, the redness around the wound had
resolved.  <u>Id.</u> at paragraph 28.

If Plaintiff experienced a toxic reaction to the Dakin's
Solution and the irritation was not caused by the tape, it is
illogical that on July 6, 1999, the redness would be in the exact
location of the tape.  Rather, the irritation from a reaction
that caused "intense burning" would no doubt spread to an area
outside the distribution of the tape.

Dr. Halford also stated that the reaction to Dakin's
Solution would be immediate.  <u>See</u> Eron Declaration at paragraph
28 and Exhibit "E" at 49:5-49:12.  However, even accepting Dr.
Halford's opinion, the objective evidence indicates that he did
not experience a reaction to the Dakin's Solution.

There was no evidence in the TAMC records of Plaintiff
complaining of immediate burning reactions to the Dakin's
Solution when it was applied to his wound on July 1, 1999 and
July 2, 1999.  <u>See</u> Milnes Declaration and Exhibit "F".
Conversely, these observations are consistent with Dr. Eron's
opinion that "little irritation" occurs during the first two days
after application.  <u>See</u> Eron Declaration at paragraph 28.

_____

[4]  Plaintiff does not dispute Dr. Cirangle's description of
the area of the observed irritation on July 6, 1999.

17

A question also exists as to whether Plaintiff applied Dakin's Solution to his wound when he was discharged from TAMC on July 2, 1999. During his January 13, 2006 deposition, Plaintiff, under oath, stated that when discharged on July 2, 1999, he was only given "basic bandage material and saline solution" to clean his wound and that he did not receive Dakin's Solution until he visited his surgeon on 6, 1999. See Exhibit "12" at 96:9-97:13.

In his Declaration dated April 16, 2007, Plaintiff, curiously, did not refer to Dakin's Solution being applied to his wound from July 2, 1999 to July 6, 1999. See Milnes Declaration. However, in his July 2, 1999 interrogatory response, Plaintiff stated that Dakin's Solution was applied to his wound from July 3, 1999 to July 5, 1999. See Exhibit "F". Even Dr. Halford was uncertain if Plaintiff applied Dakin's Solution after his July 2, 1999 discharge. See Exhibit "E" at 48:15-48:19.

Based on the foregoing, summary judgment must be granted on the issue of whether Plaintiff experienced a reaction to the Dakin's Solution because there is no evidence that he experienced reactions in the TAMC records and a question exists as to whether he actually applied Dakin's Solution to his wound between July 2, 1999 and July 6, 1999.

G.   It Is Undisputed That Dr. Sakaguchi Did Not Violate The Standard Of Care By Treating Plaintiff As An Outpatient On June 24, 1999.

During his deposition, Dr. Halford gave a hesitant recitation of the standard of care as it pertained to the decision to treat Plaintiff as an outpatient on June 24, 1999. During the deposition, he stated:

> I **think** the standard is if you have a major dehiscence of a wound of this sort, you should return the outpatient to the operating room to prepare the dehiscence.

See Exhibit "E" at 38:22-39:8 (emphasis added).

Without addressing Dr. Halford's failure to definitively state the relevant standard of care, Plaintiff has already stipulated to the relevant standard of care in his response to Defendant's First Request For Admissions.

> Admission No. 25:  Admit that treating a wound dehiscence without evisceration or infection by the application of dressing, suturing it at a later date or allowing it to heal to close on its own (secondary intention) in an outpatient setting is within the standard of care in Hawaii.
>
> Admit __ X __          Deny _____
>
> (With Comments)

Admission No. 25 (with comments):

Under ideal circumstances, with no surgery delays, with no diagnosis of Infection 1, Infection II (please see Operation Reports of 6/26/99 and 07/02/99) and gangrenous gallbladder (please see Discharge Summary Note dated 07/02/99), one can probably apply some benefit of the doubt to secondary closure and secondary intention in an outpatient setting.  However, it was not my case and as is, it was not applicable to my critical situation.  Dr. Halford admitted he would be treating me in a different way, considering my condition.

19

<u>See</u> Exhibit 10.

Based on the foregoing, the relevant issues are whether Plaintiff exhibited evisceration and whether his wound was infected.  During his deposition, Dr. Halford admitted that during Plaintiff's June 24, 1999 emergency department visit, there were no signs of evisceration.  <u>See</u> Exhibit "E" at 40:25-41:4.  Further, as noted above, the objective evidence did not indicate any signs of wound infection.  Thus, it is clear that Dr. Sakaguchi's decision to treat Plaintiff as an outpatient on June 24, 1999 was within the applicable standard of care.

Even if Dr. Sakaguchi did violate the standard of care, there is no evidence that the delay in admitting him as an inpatient delayed wound healing.  Dr. Halford apportioned the delay in wound healing to infection (60%), smoking (20%), weight (10%) coughing (5%) and technique (5%).  <u>Id.</u> at 54:8-54:16. As such, summary judgment should be granted on this issue.

II.  <u>CONCLUSION</u>

Based on the foregoing, Defendant requests that the Court grant summary judgment in its favor.

DATED:  July 16, 2007, at Honolulu, Hawaii.

> EDWARD H. KUBO, JR.
> United States Attorney
> District of Hawaii
>             /s/ Edric M. Ching
> By_____
>   EDRIC M. CHING
>   Assistant U.S. Attorney
> Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

```
KEVIN MILNES,                 )    CIVIL NO. 02—00365 BMK
                              )
            Plaintiff,        )    CERTIFICATE OF SERVICE
                              )
      vs.                     )
                              )
UNITED STATES OF AMERICA,     )
                              )
            Defendant.        )
_____)
```

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on the date and by the method of service noted below, a true and correct copy of the foregoing was served on the following at their last known address:

Served via Hand Delivery:

Gary Victor Dubin, Esq.              July 16, 2007
Dubin Law Offices
55 Merchant Street, Suite 310
Honolulu, Hawaii  96813

DATED:  July 16, 2007, at Honolulu, Hawaii.


                              /s/ Coleen Tasaka-Shoda
                              _____