# Exhibit "E"
# Part 1 of 2

1

1       IN THE UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF HAWAII

3

4   KEVIN MILNES,                    )   CIVIL NO. 02-00365 BMK
                                     )
5               Plaintiff,           )
                                     )
6       vs.                          )
                                     )
7   UNITED STATES OF AMERICA,        )
                                     )
8               Defendant.           )
    ─────────────────────────────────)

9

10

11          DEPOSITION OF PETER A. HALFORD, M.D.

12   Taken on behalf of the Defendants UNITED STATES OF

13   AMERICA, at the medical offices of Peter A. Halford,

14   M.D., Queen's Medical Center, Physicians' Office

15   Building II, 1329 Lusitana Street, Suite 706, Honolulu,

16   Hawaii 96813, commencing at 10:09 a.m., on Tuesday, June

17   19, 2007 pursuant to Notice.

18

19          BEFORE:  MYRLA R. ROMERO, CSR No. 397

20          Notary Public, State of Hawaii

21

22

23

24

25                  Exhibit "E"

2

1    APPEARANCES:

2         For Plaintiff KEVIN MILNES:

3              GARY VICTOR DUBIN, ESQ.
               Dubin Law Offices
4              55 Merchant Street, Suite 3100
               Honolulu, Hawaii 96813

5

6

7         For Defendant UNITED STATES OF AMERICA:

8              EDRIC M. CHING, ESQ.
               Assistant U.S. Attorney
9              PJKK Federal Building, Room 6-100
               300 Ala Moana Boulevard
10             Honolulu, Hawaii 96850

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                                    I N D E X

2

3    EXAMINATION BY:                                        PAGE

4         MR. CHING...................................4

5         MR. DUBIN..................................57

6         MR. CHING..................................58

7

8    EXHIBITS MARKED FOR IDENTIFICATION                     PAGE

9    1                Opinions of Peter A. Halford,         4
                      M.D., May 25, 2005
10
     2                Declaration of Juan J.                15
11                    Sanchez-Martinez

12   3                Excerpts from Current Surgical        20
                      Therapy, 8th Edition
13
     4                Excerpts from Fourteenth              20
14                    Edition textbook of surgery

15   5                Excerpts from Principles of           40
                      Surgery
16
     6                Excerpts from American College        47
17                    of Surgeons

18   7                Paper regarding topical               47
                      antimicrobial toxicity
19

20

21

22

23

24

25

4

1              (Disclosure presented to all counsel.)

2                      (Exhibit No. 1 was marked for

3                          identification.)

4                  PETER A. HALFORD, M.D.,

5      called as a witness by and on behalf of the Defendant,

6      having been first duly sworn to tell the truth, the

7      whole truth and nothing but the truth, was examined and

8      testified as follows:

9                          EXAMINATION

10     BY MR. CHING:

11         Q    Good morning, Dr. Halford.  Can you please

12     state your name.

13         A    My name is Peter Halford.

14         Q    And your business address?

15         A    1329 Lusitana Street, Suite 706, Honolulu,

16     96813.

17         Q    Dr. Halford, I'm assuming that you have

18     been deposed before.  But just before we start today,

19     I'd like to go over some ground rules with regard to

20     this deposition to make it a little bit more clear

21     for both sides.

22              Dr. Halford, you understand today that

23     you're testifying under oath?

24         A    Yes.

25         Q    And you understand that your testimony

5

1    today under oath is the same as if you were

2    testifying in a court of law before a judge?

3        A    Yes.

4        Q    And you also understand that all the

5    questions and answers are being taken down by the

6    court reporter who's sitting to my right?

7        A    Yes.

8        Q    And you understand that at the conclusion

9    of this deposition, she will prepare a transcript.

10    Do you understand that?

11        A    Yes.

12        Q    And you understand that you will have the

13    opportunity to make changes to this transcript?

14        A    Yes.

15        Q    And you understand that if you do make

16    changes to the transcript that I will have the

17    opportunity to comment on those changes and

18    corrections?

19        A    Yes.

20        Q    Now, Dr. Halford, I know I speak a little

21    fast.  But at times today I may ask a question and

22    you may not understand me or understand the question.

23    And if you do not understand, can you please inform

24    me and I'll either rephrase or repeat the question.

25        A    Yes.

6

1    Q    Dr. Halford, today I may ask you questions

2    in which I assume some facts.  If I misstate anything

3    or if I misstate any facts in my questions, can you

4    please tell me and we can try to clear that up?

5    A    Yes.

6    Q    You're doing a very good job, Dr. Halford,

7    in answering verbally yes or no.  I would request

8    that you avoid giving responses such as shaking your

9    head up and down or giving answers like uh-huh or

10   uh-uh.  Do you understand that?

11   A    Yes.

12   Q    Dr. Halford, I will try to give you this

13   courtesy, but I think it's good for the court

14   reporter if only one of us speaks at a time.  So that

15   she can take down a good transcript.

16   A    Okay.

17   Q    And is there any reason why you would not

18   be able to testify accurately and truthfully at

19   today's deposition?

20   A    No.

21   Q    Dr. Halford, what documents did you review

22   in preparation for today's deposition?

23   A    I reviewed my letter.  I reviewed the

24   medical records furnished to me concerning the care

25   rendered to Mr. Milnes.  I reviewed your expert

7

1  letters submitted as well as the documents for and

2  against the summary judgment thing.

3      Q    Okay.  Just to be clarify.  When you say

4  the expert letters, that's the two letters written by

5  Dr. Lim and the one that are written by Dr. Erron?

6      A    Yes.

7      Q    And when you say the documents attached to

8  the summary judgment motion, that would be in the

9  form of declarations and exhibits?

10     A    Correct.

11     Q    And you reviewed documents submitted on

12  behalf of my client the United States of America,

13  correct?

14     A    Correct.

15     Q    And you also reviewed documents submitted

16  to the court submitted by Mr. Dubin on behalf of his

17  client Mr. Milnes?

18     A    Correct.

19     Q    Did you review any other documents?

20     A    A number of textbooks to back up my

21  testimony.

22     Q    Okay.  I'll be asking you about that later.

23     A    Okay.

24     Q    Dr. Halford, did you have any discussions

25  with Mr. Dubin in the past 12 months regarding this

8

1    case?

2        A    Yes.

3        Q    And what did you discuss?

4        A    He talked to me a week or two ago to let me

5    know that we're going to have this deposition today

6    and that he would forward some documents to me to

7    review, which are the ones I just mentioned, to me.

8    And we met for about a half an hour earlier this

9    morning to go over what to expect today.

10       Q    And you just discussed the opinions that

11   you're going to render in this case?

12       A    Correct, yes.

13       Q    Dr. Halford, at the current time or strike

14   that.  In the past five years, how many cases have

15   you served as an expert witness approximately?

16       A    Approximately three.

17       Q    And were those cases detailed in the

18   correspondence in which you provided to Mr. Dubin

19   last year, I believe?

20       A    Yes.

21       Q    And of those three cases, what's the

22   breakdown between plaintiff and defendant?

23       A    I think there were two as a defendant and

24   one as a plaintiff.

25       Q    Do you have any current cases involving --

9

1 strike that.  Are you currently serving as an expert

2 in any cases involving the United States of America?

3     A    No.

4     Q    Dr. Halford, I'm going to ask you for an

5 approximate number.  What percentage of your current

6 income from your medical practice is derived from

7 serving as an expert witness?

8     A    Less than 1 percent.

9     Q    Dr. Halford, in the past five years, have

10 you been -- strike that.

