# EXHIBIT "A"

1

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF HAWAII

3

4    KEVIN MILNES,                ) CIVIL NO. 02-00365 BMK
                                  )
5                   Plaintiff,    )
                                  )
6        vs.                      )
                                  )
7    UNITED STATES OF AMERICA,    )
                                  )
8                   Defendant.    )
     _____)
9

10

11           DEPOSITION OF PETER A. HALFORD, M.D.

12   Taken on behalf of the Defendants UNITED STATES OF

13   AMERICA, at the medical offices of Peter A. Halford,

14   M.D., Queen's Medical Center, Physicians' Office

15   Building II, 1329 Lusitana Street, Suite 706, Honolulu,

16   Hawaii 96813, commencing at 10:09 a.m., on Tuesday, June

17   19, 2007 pursuant to Notice.

18

19           BEFORE:  MYRLA R. ROMERO, CSR No. 397

20           Notary Public, State of Hawaii

21

22

23

24

25

2

1  APPEARANCES:

2      For Plaintiff KEVIN MILNES:

3          GARY VICTOR DUBIN, ESQ.
           Dubin Law Offices
4          55 Merchant Street, Suite 3100
           Honolulu, Hawaii 96813
5

6

7      For Defendant UNITED STATES OF AMERICA:

8          EDRIC M. CHING, ESQ.
           Assistant U.S. Attorney
9          PJKK Federal Building, Room 6-100
           300 Ala Moana Boulevard
10         Honolulu, Hawaii 96850

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                          I N D E X

2

3    EXAMINATION BY:                                    PAGE

4         MR. CHING.................................4

5         MR. DUBIN................................57

6         MR. CHING................................58

7

8    EXHIBITS MARKED FOR IDENTIFICATION             PAGE

9    1              Opinions of Peter A. Halford,      4
                    M.D., May 25, 2005
10
     2              Declaration of Juan J.            15
11                  Sanchez-Martinez

12   3              Excerpts from Current Surgical    20
                    Therapy, 8th Edition
13
     4              Excerpts from Fourteenth          20
14                  Edition textbook of surgery

15   5              Excerpts from Principles of       40
                    Surgery
16
     6              Excerpts from American College    47
17                  of Surgeons

18   7              Paper regarding topical           47
                    antimicrobial toxicity
19

20

21

22

23

24

25

4

1          (Disclosure presented to all counsel.)

2                    (Exhibit No. 1 was marked for

3                        identification.)

4          PETER A. HALFORD, M.D.,

5    called as a witness by and on behalf of the Defendant,

6    having been first duly sworn to tell the truth, the

7    whole truth and nothing but the truth, was examined and

8    testified as follows:

9                         EXAMINATION

10   BY MR. CHING:

11        Q     Good morning, Dr. Halford.  Can you please

12   state your name.

13        A     My name is Peter Halford.

14        Q     And your business address?

15        A     1329 Lusitana Street, Suite 706, Honolulu,

16   96813.

17        Q     Dr. Halford, I'm assuming that you have

18   been deposed before.  But just before we start today,

19   I'd like to go over some ground rules with regard to

20   this deposition to make it a little bit more clear

21   for both sides.

22              Dr. Halford, you understand today that

23   you're testifying under oath?

24        A     Yes.

25        Q     And you understand that your testimony

5

1   today under oath is the same as if you were

2   testifying in a court of law before a judge?

3       A    Yes.

4       Q    And you also understand that all the

5   questions and answers are being taken down by the

6   court reporter who's sitting to my right?

7       A    Yes.

8       Q    And you understand that at the conclusion

9   of this deposition, she will prepare a transcript.

10  Do you understand that?

11      A    Yes.

12      Q    And you understand that you will have the

13  opportunity to make changes to this transcript?

14      A    Yes.

15      Q    And you understand that if you do make

16  changes to the transcript that I will have the

17  opportunity to comment on those changes and

18  corrections?

19      A    Yes.

20      Q    Now, Dr. Halford, I know I speak a little

21  fast.  But at times today I may ask a question and

22  you may not understand me or understand the question.

23  And if you do not understand, can you please inform

24  me and I'll either rephrase or repeat the question.