11         During the past 10 years, have you ever

12 testified in court?

13     A    I believe so in one case.  I'd have to go

14 back and look.  There was a case in Kona.  I believe

15 it was in five years.

16     Q    So that was in state court in Kona?

17     A    Kurozawa versus the plaintiff.  Yeah, I was

18 for the defense.  I think that was about the four

19 years ago.

20     Q    And who was the defense, was it a hospital

21 or?

22     A    The physician Dr. Kurozawa.

23     Q    Dr. Kurozawa.  And --

24     A    And John Nishimoto was on the defense side,

25 and I was his expert witness.

10

1    Q    And you actually gave court testimony in

2  that case?

3    A    Yes.

4    Q    And was your testimony admitted as expert

5  testimony?

6    A    Yes.

7    Q    Did you ever testify in court and not have

8  your testimony admitted as expert testimony?

9    A    No.

10    Q    Dr. Halford, I earlier provided you with a

11  document which I have asked the court to list as

12  Exhibit 1.  This is a correspondence from you dated

13  May 25, 2005.  It's approximately three pages.  And

14  at the end of this document, it's your CV, your

15  curriculum vitae.  I would ask that you take a look

16  at this at this time.

17    A    Okay.

18    Q    And do you have any additions, corrections

19  or amendments to make to this document because I

20  realize that you produced it to us several years ago?

21    A    Yes.  Under recertification by the American

22  Board of Surgery, I was recertified again in 2006.

23    Q    Anything else?

24    A    And on the next page, there is nothing to

25  add.  On page 4 at the top it says chief of staff,

11

1  Queen's Medical Center from 2000-2004.  Since then, I

2  was chairman of the credentials committee for Queen's

3  Medical Center from 2004 until 2005, and I've been

4  chief of the department of surgery from 2005 until

5  the current time.  I'm still chief of surgery here.

6       Q    Just out of curiosity, Dr. Lim, he's the

7  chief of general surgery at Queen's Medical Center?

8       A    He's chief of the division of general

9  surgery.  So he's under me.  I'm the overall chief of

10 the whole department of surgery.

11      Q    So he just has one branch of the --

12      A    He's the general surgical branch.

13      Q    I'm sorry to interrupt.

14      A    He's no longer chief, but his term expired

15 about two months ago.

16      Q    Sorry to interrupt with any --

17      A    No problem.

18      Q    Is there anything else with regard to your

19 CV?

20      A    I think that's all.

21      Q    So in addition to these two publications,

22 have you published any other articles since then?

23      A    No.

24      Q    Dr. Halford, what are your current rates

25 that you charge as an expert?

12

1    A    For deposition or for everything?

2    Q    Yes, for everything.

3    A    I charge $300 an hour for review of records

4    and research being done in reviewing records for

5    preparation.  For a deposition or preparing a letter

6    for submission, I charge $350 an hour and for

7    deposition $500 an hour.

8    Q    And how much would you charge your client

9    for court testimony?

10    A    $500 an hour.

11    Q    Just out of curiosity, do you charge for,

12    for example, if we had your deposition at our office

13    today, would you have charged travel time?

14    A    Time away, yes.

15    Q    Okay.  I'm glad we're having it here.

16         Dr. Halford, I'm still referring to

17    Exhibit No. 1 and now I'm referring to your

18    correspondence May 25, 2005.

19    A    Okay.

20    Q    Do you see it's a three-page document dated

21    May 25, 2005 and it's signed by yourself, correct?

22    A    Correct.

23    Q    And this was prepared by you at the request

24    of Mr. Dubin, Mr. Milnes's attorney, correct?

25    A    Correct.

13

1      Q    Now, before we go into each subject matter,

2    you've listed six paragraphs in this letter, correct?

3      A    Yes.

4      Q    And I'm going to be asking you questions

5    about these six paragraphs.  But as we sit here

6    today, do you have any additional opinions outside of

7    the subject matter in these six paragraphs with

8    regard to your expert opinion?

9      A    State that again.

10      Q    Yes, do you have any expert opinions

11    outside of the subject matters of these six

12    paragraphs?

13      A    No, I don't, but I do have additional

14    comments to make that fall within the subject matter

15    of each of these paragraphs.

16      Q    I'm going to ask you about that now.

17      A    Okay.

18      Q    I just want to make sure there's nothing

19    outside of this.

20          Dr. Halford, now I'm going to ask you about

21    with regard to your expert letter.  With regard to

22    paragraph 1, the subject matter was whether

23    Mr. Milnes was provided with antibiotics prior to the

24    cholecystectomy, correct?

25      A    It revolves around that topic, yes.

14

1      Q    Now, maybe just so I'm not a medical

2    professional, would it be correct to refer to this

3    procedure as being a gallbladder removal or

4    gallbladder surgery?

5      A    Yes.

6      Q    Maybe I'll just refer to that.  It's easier

7    for me to pronounce.

8      A    Okay.

9      Q    Now, I think you earlier stated that you

10   reviewed the inpatient records from Tripler Army

11   Medical Center with regard to the gallbladder

12   surgery, correct?

13     A    Correct.  Not only inpatient but emergency

14   room, and there was a visit I think to the VA clinic

15   before admitted officially to the hospital.

16     Q    And in your review of these records, you

17   found no mention of antibiotics and more specifically

18   Zosyn being given to Mr. Milnes prior to his

19   gallbladder surgery?

20     A    Initially I did not.  But on further

21   perusal, there is a note in the progress notes about

22   a Zosyn dose being given.

23     Q    Okay.  And was that by Sanchez Martinez?

24     A    Yes.

25     Q    And since I have it here, why don't I ask

15

1   this to be labeled as Exhibit No. 2.

2                           (Exhibit No. 2 was marked for

3                              identification.)

4   BY MR. CHING:

5       Q    Dr. Halford, I just handed you a three-page

6   document.  This is Exhibit No. 2.  It's a two-page

7   declaration and a progress note dated June 15, 1999.

8       A    Correct.

9       Q    You had earlier mentioned that there was a

10  progress note indicating that Zosyn was provided to

11  Mr. Milnes prior to the June 15, 1999 gallbladder

12  surgery, correct?

13      A    Correct.

14      Q    Is this notation contained on the page that

15  we're referring to now in Exhibit No. 2?

16      A    Yes.

17      Q    And that would be the second of three

18  notations, correct?

19      A    I beg your pardon?

20      Q    I believe there's one at 6/15/99 at 0200.

21      A    Yes.

22      Q    And there's one at 15, June '99 at 1250 or

23  1256.  I'm looking at the left-hand corner.

24      A    Yes.

25      Q    And in that note it indicates that -- and

16

1    it looks like it's signed by Juan Sanchez Martinez

2    indicating that Zosyn was hung at 0920, correct?

3         A    Correct.

4         Q    Now, with regard to the word "hung", what

5    does that mean in medical terms?

6         A    It means it was hung up on the pole

7    adjacent to the bed to drip in through an IV device

8    into the patient.

9         Q    So based on this record or this record

10   entry, does this indicate Zosyn was to be provided to

11   Mr. Milnes prior to the June 15, 1999 gallbladder

12   surgery?

13        A    I don't know.

14        Q    But do you have any reason to dispute that

15   this record entry was incorrect?

16        A    Yes.

17        Q    And what's your basis for that?

18        A    A number of entries in the other

19   computerized portion of the record that says that

20   antibiotics weren't given or were discontinued.