25      A    Yes.

6

1      Q      Dr. Halford, today I may ask you questions

2  in which I assume some facts.  If I misstate anything

3  or if I misstate any facts in my questions, can you

4  please tell me and we can try to clear that up?

5      A      Yes.

6      Q      You're doing a very good job, Dr. Halford,

7  in answering verbally yes or no.  I would request

8  that you avoid giving responses such as shaking your

9  head up and down or giving answers like uh-huh or

10  uh-uh.  Do you understand that?

11      A      Yes.

12      Q      Dr. Halford, I will try to give you this

13  courtesy, but I think it's good for the court

14  reporter if only one of us speaks at a time.  So that

15  she can take down a good transcript.

16      A      Okay.

17      Q      And is there any reason why you would not

18  be able to testify accurately and truthfully at

19  today's deposition?

20      A      No.

21      Q      Dr. Halford, what documents did you review

22  in preparation for today's deposition?

23      A      I reviewed my letter.  I reviewed the

24  medical records furnished to me concerning the care

25  rendered to Mr. Milnes.  I reviewed your expert

7

1    letters submitted as well as the documents for and

2    against the summary judgment thing.

3        Q    Okay.  Just to be clarify.  When you say

4    the expert letters, that's the two letters written by

5    Dr. Lim and the one that are written by Dr. Erron?

6        A    Yes.

7        Q    And when you say the documents attached to

8    the summary judgment motion, that would be in the

9    form of declarations and exhibits?

10       A    Correct.

11       Q    And you reviewed documents submitted on

12   behalf of my client the United States of America,

13   correct?

14       A    Correct.

15       Q    And you also reviewed documents submitted

16   to the court submitted by Mr. Dubin on behalf of his

17   client Mr. Milnes?

18       A    Correct.

19       Q    Did you review any other documents?

20       A    A number of textbooks to back up my

21   testimony.

22       Q    Okay.  I'll be asking you about that later.

23       A    Okay.

24       Q    Dr. Halford, did you have any discussions

25   with Mr. Dubin in the past 12 months regarding this

8

1    case?

2         A    Yes.

3         Q    And what did you discuss?

4         A    He talked to me a week or two ago to let me

5    know that we're going to have this deposition today

6    and that he would forward some documents to me to

7    review, which are the ones I just mentioned, to me.

8    And we met for about a half an hour earlier this

9    morning to go over what to expect today.

10        Q    And you just discussed the opinions that

11   you're going to render in this case?

12        A    Correct, yes.

13        Q    Dr. Halford, at the current time or strike

14   that.  In the past five years, how many cases have

15   you served as an expert witness approximately?

16        A    Approximately three.

17        Q    And were those cases detailed in the

18   correspondence in which you provided to Mr. Dubin

19   last year, I believe?

20        A    Yes.

21        Q    And of those three cases, what's the

22   breakdown between plaintiff and defendant?

23        A    I think there were two as a defendant and

24   one as a plaintiff.

25        Q    Do you have any current cases involving --

9

1    strike that.  Are you currently serving as an expert

2    in any cases involving the United States of America?

3         A    No.

4         Q    Dr. Halford, I'm going to ask you for an

5    approximate number.  What percentage of your current

6    income from your medical practice is derived from

7    serving as an expert witness?

8         A    Less than 1 percent.

9         Q    Dr. Halford, in the past five years, have

10   you been -- strike that.

11            During the past 10 years, have you ever

12   testified in court?

13        A    I believe so in one case.  I'd have to go

14   back and look.  There was a case in Kona.  I believe

15   it was in five years.

16        Q    So that was in state court in Kona?

17        A    Kurozawa versus the plaintiff.  Yeah, I was

18   for the defense.  I think that was about the four

19   years ago.

20        Q    And who was the defense, was it a hospital

21   or?

22        A    The physician Dr. Kurozawa.

23        Q    Dr. Kurozawa.  And --

24        A    And John Nishimoto was on the defense side,

25   and I was his expert witness.

10

1    Q    And you actually gave court testimony in

2    that case?

3    A    Yes.

4    Q    And was your testimony admitted as expert

5    testimony?

6    A    Yes.

7    Q    Did you ever testify in court and not have

8    your testimony admitted as expert testimony?