21        Q    Did you see any entries that this specific

22   dosage was canceled or not given to Mr. Milnes?

23        A    State the question again.

24        Q    Did you review any documentation in the

25   Tripler Army Medical Center records that indicated

17

1   that the Zosyn hung by Juan Sanchez Martinez was

2   canceled?

3        A    Not so much that it was cancelled, but it

4   was never ordered in the computerized record.  So I

5   don't see any orders for it per se in the

6   computerized record, and then there's a lot of orders

7   that mention that Zosyn subsequently it was ordered

8   after that time frame was canceled which is

9   confusing; so that's why I say I'm not sure it was

10  really given or not.  There seems to be conflictual

11  items in the medical record about this.

12       Q    But there's nothing indicating there that

13  the Zosyn hung at 9:20 a.m. was cancelled or was

14  stopped?

15       A    Correct.

16       Q    Dr. Halford, and just because it's not in

17  the computer record does not indicate that it was not

18  given, correct?

19       A    Correct.

20       Q    Now, Dr. Halford I would like you to take a

21  look at Exhibit 2 to this declaration of Juan Sanchez

22  Martinez.  If you can just take a quick look at it

23  and when you're done, take a look up at me or

24  something.

25       A    Okay.

18

1    Q    In this declaration, isn't it correct that

2    Mr. Sanchez Martinez indicates that at 9:20 a.m. he

3    hung a bag of Zosyn and connected it to the line

4    leading in to Milnes's body?

5    A    Correct.

6    Q    Do you have any reason to dispute that this

7    did not occur?

8    A    No.

9    Q    And in fact, I'm sorry.  This may be a

10   stupid question but in fact, you weren't present at

11   Tripler Army Medical Center on June?

12   A    No.

13   Q    -- 15, 1999?

14   A    No.

15   Q    And if you'll just let me finish my

16   question, I'm sorry.

17        And based on your experience, which is

18   described in your CV, would a record not being in the

19   computer records indicate that something did not

20   happen?

21   A    It might.

22   Q    But you're -- I mean, you can't say

23   conclusively that it did not happen just because it's

24   not in the computer records?

25   A    I can't state conclusively, but I can tell

19

1   you the medical record should document that it,

2   indeed, was given somewhere in the medical records

3   and I never could find that except this handwritten

4   note, which is quite odd.

5       Q    Dr. Halford, do you have any other --

6   strike that.  With regard to paragraph 1 other than

7   what we discussed, do you have any other opinions

8   whether antibiotics were given or not?

9       A    Yes.  In fact, concerning this topic of

10  preoperative antibiotics, I believe even if he was

11  administered this dose at the time frame that was

12  stated, is still below the standard of care for a man

13  of his condition.  And my opinion it should have been

14  started immediately once he was admitted to the

15  hospital since that is the standard for treatment of

16  acute cholecystitis.

17      Q    Okay.  So with regard to that condition,

18  the standard of care is that upon admission to the

19  hospital, he should be given antibiotics?

20      A    Immediately.

21      Q    And what is your basis for that opinion?

22      A    The textbooks and the papers I'll give to

23  you, and I have two referenced here.

24      Q    Okay.  Maybe you can give to it the court

25  reporter and we'll have that labeled as Exhibits 3

20

1    and 4.

2                        (Exhibit No. 3 was marked for

3                          identification.)

4                        (Exhibit No. 4 was marked for

5                          identification.)

6                    THE WITNESS:  May I read from them?

7    BY MR. CHING:

8        Q    Yes.

9        A    So this first is from Cameron's textbook

10    which is a well-accepted standard of care text that

11    talks about the management of acute cholecystitis.

12    And under the paragraph entitled "management," it

13    says, "Once the diagnosis of acute cholecystitis is

14    favored by physical examination and confirmed by

15    radiographic assessment, the patient should be

16    hospitalized for further management.  Broad-spectrum

17    intravenous antibiotics -- rather broad-spectrum

18    intravenous antibiotic therapy should be initiated

19    immediately as 50 to 70 percent of these patients

20    will have positive bile or tissue cultures,"

21    et cetera.

22                    MR. DUBIN:  What page was that on?

23                    THE WITNESS:  This is on page 386.

24    BY MR. CHING:

25        Q    Now, Dr. Halford, with regard to --

21

1       A      And.

2       Q      Oh, I'm sorry.  I'm sorry.  Go ahead.  I

3  thought you were done.

4       A      And the other text I cited is from

5  Sabiston's textbook of surgery.  This is the 14th

6  edition concerning the same topic which is acute

7  cholecystitis.  And on page 1052 concerning treatment

8  it says, "Patient suspected of having acute

9  cholecystitis should be hospitalized.  Initial

10  management should include administration of an

11  antibiotic that is effective against the enteric

12  organisms found in bile," et cetera, et cetera.  And

13  I'll elucidate on this further concerning cultures.

14  So these two supporting documents are the basis for

15  my opinion.

16      Q      Okay.  With regard to that, are you saying

17  that the antibiotics should be administered as soon

18  as the X-rays or the CAT scans indicate that it's a

19  gallbladder issue or is it upon immediate admission

20  for this condition?

21      A      Isn't that the same thing.

22      Q      I'm sorry.  Let me rephrase that.  With

23  regard to if you're admitted to the hospital, but

24  they don't know your condition yet, are you saying

25  they should give the patient antibiotics immediately

22

1  or only upon confirming that that's the relevant

2  condition?

3      A    They should administer antibiotics

4  immediately.  Once you are suspect of this being the

5  diagnosis.

6      Q    Okay.  So as soon as they have -- as soon

7  as that's a potential diagnosis, they should provide

8  the antibiotics?

9      A    If that's your suspected diagnosis, yes.

10     Q    So in this case, what time do you opine

11 that the antibiotics should have been administered?

12     A    At least certainly 1:00 or 2:00 in the

13 morning.  I mean, he was in the emergency room in the

14 late afternoon.  The CT scan confirmed a thickened

15 gallbladder at that time.  So I can give a few hours

16 until he got to the hospital.  Preferentially you'd

17 want to give it in the emergency room before you move

18 him even into the hospital.  But on or about midnight

19 when he got to the floor, I would have assumed

20 antibiotics would have been started since the

21 diagnosis at that time was clearly acute

22 cholecystitis.

23     Q    And in your opinion, what antibiotics

24 should have been given at 1:00 or 2:00 in the

25 morning?

23

1      A      Zosyn is fine to start with.

2      Q      So you have no issue with regard to giving

3   Zosyn in the preoperative setting?

4      A      I have no issue with that.

5      Q      So your opinion today is that with regard

6   to paragraph 1, is that the breach was not giving

7   Mr. Milnes antibiotics?

8              MR. DUBIN:  I think that's three and

9   four.  You were marking them, I'm sorry.

10             MR. CHING:  Yes.

11             MR. DUBIN:  I think that's three and

12  four.

13  BY MR. CHING:

14     Q      So with regard to paragraph 1, your opinion

15  today is that the breach of a standard of care was

16  not giving Mr. Milnes the Zosyn earlier in the

17  proceedings?

18     A      I think it should have been started

19  immediately upon admission.  And furthermore, it

20  should have been redosed within an hour of cut time

21  for surgery which is the standard for prevention of

22  wound infection.  It appeared he may have got it

23  around 9:00.  Again, I'm unclear whether this really

24  did get administered.  But my issues concerning

25  antibiotics are, as you stated, should have been

24

1   started much sooner and redosed within an hour time

2   frame of surgery which is the current standard

3   accepted by everybody.