9    A    No.

10    Q    Dr. Halford, I earlier provided you with a

11    document which I have asked the court to list as

12    Exhibit 1.  This is a correspondence from you dated

13    May 25, 2005.  It's approximately three pages.  And

14    at the end of this document, it's your CV, your

15    curriculum vitae.  I would ask that you take a look

16    at this at this time.

17    A    Okay.

18    Q    And do you have any additions, corrections

19    or amendments to make to this document because I

20    realize that you produced it to us several years ago?

21    A    Yes.  Under recertification by the American

22    Board of Surgery, I was recertified again in 2006.

23    Q    Anything else?

24    A    And on the next page, there is nothing to

25    add.  On page 4 at the top it says chief of staff,

11

1   Queen's Medical Center from 2000-2004.  Since then, I

2   was chairman of the credentials committee for Queen's

3   Medical Center from 2004 until 2005, and I've been

4   chief of the department of surgery from 2005 until

5   the current time.  I'm still chief of surgery here.

6       Q    Just out of curiosity, Dr. Lim, he's the

7   chief of general surgery at Queen's Medical Center?

8       A    He's chief of the division of general

9   surgery.  So he's under me.  I'm the overall chief of

10  the whole department of surgery.

11      Q    So he just has one branch of the --

12      A    He's the general surgical branch.

13      Q    I'm sorry to interrupt.

14      A    He's no longer chief, but his term expired

15  about two months ago.

16      Q    Sorry to interrupt with any --

17      A    No problem.

18      Q    Is there anything else with regard to your

19  CV?

20      A    I think that's all.

21      Q    So in addition to these two publications,

22  have you published any other articles since then?

23      A    No.

24      Q    Dr. Halford, what are your current rates

25  that you charge as an expert?

12

1    A    For deposition or for everything?

2    Q    Yes, for everything.

3    A    I charge $300 an hour for review of records

4  and research being done in reviewing records for

5  preparation.  For a deposition or preparing a letter

6  for submission, I charge $350 an hour and for

7  deposition $500 an hour.

8    Q    And how much would you charge your client

9  for court testimony?

10    A    $500 an hour.

11    Q    Just out of curiosity, do you charge for,

12  for example, if we had your deposition at our office

13  today, would you have charged travel time?

14    A    Time away, yes.

15    Q    Okay.  I'm glad we're having it here.

16        Dr. Halford, I'm still referring to

17  Exhibit No. 1 and now I'm referring to your

18  correspondence May 25, 2005.

19    A    Okay.

20    Q    Do you see it's a three-page document dated

21  May 25, 2005 and it's signed by yourself, correct?

22    A    Correct.

23    Q    And this was prepared by you at the request

24  of Mr. Dubin, Mr. Milnes's attorney, correct?

25    A    Correct.

13

1      Q    Now, before we go into each subject matter,

2  you've listed six paragraphs in this letter, correct?

3      A    Yes.

4      Q    And I'm going to be asking you questions

5  about these six paragraphs.  But as we sit here

6  today, do you have any additional opinions outside of

7  the subject matter in these six paragraphs with

8  regard to your expert opinion?

9      A    State that again.

10     Q    Yes, do you have any expert opinions

11  outside of the subject matters of these six

12  paragraphs?

13     A    No, I don't, but I do have additional

14  comments to make that fall within the subject matter

15  of each of these paragraphs.

16     Q    I'm going to ask you about that now.

17     A    Okay.

18     Q    I just want to make sure there's nothing

19  outside of this.

20          Dr. Halford, now I'm going to ask you about

21  with regard to your expert letter.  With regard to

22  paragraph 1, the subject matter was whether

23  Mr. Milnes was provided with antibiotics prior to the

24  cholecystectomy, correct?

25     A    It revolves around that topic, yes.

14

1     Q     Now, maybe just so I'm not a medical

2  professional, would it be correct to refer to this

3  procedure as being a gallbladder removal or

4  gallbladder surgery?

5     A     Yes.

6     Q     Maybe I'll just refer to that.  It's easier

7  for me to pronounce.

8     A     Okay.

9     Q     Now, I think you earlier stated that you

10  reviewed the inpatient records from Tripler Army

11  Medical Center with regard to the gallbladder

12  surgery, correct?

13     A     Correct.  Not only inpatient but emergency

14  room, and there was a visit I think to the VA clinic

15  before admitted officially to the hospital.