4       Q    So it should have been done, for example,

5   at -- it should have been done at 1:00 in the

6   morning, for example, and then one hour prior to the

7   surgery occurring?

8       A    Well, every six hours.  This is an every

9   six-hour dosing.  And usually you can give it less

10  than six hours just before surgery, provided it's not

11  given at 12:00 and then you're going to give it again

12  at 1:00 o'clock if surgery is, say, at 1:15.

13          It looked like he moved to the operating

14  room about 1:15, 1:30.  And again, there's the

15  confusing order by Dr. Lim to give Zosyn at

16  2:00 o'clock, which is during surgery and then that

17  order was canceled.  So again, that's too late

18  because the surgery had already started.  So my

19  issues are as I stated.

20      Q    So as a hypothetical, if he was admitted at

21  9:20 in the morning on the 15th and they immediately

22  give him the antibiotics and he was worked up and he

23  had surgery at 1:30 p.m., would that have been okay?

24      A    No, I would have redosed him again around

25  1:00 o'clock before the cut time starts, before the

25

1    skin actually gets incised.

2        Q    And with regard to your opinion, what

3    injury did this cause?

4        A    This allowed a wound infection to happen.

5        Q    And in your review of the records, did you

6    see any wound infections?

7        A    I didn't see any cultures.

8        Q    Did you see any evidence or any notations

9    of wound infections?

10       A    Well, yes, the wound fell apart and had

11   lousy healing and cultures were never seen; so we

12   never know if their antibiotics were proper or not,

13   but we'll get on to that later on.  But I think

14   largely his wound fell apart and continued to have

15   poor healing because of an infection that wasn't

16   recognized.

17       Q    I think that's No. 3 or No. 4.  With regard

18   to paragraph No. 1, are all your opinions made with

19   regard to a reasonable medical probability?

20       A    Yes.

21       Q    Let's move on to paragraph No. 2,

22   Dr. Halford.  Number 2?

23       A    Okay.

24       Q    And No. 2 is with regard to whether the

25   surgery was delayed and whether that breached the

26

1    standard of care, correct?

2         A    Yes.

3         Q    And what is the standard of care with

4    regard to gallbladder surgery and with regard to the

5    date of admission or the time of admission?

6         A    That wasn't my issue.  But to answer your

7    questions, it's within 48 to 72 hours is the accepted

8    standard.

9         Q    Okay.  So what exactly is your issue with

10   regard to paragraph 2?

11        A    My issue is that the medical records may

12   have been altered to reflect the date that really

13   wasn't true.  And if that was -- if this is and was

14   the case, this is, as I mentioned, an egregious

15   breach in care standards.

16        Q    Which medical records indicated that or

17   strike that.  Which medical records appear to be

18   breached or altered, I'm sorry?

19        A    The records from the patient himself, not

20   the records but his personal statement was pretty

21   convincing that he was absolutely convinced that

22   things were delayed by 24 hours or more due to

23   various and sundry things.  And then there's dates in

24   the records that mention surgery actually being done

25   on the 16th even though it was done on the 15th, I

27

1    think.  So I just raised this issue to be further

2    investigated.

3          And again, I'm not convinced this did

4    indeed happen and I qualified my statement in

5    paragraph 2.  But if we really go into depth and

6    search this thoroughly and it's found that records

7    were, indeed, changed, this is a serious breach in

8    standards and medical care.

9       Q    Do you have any evidence that the records

10   were, indeed, changed or altered?

11      A    No.

12      Q    Other than what the plaintiff told you and

13   references to the surgery occurring on June 16, do

14   you have any evidence or can you refer to any records

15   that indicate that the surgery did not take place on

16   June 15?

17              MR. DUBIN:  Let me make an objection.

18   The use of the word "evidence" is vague and

19   ambiguous.

20              MR. CHING:  I'll rephrase that.

21   BY MR. CHING:

22      Q    Did you review any records -- strike that.

23   Other than what plaintiff told you with regard to the

24   timing of the surgery, did you review any other

25   records that indicated that the surgery occurred on

28

1    June 16 or a date other than June 15?

2        A    There was a statement by yourself, I

3    believe, that said it took place on the 16th which

4    probably was a typo.

5        Q    Yes, it was a typo.  Is there anything

6    else?

7        A    The fact that the operative notes were

8    dictated on the 16th is odd.  Usually an operative

9    note is dictated immediately after surgery and all

10   the operative notes were actually dictated on the

11   16th, and you can see that in the dictated operative

12   notes.

13           There are entries also by caregivers that

14   surgery was done on the 19th in follow-up progress

15   notes in the record.  So again, it's fuzzy and it's

16   not conclusive, but it's not airtight either.

17       Q    So you're not testifying to a reasonable

18   medical probability that the surgery occurred on the

19   16th or 17th of June, correct?

20       A    State that again.

21       Q    Is it your testimony today that the surgery

22   did not occur on June 15, 1999?

23       A    Say that again.

24       Q    Are you testifying today that the surgery

25   did not occur on June 15?

29

1      A     No.

2      Q     And as you stated earlier -- and I'm sorry

3  for repeating -- is that the standard of care for

4  performing a gallbladder surgery is 48 to 72 hours

5  after admission?

6      A     Not after admission but after the onset of

7  symptoms.  And so if he had it on the 15th, I'm fine

8  with that.

9      Q     Okay.  Fine with it meaning that they --

10      A     Within the time frame.

11      Q     Meaning that if it happened on the 15th,

12  then the standard of care was complied with?

13      A     Yes.

14      Q     Thank you.  Let's move on to paragraph 3

15  now.

16      A     Okay.

17      Q     This is in with regard to the culture

18  reports and the infection that you're claiming

19  occurred, correct?

20      A     Yes.

21      Q     Now, with regard to the culture reports,

22  when are you -- strike that.  When should these

23  culture reports have been taken?

24      A     At the time of the operation.

25      Q     This was with regard to after the

30

1   gallbladder being removed?

2       A    Correct.

3       Q    And the culture -- oh, sorry.

4       A    The culture should have been taken in the

5   operating room of the gallbladder.

6       Q    And what is the reason for that?

7       A    To identify what bacteria you're dealing

8   with so you can adjust the antibiotics appropriately.

9       Q    And what organisms do you opine would not

10  be covered by Zosyn?

11      A    Zosyn doesn't cover all of Enterobacter,

12  pseudomonas, some of the E.coli's.  Those just come

13  to mind.

14      Q    Are there any more organisms not covered by

15  Zosyn?

16      A    Probably.  I'd have to pull out an ID text.

17      Q    Are there any other times in which cultures

18  should have been taken?

19      A    Yes, I think they should have been taken of

20  the wound debris certainly at the time of the first

21  dehiscence when it was noted by Dr. Sakaguchi.

22      Q    Now, with regard to Dr. Sakaguchi, that

23  would be on the 24th of June in the Tripler emergency

24  department, correct?

25      A    Yes.

31

1    Q    At that point, in your review of the

2  records, were there any indications of an infection

3  at that point?

4    A    Yes, the wound had fallen apart, and there

5  was a lot of drainage reported.

6    Q    So it's your testimony today that the

7  reason why the wound fell apart was because of the

8  infection?

9    A    I think infection played a significant

10  role.  As you experts say, it may have been also due

11  to smoking and perhaps lifting or coughing or moving

12  about.  But my opinion is that the infection played a

13  much larger role in those things.

14    Q    If you had to give an approximation as to

15  what caused the dehiscence percentage-wise, how would

16  you attribute it?  You know, like X-percent to the

17  infection, X-percent to the smoking?