16     Q     And in your review of these records, you

17  found no mention of antibiotics and more specifically

18  Zosyn being given to Mr. Milnes prior to his

19  gallbladder surgery?

20     A     Initially I did not.  But on further

21  perusal, there is a note in the progress notes about

22  a Zosyn dose being given.

23     Q     Okay.  And was that by Sanchez Martinez?

24     A     Yes.

25     Q     And since I have it here, why don't I ask

15

1   this to be labeled as Exhibit No. 2.

2                           (Exhibit No. 2 was marked for

3                                identification.)

4   BY MR. CHING:

5        Q    Dr. Halford, I just handed you a three-page

6   document.  This is Exhibit No. 2.  It's a two-page

7   declaration and a progress note dated June 15, 1999.

8        A    Correct.

9        Q    You had earlier mentioned that there was a

10  progress note indicating that Zosyn was provided to

11  Mr. Milnes prior to the June 15, 1999 gallbladder

12  surgery, correct?

13       A    Correct.

14       Q    Is this notation contained on the page that

15  we're referring to now in Exhibit No. 2?

16       A    Yes.

17       Q    And that would be the second of three

18  notations, correct?

19       A    I beg your pardon?

20       Q    I believe there's one at 6/15/99 at 0200.

21       A    Yes.

22       Q    And there's one at 15, June '99 at 1250 or

23  1256.  I'm looking at the left-hand corner.

24       A    Yes.

25       Q    And in that note it indicates that -- and

16

1    it looks like it's signed by Juan Sanchez Martinez

2    indicating that Zosyn was hung at 0920, correct?

3          A     Correct.

4          Q     Now, with regard to the word "hung", what

5    does that mean in medical terms?

6          A     It means it was hung up on the pole

7    adjacent to the bed to drip in through an IV device

8    into the patient.

9          Q     So based on this record or this record

10   entry, does this indicate Zosyn was to be provided to

11   Mr. Milnes prior to the June 15, 1999 gallbladder

12   surgery?

13         A     I don't know.

14         Q     But do you have any reason to dispute that

15   this record entry was incorrect?

16         A     Yes.

17         Q     And what's your basis for that?

18         A     A number of entries in the other

19   computerized portion of the record that says that

20   antibiotics weren't given or were discontinued.

21         Q     Did you see any entries that this specific

22   dosage was canceled or not given to Mr. Milnes?

23         A     State the question again.

24         Q     Did you review any documentation in the

25   Tripler Army Medical Center records that indicated

17

1    that the Zosyn hung by Juan Sanchez Martinez was

2    canceled?

3        A    Not so much that it was cancelled, but it

4    was never ordered in the computerized record.  So I

5    don't see any orders for it per se in the

6    computerized record, and then there's a lot of orders

7    that mention that Zosyn subsequently it was ordered

8    after that time frame was canceled which is

9    confusing; so that's why I say I'm not sure it was

10   really given or not.  There seems to be conflictual

11   items in the medical record about this.

12       Q    But there's nothing indicating there that

13   the Zosyn hung at 9:20 a.m. was cancelled or was

14   stopped?

15       A    Correct.

16       Q    Dr. Halford, and just because it's not in

17   the computer record does not indicate that it was not

18   given, correct?

19       A    Correct.

20       Q    Now, Dr. Halford I would like you to take a

21   look at Exhibit 2 to this declaration of Juan Sanchez

22   Martinez.  If you can just take a quick look at it

23   and when you're done, take a look up at me or

24   something.

25       A    Okay.

18

1    Q    In this declaration, isn't it correct that

2    Mr. Sanchez Martinez indicates that at 9:20 a.m. he

3    hung a bag of Zosyn and connected it to the line

4    leading in to Milnes's body?

5    A    Correct.

6    Q    Do you have any reason to dispute that this

7    did not occur?

8    A    No.

9    Q    And in fact, I'm sorry.  This may be a

10    stupid question but in fact, you weren't present at

11    Tripler Army Medical Center on June?

12    A    No.

13    Q    -- 15, 1999?

14    A    No.

15    Q    And if you'll just let me finish my

16    question, I'm sorry.