18    A    60 percent infection; 20 percent smoking;

19  20 percent coughing due to his chronic lung problem

20  asthma and so forth.

21    Q    Dr. Halford, when you have patients who

22  have elective procedures, do you inform them to stop

23  smoking prior to the proceeding?

24    A    Yes.

25    Q    And how long do you tell them before the

32

1    procedure to stop smoking?

2        A    Depends how urgent the elective procedure

3    can wait.  But usually you'd like to get them off

4    smoking for weeks, if at all possible.

5        Q    And what is the reason to get them off

6    smoking?

7        A    It's associated with higher risk of

8    postoperative complications such as pneumonia,

9    pulmonary issues, wound healing.

10       Q    And dehiscence is one of the risks if you

11   smoke?

12       A    Yes.

13       Q    And after the operation is concluded, how

14   long do you tell them to stay off the smoking?

15       A    Forever if they're able to.  But most

16   people aren't able to comply with that.

17       Q    With regard to the culture reports, how

18   long would the culture take -- strike that.  How long

19   would it take for the culture report to come back?

20       A    Usually within one day, you'll have the

21   report of the organism and within two days the

22   sensitivities of the organism to, say, Zosyn in this

23   particular case.

24       Q    So the medical records with regard to

25   Dr. Sakaguchi's examination indicated that the wound

33

1   was infected?

2       A    They indicated the wound was dehisced.

3       Q    So just by being dehisced means it was

4   being infected?

5       A    No.  Dehiscence means the wound has opened

6   up, fallen apart.  And with a lot of drainage

7   preceding that and the surgery he had for an infected

8   gallbladder, my opinion is that this dehiscence was

9   more than likely caused by an infection that wasn't

10  treated properly rather than smoking or lifting

11  something.

12      Q    Now, what would be the symptoms of

13  infection, for example, would it be redness, foul

14  smelling, discharge?

15      A    It can be that or it can be just poor

16  healing and the wound falls apart.  Remember he was

17  on Zosyn all this time postoperatively, I think,

18  although my issues with all these orders being

19  canceled and so forth.  So Zosyn may just select out

20  some of the organisms and leave the others to

21  continue unabated so the wound doesn't always look as

22  bad as it otherwise would without any antibiotics.

23          So you don't see the smell and a lot of the

24  changes associated with infection all the time.  All

25  you see is a poorly healing wound that subsequently

34

1    falls apart prematurely.

2        Q    So you could have an infection without

3    having the symptoms that you earlier discussed, for

4    example, the --

5        A    The foul smelling.

6        Q    Yes.

7        A    And he did have some mild redness.  That

8    was described in the record, and he had a lot of

9    drainage reported before he came in to see Sakaguchi,

10   which is consistent with a collection of bacteria,

11   dead bacteria or live bacteria and white cells and so

12   forth.  So I don't think his findings were

13   inconsistent with an infection.

14       Q    Were there any other points in time in

15   which culture reports should have been taken?

16       A    Probably not.

17       Q    And what was the injury caused by the

18   failure to take these culture reports?

19       A    The injury was a dehisced wound which

20   resulted in readmission, prolonged hospitalization,

21   several subsequent operations, and a long

22   postoperative course requiring a wound vac and so

23   forth and an ugly scar and chronic pain now as a

24   result of this.

25       Q    And would you opine that some of these

35

1  injuries were also caused by the continuous smoking?

2      A    Again, a portion of it probably is due to

3  smoking, 20 percent perhaps in my opinion.

4      Q    And the remainder is with the infection?

5      A    I think largely it's still infection that

6  was the culprit here.

7      Q    So just to make it clear, the standard of

8  care in doing the gallbladder surgery is if the

9  gallbladder appears to be infected that you should

10  take a culture report of that gallbladder?

11      A    Yes, and it's cited in both of these texts

12  I mentioned No. 3 and No. 4.

13      Q    Can you point out which areas of the text?

14      A    In No. 3, the Cameron's textbook under

15  management it says antibiotic coverage should

16  continue at least 24 hours after surgical

17  intervention depending on the severity of

18  intraoperative findings, general patient condition,

19  and clinical evidence for sepsis or peritonitis.  As

20  soon as final culture results are available,

21  antibiotics should be adjusted appropriately.

22          And then the other paper or the other item

23  referenced as No. 2 which is Sabiston's textbook.  It

24  says at the bottom of the paragraph under treatment,

25  "Changes in the regimen" -- meaning antibiotics --

36

1    "may be indicated by the course of the patient and

2    the result of cultures of bile and gallbladder wall

3    taken at operation."  So that's why I stated what I

4    did.

5        Q    Doctor, I noticed in these two textbooks

6    you have areas that are highlighted that you referred

7    to?

8        A    Yes.

9        Q    You know, I think the problem is when we

10   get the copies, the highlights might not show up.

11   Can you just draw --

12             MR. DUBIN:  We can ask for colored

13   copies.

14             MR. CHING:  Okay.  Okay.  Okay.

15             THE WITNESS:  May I add something to

16   my testimony?

17   BY MR. CHING:

18       Q    Yes.

19       A    I think another thing that concerned me

20   concerning all this culture or lack of culturing was

21   the fact that he repeatedly was put on antibiotics by

22   the staff, an antibiotic powder was sprinkled in the

23   wound repeatedly.  So one would think that if you're

24   using antibiotics, you are using it for a reason

25   which is to kill bacteria.  So why not identify what

37

1  bacteria you're dealing with, which they never did.

2      Q    Correct me if I'm wrong, but wasn't the

3  antibiotic powder used in some of the surgical

4  procedures?

5      A    That's what I'm talking about.  They used

6  powder in the wound at the initial operation.  And

7  then during the repair of the dehiscence procedures,

8  antibiotics were given preoperatively and antibiotic

9  powder was thrown into the wound.  So presumably

10  you're suspecting infection or trying to treat

11  infection and yet no culture was then to verify if

12  you're using the correct antibiotic.

13      Q    Would antibiotic powder be used in surgical

14  procedures for preventative purposes?

15      A    If you're suspecting infection, yes.  If

16  you have a clean wound that's just falling apart from

17  smoking, I don't think an antibiotic is an essential

18  need.  If you have a dirty wound or you're having

19  bacteria that you're suspecting being present, then

20  yes, it's used to prevent further infection.

21          It just seems odd to me that they obviously

22  are concerned about infection or they wouldn't have

23  used all these antibiotics in the intravenous form

24  and in the topical powder form into the wound.

25      Q    So I mean, are you testifying today that

38

1    because they used antibiotic powder during these

2    procedures that there was, in fact, an infection?

3        A    Yes, or they were suspecting infection and

4    trying to eliminate it or minimize it.

5        Q    So you're not testifying that because they

6    used powder that, in fact, there was an infection?

7        A    I'm implying that.  That they are using

8    powder to treat infection that's presumably there or

9    in the region.  And yet no cultures were ever done,

10   which seems to fly in the face of what they were

11   trying to do for proper care of this patient.

12       Q    Okay.  We just discussed a bunch of

13   opinions with regard to paragraph 3.  Are all your

14   opinions made to a reasonable degree of medical

15   probability?

16       A    Yes.

17       Q    Doctor, can I just take a quick two-minute

18   break to use the restroom?

19       A    Sure.

20            (Recess from 10:54 a.m. to 10:59 a.m.)