17         And based on your experience, which is

18    described in your CV, would a record not being in the

19    computer records indicate that something did not

20    happen?

21    A    It might.

22    Q    But you're -- I mean, you can't say

23    conclusively that it did not happen just because it's

24    not in the computer records?

25    A    I can't state conclusively, but I can tell

19

1   you the medical record should document that it,

2   indeed, was given somewhere in the medical records

3   and I never could find that except this handwritten

4   note, which is quite odd.

5        Q    Dr. Halford, do you have any other --

6   strike that.  With regard to paragraph 1 other than

7   what we discussed, do you have any other opinions

8   whether antibiotics were given or not?

9        A    Yes.  In fact, concerning this topic of

10  preoperative antibiotics, I believe even if he was

11  administered this dose at the time frame that was

12  stated, is still below the standard of care for a man

13  of his condition.  And my opinion it should have been

14  started immediately once he was admitted to the

15  hospital since that is the standard for treatment of

16  acute cholecystitis.

17       Q    Okay.  So with regard to that condition,

18  the standard of care is that upon admission to the

19  hospital, he should be given antibiotics?

20       A    Immediately.

21       Q    And what is your basis for that opinion?

22       A    The textbooks and the papers I'll give to

23  you, and I have two referenced here.

24       Q    Okay.  Maybe you can give to it the court

25  reporter and we'll have that labeled as Exhibits 3

20

1    and 4.

2                              (Exhibit No. 3 was marked for

3                              identification.)

4                              (Exhibit No. 4 was marked for

5                              identification.)

6                    THE WITNESS:  May I read from them?

7    BY MR. CHING:

8        Q    Yes.

9        A    So this first is from Cameron's textbook

10   which is a well-accepted standard of care text that

11   talks about the management of acute cholecystitis.

12   And under the paragraph entitled "management," it

13   says, "Once the diagnosis of acute cholecystitis is

14   favored by physical examination and confirmed by

15   radiographic assessment, the patient should be

16   hospitalized for further management.  Broad-spectrum

17   intravenous antibiotics -- rather broad-spectrum

18   intravenous antibiotic therapy should be initiated

19   immediately as 50 to 70 percent of these patients

20   will have positive bile or tissue cultures,"

21   et cetera.

22                    MR. DUBIN:  What page was that on?

23                    THE WITNESS:  This is on page 386.

24   BY MR. CHING:

25       Q    Now, Dr. Halford, with regard to --

21

1      A      And.

2      Q      Oh, I'm sorry.  I'm sorry.  Go ahead.  I

3   thought you were done.

4      A      And the other text I cited is from

5   Sabiston's textbook of surgery.  This is the 14th

6   edition concerning the same topic which is acute

7   cholecystitis.  And on page 1052 concerning treatment

8   it says, "Patient suspected of having acute

9   cholecystitis should be hospitalized.  Initial

10  management should include administration of an

11  antibiotic that is effective against the enteric

12  organisms found in bile," et cetera, et cetera.  And

13  I'll elucidate on this further concerning cultures.

14  So these two supporting documents are the basis for

15  my opinion.

16     Q      Okay.  With regard to that, are you saying

17  that the antibiotics should be administered as soon

18  as the X-rays or the CAT scans indicate that it's a

19  gallbladder issue or is it upon immediate admission

20  for this condition?

21     A      Isn't that the same thing.

22     Q      I'm sorry.  Let me rephrase that.  With

23  regard to if you're admitted to the hospital, but

24  they don't know your condition yet, are you saying

25  they should give the patient antibiotics immediately

22

1    or only upon confirming that that's the relevant

2    condition?

3         A    They should administer antibiotics

4    immediately.  Once you are suspect of this being the

5    diagnosis.

6         Q    Okay.  So as soon as they have -- as soon

7    as that's a potential diagnosis, they should provide

8    the antibiotics?

9         A    If that's your suspected diagnosis, yes.

10         Q    So in this case, what time do you opine

11   that the antibiotics should have been administered?

12         A    At least certainly 1:00 or 2:00 in the

13   morning.  I mean, he was in the emergency room in the

14   late afternoon.  The CT scan confirmed a thickened

15   gallbladder at that time.  So I can give a few hours

16   until he got to the hospital.  Preferentially you'd

17   want to give it in the emergency room before you move

18   him even into the hospital.  But on or about midnight

19   when he got to the floor, I would have assumed

20   antibiotics would have been started since the

21   diagnosis at that time was clearly acute

22   cholecystitis.