21   BY MR. CHING:

22       Q    Dr. Halford, now I'm referring to

23   Exhibit No. 1, page No. 2, paragraph No. 4.  And in

24   this paragraph, you indicated that Mr. Milnes should

25   have been admitted on the 24th with the dehiscence of

39

1    that degree, correct?

2        A    Correct.

3        Q    What is the standard of care with regard to

4    that opinion?

5        A    I think the standard is if you have a major

6    dehiscence of a wound of this sort, you should return

7    the outpatient to the operating room to prepare the

8    dehiscence.

9        Q    Now, I believe that Dr. Lim stated that as

10   long as there's no signs of evisceration, that you

11   can treat that in an outpatient setting.  Do you

12   disagree with that?

13       A    I agree with that if it's a small

14   dehiscence, but this wound seemed to me to have a

15   major dehiscence of the whole anterior fascial layer.

16   So he lucked out and didn't eviscerate over the time

17   he was at home, but he well could have.

18       Q    And what is the basis for your opinion with

19   regard to the standard of care?

20       A    The basis I'll quote for backing up my

21   opinions from Principles of Surgery.  This is by

22   Schwartz is the editor.  I guess we'll label this No.

23   five.

24       Q    Five.

25                   (Exhibit No. 5 was marked for

40

1                   identification.)

2              THE WITNESS:  And this is a text,

3    again, that's well accepted, and I cited several

4    paragraphs under wound dehiscence and under treatment

5    or rather clinical manifestations.  It says, "With

6    the appearance of such fluid draining from the wound

7    and appearance of this drainage and the dehiscence,

8    the patient should be returned to the operating room

9    and the wound opened under sterile conditions.

10   Dehiscences may become manifest when skin sutures are

11   removed and evisceration of a bowel content occurs,"

12   which didn't occur in this situation obviously.

13              But I guess the reason I was concerned

14   about this was this was the whole anterior layer had

15   given way.  So the only thing holding him together is

16   a very thin posterior layer of fascia.  If that had

17   started to split, he, indeed, would have eviscerated.

18   And not only that, I think leaving the wound open for

19   that period of time until he got back to the hospital

20   the next day allowed colonization of bacteria to move

21   into the wound unless they were there already of

22   course.  And it just delayed the inevitable which was

23   a return to the operating room to have proper closure

24   done which he eventually did on the 26th of June.

25        Q    But in this case when Mr. Milnes presented

41

1    to the emergency department based on the medical

2    records, there's no evidence of evisceration,

3    correct?

4          A    Correct.

5          Q    And you don't disagree with Dr. Lim's

6    statement with regard to the standard of care in this

7    context?

8          A    I do disagree because this was a major

9    dehiscence, not a small minor dehiscence.  So if the

10   wound -- if there's a small dehiscence yes, you can

11   treat that as an outpatient.  But a major dehiscence

12   is something you need to act on ASAP.

13         Q    Okay.  How do you differentiate between a

14   major dehiscence and a minor dehiscence?

15         A    The whole layer being spread open versus

16   just say a centimeter or two.  And from the review of

17   the records, his whole anterior fascial layer had

18   split open which is a good six or eight inches of

19   separation of a major structure holding your wound

20   together.

21              Furthermore, it seems odd to me that they

22   were very perturbed when he left the hospital for a

23   few hours when he did get in; so if they were that

24   perturbed that he left for a few hours over concern

25   of the wound getting in more trouble, why didn't they

42

1   have that same concern when he had this diagnosed and

2   let him actually stay at home for some 12 hours

3   instead of just a mere two hours?  So this was not a

4   minor wound dehiscence which I think Dr. Lim's

5   comments that are pertinent to.

6        Q    And what was the injury caused by the

7   failure to not admit him as an inpatient on the 24th?

8        A    Further discomfort for the patient,

9   possible further bacterial colonization, which I

10   can't prove because no cultures were done, of course,

11   and just delay in him getting proper treatment for

12   some 48 hours.

13        Q    But he was admitted the subsequent day or

14   the next day, correct?

15        A    He was admitted the next day and then had

16   surgery the day after that.

17        Q    So in your opinion, by not admitting him on

18   the 24th just delayed his wound healing?

19        A    His contributed to, I think, an overall

20   delay in poor healing eventually.

21        Q    Other than what we discussed with regard to

22   Dr. Sakaguchi's failure to or failure to take a

23   culture and by not admitting him as an inpatient, do

24   you have any other opinions with regard to Dr.

25   Sakaguchi's care?

43

1    A    No.

2    Q    And with regard to our discussions with

3    regard to paragraph 4, are all your opinions made to

4    a reasonable medical probability?

5    A    Yes.

6    Q    I'm sorry to jump around, Dr. Halford, but

7    with regard to No. 1, you indicated that originally

8    you did not find any entry with regard to giving

9    antibiotics prior to surgery.  And then later on when

10    you looked at it, you realized that there was an

11    entry by Sanchez Martinez?

12    A    I didn't see a specific order for it in the

13    computerized record nor a computerized statement that

14    it had been given.  It's just a progress note which I

15    said was odd.

16    Q    Okay.  But when did you see the progress

17    note with regard -- was that during your initial

18    review?

19    A    I'm missing that one when I first reviewed

20    these records.  That's why I qualified that statement

21    at first.

22    Q    And do you recall when you saw that

23    statement, you know, when you reviewed the records

24    again?

25    A    After you pointed it out in your summary

44

1    judgment.

2         Q    Okay.  So I think that was last year,

3    Mr. Dubin, 2006, correct, somewhere around then?

4                   MR. DUBIN:  The papers were --

5                   THE WITNESS:  About a month ago.

6    BY MR. CHING:

7         Q    Oh, about a month ago you got them?

8         A    Right.

9         Q    Okay.

10        A    Correct.

11        Q    With regard to paragraph 5 now, that

12   discusses giving Dakin's solution or applying Dakin's

13   solution to Mr. Milnes's wound, correct?

14        A    Correct.

15        Q    And you stated that your review of the

16   medical records indicated that Mr. Milnes was

17   allergic to bleach?

18        A    Correct.

19        Q    Now, was that information based on

20   Mr. Milnes's statements or was it based on what other

21   doctors had diagnosed him with?

22        A    I don't remember.

23        Q    And you state in paragraph 5 that the

24   Dakin's solution resulted in an intense reaction and

25   further delayed his wound healing in addition to

45

1    other side effects, correct?

2        A    Yes.

3        Q    Now, with regard to wound healing, is it

4    your opinion today that the Dakin's solution

5    application delayed his wound healing?

6        A    Yes.

7        Q    And what is that based upon?

8        A    I'll cite a reference from American College

9    of Surgery, the ACS surgery text principles and

10   practice from 2006.  And this is paragraph cited

11   about basic surgical and perioperative

12   considerations.  And it mentions that there are a

13   number of solutions that should never -- and never is

14   a key word to remember -- should never be placed in a

15   wound or on a wound.  Half percent solution of sodium

16   hypochlorite Dakin's solution has been demonstrated

17   to be toxic to fibroblasts, to impair neutrophil

18   function and to slow epithelialization in open

19   wounds.

20           And that reference is another paper I'll

21   submit which talks about topical antimicrobial

22   toxicity which pretty much confirms that this is a

23   bad solution to put in a wound anyway let alone if

24   you're allergic to it, which is just a double whammy.

25   So this material impairs healing, delays healing,

46

1    more than helps, and it should not have been used.

2         Q    Now, what is Dakin's solution normally

3    usually used for?