23         Q    And in your opinion, what antibiotics

24   should have been given at 1:00 or 2:00 in the

25   morning?

23

1        A    Zosyn is fine to start with.

2        Q    So you have no issue with regard to giving

3   Zosyn in the preoperative setting?

4        A    I have no issue with that.

5        Q    So your opinion today is that with regard

6   to paragraph 1, is that the breach was not giving

7   Mr. Milnes antibiotics?

8                MR. DUBIN:  I think that's three and

9   four.  You were marking them, I'm sorry.

10                MR. CHING:  Yes.

11                MR. DUBIN:  I think that's three and

12   four.

13   BY MR. CHING:

14        Q    So with regard to paragraph 1, your opinion

15   today is that the breach of a standard of care was

16   not giving Mr. Milnes the Zosyn earlier in the

17   proceedings?

18        A    I think it should have been started

19   immediately upon admission.  And furthermore, it

20   should have been redosed within an hour of cut time

21   for surgery which is the standard for prevention of

22   wound infection.  It appeared he may have got it

23   around 9:00.  Again, I'm unclear whether this really

24   did get administered.  But my issues concerning

25   antibiotics are, as you stated, should have been

24

1    started much sooner and redosed within an hour time

2    frame of surgery which is the current standard

3    accepted by everybody.

4         Q    So it should have been done, for example,

5    at -- it should have been done at 1:00 in the

6    morning, for example, and then one hour prior to the

7    surgery occurring?

8         A    Well, every six hours.  This is an every

9    six-hour dosing.  And usually you can give it less

10   than six hours just before surgery, provided it's not

11   given at 12:00 and then you're going to give it again

12   at 1:00 o'clock if surgery is, say, at 1:15.

13             It looked like he moved to the operating

14   room about 1:15, 1:30.  And again, there's the

15   confusing order by Dr. Lim to give Zosyn at

16   2:00 o'clock, which is during surgery and then that

17   order was canceled.  So again, that's too late

18   because the surgery had already started.  So my

19   issues are as I stated.

20        Q    So as a hypothetical, if he was admitted at

21   9:20 in the morning on the 15th and they immediately

22   give him the antibiotics and he was worked up and he

23   had surgery at 1:30 p.m., would that have been okay?

24        A    No, I would have redosed him again around

25   1:00 o'clock before the cut time starts, before the

25

1   skin actually gets incised.

2        Q    And with regard to your opinion, what

3   injury did this cause?

4        A    This allowed a wound infection to happen.

5        Q    And in your review of the records, did you

6   see any wound infections?

7        A    I didn't see any cultures.

8        Q    Did you see any evidence or any notations

9   of wound infections?

10       A    Well, yes, the wound fell apart and had

11  lousy healing and cultures were never seen; so we

12  never know if their antibiotics were proper or not,

13  but we'll get on to that later on.  But I think

14  largely his wound fell apart and continued to have

15  poor healing because of an infection that wasn't

16  recognized.

17       Q    I think that's No. 3 or No. 4.  With regard

18  to paragraph No. 1, are all your opinions made with

19  regard to a reasonable medical probability?

20       A    Yes.

21       Q    Let's move on to paragraph No. 2,

22  Dr. Halford.  Number 2?

23       A    Okay.

24       Q    And No. 2 is with regard to whether the

25  surgery was delayed and whether that breached the

26

1   standard of care, correct?

2       A    Yes.

3       Q    And what is the standard of care with

4   regard to gallbladder surgery and with regard to the

5   date of admission or the time of admission?

6       A    That wasn't my issue.  But to answer your

7   questions, it's within 48 to 72 hours is the accepted

8   standard.

9       Q    Okay.  So what exactly is your issue with

10  regard to paragraph 2?

11      A    My issue is that the medical records may

12  have been altered to reflect the date that really

13  wasn't true.  And if that was -- if this is and was

14  the case, this is, as I mentioned, an egregious

15  breach in care standards.

16      Q    Which medical records indicated that or

17  strike that.  Which medical records appear to be

18  breached or altered, I'm sorry?