4         A    It was used in World War I for killing

5    bacteria before antibiotics were invented.  So it's

6    used to kill bacteria in a wound, but the trade off

7    is it impairs healing.  It has toxic side effects to

8    the natural healing of a wound which includes this

9    thing called fibroblast migration and

10   epithelialization and neutrophil function which are

11   the white cells coming in to do their work.  So the

12   trade off is not worth using it.  And in fact, this

13   standard said it should never be put in a wound.

14        Q    Did you have the opportunity to review

15   Dr. Eron's report?

16        A    Yes.

17        Q    And it said that Dr. Eron opined that the

18   Dakin's solution did not affect wound healing?

19        A    Yes.

20        Q    And I assume you disagree with that

21   opinion?

22        A    I disagree with that opinion.

23        Q    Did you have an opportunity to review the

24   studies that he cited to?

25        A    I didn't review the study, but I saw it

47

1    when I read the title of it.  It didn't talk about

2    Dakins even being in that study; so I'm not sure

3    where he got that information.  I can tell you this

4    is like the Bible for surgery, this ACS surgery text.

5    And for them to say never put it in a wound, I've got

6    to believe it.

7                         (Exhibit No. 6 was marked for

8                           identification.)

9                         (Exhibit No. 7 was marked for

10                          identification.)

11   BY MR. CHING:

12       Q    Now, you also stated in your letter that

13   the Dakin's solution caused an intense reaction?

14       A    Yes.

15       Q    Now, what kind of reaction are you

16   referring to in your letter?

17       A    The patient said it was very painful, and

18   it burned when it was applied and they noticed

19   redness on the margins of the wound; so the solution,

20   you understand, is put into a wet dressing and then

21   that wet dressing touches not only the inside of the

22   wound, but the outside skin.  And it got -- it was

23   noted to be red at least from what I could read in

24   the records.

25       Q    And you said the patient indicated that

48

1   when they put the bleach on or the Dakin's solution

2   on, it burned?

3        A    I think so, yes.

4        Q    And did it indicate how long it took for it

5   to burn, was it immediate?

6        A    It was pretty much immediate which I would

7   expect since this is a toxic material anyway, and

8   he's allergic to it on top of that.

9        Q    And based on your records, does it indicate

10  that he applied this Dakin's solution to his wound

11  more than once?

12       A    It appeared it was ordered as part of his

13  wet to dry dressing three times a day.  So it

14  continued on for a number of days, I believe.

15       Q    So I think it started in the hospital,

16  correct?

17       A    Correct.

18       Q    And then it continued while he went home?

19       A    I think so.

20       Q    And I believe it ended when Dr. Sarango --

21       A    Changed it to the sodium chlorite.

22       Q    Yes.  Now, would this burning reaction have

23  any symptoms?  For example, redness in the skin,

24  irritation or anything?

25       A    Yes.  As mentioned, he did have redness of

49

1    the skin and the symptom of burning.  And I know that

2    your experts felt it was due to the tape, but I would

3    disagree and say it's due more to this than the tape

4    reaction.

5        Q    Did you review Dr. Eron's report with

6    regard to the timing of symptoms occurring?

7        A    Yes, being four to five days.

8        Q    And do you agree or disagree with that?

9        A    I disagree.  I would think if it's toxic

10    and you're reacting to it, you'll see an immediate

11    reaction since it's material the body is reacting to

12    immediately.

13        Q    Now, Doctor, when you have patients and

14    they apply topical solutions and it burns, do you

15    tell them to report it to you right away if

16    discomfort occurs?

17        A    If it's a major burning sensation, yes.  If

18    it was just minor from the sensitivity of the wound,

19    I could handle that.  But this isn't just a saline

20    dressing.  This is a solution that's quite toxic in

21    and of itself.

22        Q    So I believe in your letter you described

23    the reaction of being "intense," quote, end quote?

24        A    According to the patient, he noted it as

25    that.

50

1    Q    And there's nothing in the records

2   indicating that he reported, you know, this reaction

3   to his healthcare providers prior to meeting with

4   Dr. Sarango on July 6, correct?

5    A    I don't know.  I'd have to research that.

6   I don't remember seeing that.

7    Q    Do you agree or disagree with Dr. Eron's

8   opinion that the peak symptoms should have occurred

9   approximately on July 10 or July 11 with regard to

10  the Dakin's solution?

11   A    I disagree.

12   Q    And your basis for that is?

13   A    It's a toxic material that he's allergic

14  to, and you're going to get an immediate reaction

15  when it touches tissue that's vulnerable.

16   Q    Dr. Halford, with regard to paragraph 5,

17  are your opinions made to a reasonable medical

18  probability?

19   A    Yes.

20   Q    Now, Dr. Halford, did Mr. Milnes's weight

21  also affect the ability of his wound to heal?

22   A    Probably.

23   Q    I realize, and I don't know if you reviewed

24  Dr. Lim's report, but it mentioned that based on some

25  type of scale that he was obese?

1      A     Yes.

2      Q     And then that would affect the ability for

3  a scar to heal?

4      A     Yes.

5      Q     Do you agree or disagree with that?

6      A     I agree.

7      Q     Would that also be a cause for -- strike

8  that.  Would his obesity also be a cause of the

9  inability of the scar to -- strike that.

10           Would his obesity also be a cause of a

11  failure of his wound to heal?

12              MR. DUBIN:  Objection.  Vague and

13  ambiguous.

14              THE WITNESS:  I think it was a minor

15  contributing factor.  I might mention from this,

16  since you brought up the subject of healing again,

17  from this article No. 5 Principles of Surgery by

18  Schwartz under dehiscence, they state many patient

19  characteristics may contribute to a fascial

20  dehiscence, but generally it's caused by technical

21  factors that means the way they sewed it together.

22              Patient characteristics that

23  contribute to fascial dehiscence should sensitize the

24  surgeon to take precautions using mass closure or

25  anterior fascial retention sutures, which may not

52

1   prevent dehiscence but may prevent evisceration.

2                    Malnutrition, low protein levels,

3   morbid obesity, malignancy, uremia, diabetes,

4   coughing and infection are contributory factors.  And

5   then in the next paragraph they say local factors

6   increase wound disruption include hemorrhage,

7   infection, excessive suture material and poor

8   technique.

9                    So I just mentioned all these things

10  because there's a myriad of factors that cause a

11  wound to fall apart.  And it's still my opinion

12  infection played a major role here and the minor ones

13  were his size, his coughing, his smoking.

14       Q    But you said his smoking was about

15  20 percent, correct?

16       A    I would guess it's 20 percent.

17       Q    So then that's not minor?

18       A    Well, it's 20 percent, but it's not

19  100 percent like they imply.

20       Q    Yeah.  With regard to his obesity, if you

21  have to give a percentage to it with regard to the

22  failure of the wound to heal, what number would you

23  give?

24       A    I already used up 100 percent.

25       Q    Yes.  I mean, do you want to revise that?

53

 1      A    Probably.  He wasn't morbidly obese.  He

 2   was probably 30 pounds, 40 pounds overweight; so I'd

 3   say probably about 5 percent.

 4      Q    Maybe at the end of this deposition we'll

 5   just do the math over again.

 6      A    Okay.

 7      Q    I was going to ask you about a few more

 8   things.  There's indications in the medical records

 9   that he may have been driving during that period.

10   You know, after his surgery.

11      A    Yes.

12      Q    Do you usually recommend that somebody who

13   undergoes this type of surgery not drive after?