19      A    The records from the patient himself, not

20  the records but his personal statement was pretty

21  convincing that he was absolutely convinced that

22  things were delayed by 24 hours or more due to

23  various and sundry things.  And then there's dates in

24  the records that mention surgery actually being done

25  on the 16th even though it was done on the 15th, I

27

1   think.  So I just raised this issue to be further

2   investigated.

3          And again, I'm not convinced this did

4   indeed happen and I qualified my statement in

5   paragraph 2.  But if we really go into depth and

6   search this thoroughly and it's found that records

7   were, indeed, changed, this is a serious breach in

8   standards and medical care.

9      Q    Do you have any evidence that the records

10  were, indeed, changed or altered?

11     A    No.

12     Q    Other than what the plaintiff told you and

13  references to the surgery occurring on June 16, do

14  you have any evidence or can you refer to any records

15  that indicate that the surgery did not take place on

16  June 15?

17          MR. DUBIN:  Let me make an objection.

18  The use of the word "evidence" is vague and

19  ambiguous.

20          MR. CHING:  I'll rephrase that.

21  BY MR. CHING:

22     Q    Did you review any records -- strike that.

23  Other than what plaintiff told you with regard to the

24  timing of the surgery, did you review any other

25  records that indicated that the surgery occurred on

28

1    June 16 or a date other than June 15?

2        A    There was a statement by yourself, I

3    believe, that said it took place on the 16th which

4    probably was a typo.

5        Q    Yes, it was a typo.  Is there anything

6    else?

7        A    The fact that the operative notes were

8    dictated on the 16th is odd.  Usually an operative

9    note is dictated immediately after surgery and all

10   the operative notes were actually dictated on the

11   16th, and you can see that in the dictated operative

12   notes.

13           There are entries also by caregivers that

14   surgery was done on the 19th in follow-up progress

15   notes in the record.  So again, it's fuzzy and it's

16   not conclusive, but it's not airtight either.

17       Q    So you're not testifying to a reasonable

18   medical probability that the surgery occurred on the

19   16th or 17th of June, correct?

20       A    State that again.

21       Q    Is it your testimony today that the surgery

22   did not occur on June 15, 1999?

23       A    Say that again.

24       Q    Are you testifying today that the surgery

25   did not occur on June 15?

29

1       A    No.

2       Q    And as you stated earlier -- and I'm sorry

3   for repeating -- is that the standard of care for

4   performing a gallbladder surgery is 48 to 72 hours

5   after admission?

6       A    Not after admission but after the onset of

7   symptoms.  And so if he had it on the 15th, I'm fine

8   with that.

9       Q    Okay.  Fine with it meaning that they --

10      A    Within the time frame.

11      Q    Meaning that if it happened on the 15th,

12  then the standard of care was complied with?

13      A    Yes.

14      Q    Thank you.  Let's move on to paragraph 3

15  now.

16      A    Okay.

17      Q    This is in with regard to the culture

18  reports and the infection that you're claiming

19  occurred, correct?

20      A    Yes.

21      Q    Now, with regard to the culture reports,

22  when are you -- strike that.  When should these

23  culture reports have been taken?

24      A    At the time of the operation.

25      Q    This was with regard to after the

30

1    gallbladder being removed?

2         A    Correct.

3         Q    And the culture -- oh, sorry.

4         A    The culture should have been taken in the

5    operating room of the gallbladder.

6         Q    And what is the reason for that?

7         A    To identify what bacteria you're dealing

8    with so you can adjust the antibiotics appropriately.

9         Q    And what organisms do you opine would not

10   be covered by Zosyn?

11        A    Zosyn doesn't cover all of Enterobacter,

12   pseudomonas, some of the E.coli's.  Those just come

13   to mind.

14        Q    Are there any more organisms not covered by

15   Zosyn?

16        A    Probably.  I'd have to pull out an ID text.

17        Q    Are there any other times in which cultures

18   should have been taken?

19        A    Yes, I think they should have been taken of

20   the wound debris certainly at the time of the first

21   dehiscence when it was noted by Dr. Sakaguchi.

22        Q    Now, with regard to Dr. Sakaguchi, that

23   would be on the 24th of June in the Tripler emergency

24   department, correct?

25        A    Yes.