14      A    I actually don't.  I let them drive after

15   they're out of the hospital if it's not uncomfortable

16   even with a right subcostal incision.  If they're

17   comfortable getting in and out of a car and they have

18   automatic transmission, they don't use a clutch and

19   they're comfortable, I don't keep them driving for

20   several weeks.

21      Q    There's also indications in the records

22   that Mr. Milnes may have been carrying heavy objects?

23      A    Correct.

24      Q    Now, do you usually, you know, warn your

25   patients who undergo this type of procedure not to

54

1    carry heavy objects?

2        A    Yes.  I usually say don't lift more than 25

3    pounds or if you're going to have to do that, use

4    your legs rather than your abdominal muscles to do

5    the lift.

6        Q    And the reason for that is?

7        A    You put undue stress on the incision.

8        Q    I'm just kind of wrapping up now.  If you

9    had to -- now, I'm going to ask you to do some new

10   math now to allocate the delay in the wound healing.

11   I know we discussed some numerous factors, you know,

12   between the infection, the coughing, the smoking and

13   the obesity.  How would you allocate the percentages?

14       A    Excuse me while I write these down.

15   Infection, smoking, weight, coughing.  What else did

16   we mention?  Technique, suture material?

17       Q    Yeah, technique, suture material.

18       A    I'd say infection, 60 percent; smoking,

19   20 percent; weight, 10 percent; coughing, 5 percent;

20   technique, 5 percent.

21            MR. CHING:  Dr. Halford, I have no

22   further questions at this time.

23            MR. DUBIN:  Can you look at No. 6?  We

24   didn't cover No. 6.

25            MR. CHING:  Oh, okay.  I'll go back

55

1 and cover No. 6.  I thought I covered -- I thought we

2 did cover that with regard to, you know, heavy

3 lifting and if it was true, you know.

4 BY MR. CHING:

5     Q   Let's go to paragraph No. 6.  In there you

6 made mention of the records of the Tripler Army

7 Medical Center indicated that he lifted a TV set

8 weighing 60 pounds.  And isn't it correct,

9 Dr. Halford, that Mr. Milnes denied lifting anything

10 that heavy?

11     A   Yes.

12     Q   Okay.  And then you indicate that by

13 fabricating this, the shift blame, this is a breach

14 of medical and ethical care standards?

15     A   Yes.

16     Q   And what's the standard of care or the

17 standard you're referring to?

18     A   Just to be honest.

19     Q   And did that affect his wound healing?

20     A   No.

21     Q   And then your last sentence, it's hard for

22 you to believe that someone could lift over 25 pounds

23 in the first two weeks after a major abdominal

24 incision.  Is that still your opinion?

25     A   I would think that it would hurt so bad,

56

1    you wouldn't be able to do it anyway.

2         Q    And if this was true, I guess if somebody

3    wanted to lift that much weight, you would tell them

4    to use their legs, I guess?

5         A    If you're going to lift 20 pounds or more,

6    I don't think anyone could lift 60 pounds without

7    having major discomfort even with just doing a leg

8    lift.

9         Q    Okay.  But if you have evidence that the

10   healthcare provider who made reference to Mr. Milnes

11   lifting this amount of weight is being dishonest?

12        A    Correct.

13        Q    And was it Dr. Sarango who made that

14   statement, I believe?

15        A    I don't recall.

16        Q    Okay.

17        A    It was somewhere in the medical record.  I

18   don't know who in particular said it.

19        Q    So you don't have any opinions with regard

20   to the person who made the statement whether he's

21   honest or dishonest in general?

22        A    No, I don't.

23        Q    Okay.

24                        EXAMINATION

25   BY MR. DUBIN:

57

1    Q    Let me just go to these percentages.  These

2    are percentages based on what?

3    A    My educated opinion.

4    Q    To what extent is it based on, the record

5    or your general view assuming that there was smoking,

6    for example?

7    A    State that again.

8    Q    Well, these are what, probabilities?

9    A    These are percentages of likelihood.  These

10   various things contributed to this wound falling

11   apart, and I think it's still more probable than not

12   the major contributor was infection.  And then the

13   others follow in the order of importance.  I think

14   smoking did play a role, but not a major role and

15   certainly his weight and his coughing and the way

16   they closed it with their technique.

17   Q    Well, let's say if someone had smoked and

18   they were 30 or 40 pounds overweight and they were

19   coughing, would that have caused the problem we had

20   here without infection?

21   A    Sure.  I mean, if you were operating on a

22   clean organ with no infection and this happened, then

23   the cause of the dehiscence would be totally those

24   reasons and the infection wouldn't have been a role

25   at all.

58

1      Q    But could smoking cause the problem?

2      A    In and of itself?

3      Q    In and of itself?

4      A    Just the wound dehiscence?

5      Q    Yes.

6      A    No, I think it's got to be combined with

7  some other factors smoking plus coughing, distension,

8  technique of suture use.

9      Q    Now, could infection cause the problem

10  itself without the other factors?

11     A    Yes.

12              MR. DUBIN:  Okay.  Thank you.

13                  FURTHER EXAMINATION

14  BY MR. CHING:

15     Q    Just one last question.  Are you making any

16  opinions today that Tripler Army Medical Center was

17  negligent with regard to or strike that.

18              Are you making any opinions that the

19  standard of care was breached with regard to the

20  suture used at Tripler Army Medical Center?

21     A    No, I'm just giving technique a percentage

22  point because it's mentioned in the cite -- the paper

23  I cited as being one of the major reasons for

24  dehiscence occurring.

25              MR. CHING:  Okay.

59

1                    MR. DUBIN:  Wouldn't that bring you to

2   101 percent?

3                    THE WITNESS:  No, it's 100.

4                    MR. CHING:  We're all done.  Mr.

5   Dubin?

6                    MR. DUBIN:  That's all.  Thank you.

7              (Deposition concluded at 11:27 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

60

1        I, PETER A. HALFORD, M.D., do hereby

2   certify that I have read the foregoing pages 1

3   through 59, inclusive, and corrections, if any, were

4   noted by me; and that same is now a true and correct

5   transcript of my testimony.

6             DATED:  Honolulu, Hawaii,_____.

7

8

9        _____.
                    PETER A. HALFORD, M.D.

10

11

12  Signed before me this _____

13  day of _____, 2007.

14

15  _____

16

17

18

19

20

21

22

23  Case:  KEVIN MILNES  vs.  UNITED STATES OF AMERICA
    Civil No.:  02-00365 BMK
24  Deposition Dated:  June 19, 2007
    Taken By:  Myrla R. Romero
25  JUN 2 7 2007

61

                    C E R T I F I C A T E

STATE OF HAWAII              )
                             )  SS:
CITY AND COUNTY OF HONOLULU  )

          I, MYRLA R. ROMERO, Notary Public, State of

Hawaii, do hereby certify:

          That on Tuesday, June 19, 2007, at

10:09 a.m., appeared before me PETER A. HALFORD,

M.D., the witness whose deposition is contained

herein; that prior to being examined he was by me

duly sworn;

          That the deposition was taken down by me in

machine shorthand and was thereafter reduced to

typewriting under my supervision; that the foregoing

represents, to the best of my ability, a true and

correct transcript of the proceedings had in the

foregoing matter.

          I further certify that I am not an attorney

for any of the parties hereto, nor in any way

concerned with the cause.

          DATED this 26th day of June, 2007, in

Honolulu, Hawaii.

                    _____
                    MYRLA R. ROMERO, CSR NO. 397
                    Notary Public, State of Hawaii
                    My Commission Exp:  1-27-20091