31

1      Q    At that point, in your review of the

2  records, were there any indications of an infection

3  at that point?

4      A    Yes, the wound had fallen apart, and there

5  was a lot of drainage reported.

6      Q    So it's your testimony today that the

7  reason why the wound fell apart was because of the

8  infection?

9      A    I think infection played a significant

10  role.  As you experts say, it may have been also due

11  to smoking and perhaps lifting or coughing or moving

12  about.  But my opinion is that the infection played a

13  much larger role in those things.

14      Q    If you had to give an approximation as to

15  what caused the dehiscence percentage-wise, how would

16  you attribute it?  You know, like X-percent to the

17  infection, X-percent to the smoking?

18      A    60 percent infection; 20 percent smoking;

19  20 percent coughing due to his chronic lung problem

20  asthma and so forth.

21      Q    Dr. Halford, when you have patients who

22  have elective procedures, do you inform them to stop

23  smoking prior to the proceeding?

24      A    Yes.

25      Q    And how long do you tell them before the

32

1    procedure to stop smoking?

2        A    Depends how urgent the elective procedure

3    can wait.  But usually you'd like to get them off

4    smoking for weeks, if at all possible.

5        Q    And what is the reason to get them off

6    smoking?

7        A    It's associated with higher risk of

8    postoperative complications such as pneumonia,

9    pulmonary issues, wound healing.

10        Q    And dehiscence is one of the risks if you

11    smoke?

12        A    Yes.

13        Q    And after the operation is concluded, how

14    long do you tell them to stay off the smoking?

15        A    Forever if they're able to.  But most

16    people aren't able to comply with that.

17        Q    With regard to the culture reports, how

18    long would the culture take -- strike that.  How long

19    would it take for the culture report to come back?

20        A    Usually within one day, you'll have the

21    report of the organism and within two days the

22    sensitivities of the organism to, say, Zosyn in this

23    particular case.

24        Q    So the medical records with regard to

25    Dr. Sakaguchi's examination indicated that the wound

33

1  was infected?

2      A    They indicated the wound was dehisced.

3      Q    So just by being dehisced means it was

4  being infected?

5      A    No.  Dehiscence means the wound has opened

6  up, fallen apart.  And with a lot of drainage

7  preceding that and the surgery he had for an infected

8  gallbladder, my opinion is that this dehiscence was

9  more than likely caused by an infection that wasn't

10  treated properly rather than smoking or lifting

11  something.

12      Q    Now, what would be the symptoms of

13  infection, for example, would it be redness, foul

14  smelling, discharge?

15      A    It can be that or it can be just poor

16  healing and the wound falls apart.  Remember he was

17  on Zosyn all this time postoperatively, I think,

18  although my issues with all these orders being

19  canceled and so forth.  So Zosyn may just select out

20  some of the organisms and leave the others to

21  continue unabated so the wound doesn't always look as

22  bad as it otherwise would without any antibiotics.

23          So you don't see the smell and a lot of the

24  changes associated with infection all the time.  All

25  you see is a poorly healing wound that subsequently

34

1   falls apart prematurely.

2       Q    So you could have an infection without

3   having the symptoms that you earlier discussed, for

4   example, the --

5       A    The foul smelling.

6       Q    Yes.

7       A    And he did have some mild redness.  That

8   was described in the record, and he had a lot of

9   drainage reported before he came in to see Sakaguchi,

10  which is consistent with a collection of bacteria,

11  dead bacteria or live bacteria and white cells and so

12  forth.  So I don't think his findings were

13  inconsistent with an infection.

14      Q    Were there any other points in time in

15  which culture reports should have been taken?

16      A    Probably not.

17      Q    And what was the injury caused by the

18  failure to take these culture reports?

19      A    The injury was a dehisced wound which

20  resulted in readmission, prolonged hospitalization,

21  several subsequent operations, and a long

22  postoperative course requiring a wound vac and so

23  forth and an ugly scar and chronic pain now as a

24  result of this.

25      Q    And would you opine that some of these

35

1   injuries were also caused by the continuous smoking?

2       A    Again, a portion of it probably is due to

3   smoking, 20 percent perhaps in my opinion.

4       Q    And the remainder is with the infection?

5       A    I think largely it's still infection that

6   was the culprit here.

7       Q    So just to make it clear, the standard of

8   care in doing the gallbladder surgery is if the

9   gallbladder appears to be infected that you should

10  take a culture report of that gallbladder?

11      A    Yes, and it's cited in both of these texts

12  I mentioned No. 3 and No. 4.

13      Q    Can you point out which areas of the text?

14      A    In No. 3, the Cameron's textbook under

15  management it says antibiotic coverage should

16  continue at least 24 hours after surgical

17  intervention depending on the severity of

18  intraoperative findings, general patient condition,

19  and clinical evidence for sepsis or peritonitis.  As

20  soon as final culture results are available,

21  antibiotics should be adjusted appropriately.

22           And then the other paper or the other item

23  referenced as No. 2 which is Sabiston's textbook.  It

24  says at the bottom of the paragraph under treatment,

25  "Changes in the regimen" -- meaning antibiotics --

36

1  "may be indicated by the course of the patient and

2  the result of cultures of bile and gallbladder wall

3  taken at operation." So that's why I stated what I

4  did.

5      Q    Doctor, I noticed in these two textbooks

6  you have areas that are highlighted that you referred

7  to?

8      A    Yes.

9      Q    You know, I think the problem is when we

10 get the copies, the highlights might not show up.

11 Can you just draw --

12          MR. DUBIN:  We can ask for colored

13 copies.

14          MR. CHING:  Okay.  Okay.  Okay.

15          THE WITNESS:  May I add something to

16 my testimony?

17 BY MR. CHING:

18     Q    Yes.

19     A    I think another thing that concerned me

20 concerning all this culture or lack of culturing was

21 the fact that he repeatedly was put on antibiotics by

22 the staff, an antibiotic powder was sprinkled in the

23 wound repeatedly.  So one would think that if you're

24 using antibiotics, you are using it for a reason

25 which is to kill bacteria.  So why not identify what

37

1    bacteria you're dealing with, which they never did.

2        Q    Correct me if I'm wrong, but wasn't the

3    antibiotic powder used in some of the surgical

4    procedures?

5        A    That's what I'm talking about.  They used

6    powder in the wound at the initial operation.  And

7    then during the repair of the dehiscence procedures,

8    antibiotics were given preoperatively and antibiotic

9    powder was thrown into the wound.  So presumably

10   you're suspecting infection or trying to treat

11   infection and yet no culture was then to verify if

12   you're using the correct antibiotic.

13       Q    Would antibiotic powder be used in surgical

14   procedures for preventative purposes?

15       A    If you're suspecting infection, yes.  If

16   you have a clean wound that's just falling apart from

17   smoking, I don't think an antibiotic is an essential

18   need.  If you have a dirty wound or you're having

19   bacteria that you're suspecting being present, then

20   yes, it's used to prevent further infection.

21            It just seems odd to me that they obviously

22   are concerned about infection or they wouldn't have

23   used all these antibiotics in the intravenous form

24   and in the topical powder form into the wound.

25       Q    So I mean, are you testifying today that

38

1    because they used antibiotic powder during these

2    procedures that there was, in fact, an infection?

3        A    Yes, or they were suspecting infection and

4    trying to eliminate it or minimize it.

5        Q    So you're not testifying that because they

6    used powder that, in fact, there was an infection?

7        A    I'm implying that.  That they are using

8    powder to treat infection that's presumably there or

9    in the region.  And yet no cultures were ever done,

10   which seems to fly in the face of what they were

11   trying to do for proper care of this patient.

12       Q    Okay.  We just discussed a bunch of

13   opinions with regard to paragraph 3.  Are all your

14   opinions made to a reasonable degree of medical

15   probability?

16       A    Yes.

17       Q    Doctor, can I just take a quick two-minute

18   break to use the restroom?

19       A    Sure.

20            (Recess from 10:54 a.m. to 10:59 a.m.)

21   BY MR. CHING:

22       Q    Dr. Halford, now I'm referring to

23   Exhibit No. 1, page No. 2, paragraph No. 4.  And in

24   this paragraph, you indicated that Mr. Milnes should

25   have been admitted on the 24th with the dehiscence of

39

1    that degree, correct?

2        A    Correct.

3        Q    What is the standard of care with regard to

4    that opinion?

5        A    I think the standard is if you have a major

6    dehiscence of a wound of this sort, you should return

7    the outpatient to the operating room to prepare the

8    dehiscence.

9        Q    Now, I believe that Dr. Lim stated that as

10   long as there's no signs of evisceration, that you

11   can treat that in an outpatient setting.  Do you

12   disagree with that?

13       A    I agree with that if it's a small

14   dehiscence, but this wound seemed to me to have a

15   major dehiscence of the whole anterior fascial layer.

16   So he lucked out and didn't eviscerate over the time

17   he was at home, but he well could have.

18       Q    And what is the basis for your opinion with

19   regard to the standard of care?

20       A    The basis I'll quote for backing up my

21   opinions from Principles of Surgery.  This is by

22   Schwartz is the editor.  I guess we'll label this No.

23   five.

24       Q    Five.

25                    (Exhibit No. 5 was marked for

40

1                    identification.)

2                    THE WITNESS:  And this is a text,

3   again, that's well accepted, and I cited several

4   paragraphs under wound dehiscence and under treatment

5   or rather clinical manifestations.  It says, "With

6   the appearance of such fluid draining from the wound

7   and appearance of this drainage and the dehiscence,

8   the patient should be returned to the operating room

9   and the wound opened under sterile conditions.

10  Dehiscences may become manifest when skin sutures are

11  removed and evisceration of a bowel content occurs,"

12  which didn't occur in this situation obviously.

13                   But I guess the reason I was concerned

14  about this was this was the whole anterior layer had

15  given way.  So the only thing holding him together is

16  a very thin posterior layer of fascia.  If that had

17  started to split, he, indeed, would have eviscerated.

18  And not only that, I think leaving the wound open for

19  that period of time until he got back to the hospital

20  the next day allowed colonization of bacteria to move

21  into the wound unless they were there already of

22  course.  And it just delayed the inevitable which was

23  a return to the operating room to have proper closure

24  done which he eventually did on the 26th of June.

25       Q    But in this case when Mr. Milnes presented

41

1    to the emergency department based on the medical

2    records, there's no evidence of evisceration,

3    correct?

4         A    Correct.

5         Q    And you don't disagree with Dr. Lim's

6    statement with regard to the standard of care in this

7    context?

8         A    I do disagree because this was a major

9    dehiscence, not a small minor dehiscence.  So if the

10   wound -- if there's a small dehiscence yes, you can

11   treat that as an outpatient.  But a major dehiscence

12   is something you need to act on ASAP.

13        Q    Okay.  How do you differentiate between a

14   major dehiscence and a minor dehiscence?

15        A    The whole layer being spread open versus

16   just say a centimeter or two.  And from the review of

17   the records, his whole anterior fascial layer had

18   split open which is a good six or eight inches of

19   separation of a major structure holding your wound

20   together.

21             Furthermore, it seems odd to me that they

22   were very perturbed when he left the hospital for a

23   few hours when he did get in; so if they were that

24   perturbed that he left for a few hours over concern

25   of the wound getting in more trouble, why didn't they

42

1  have that same concern when he had this diagnosed and

2  let him actually stay at home for some 12 hours

3  instead of just a mere two hours?  So this was not a

4  minor wound dehiscence which I think Dr. Lim's

5  comments that are pertinent to.

6      Q    And what was the injury caused by the

7  failure to not admit him as an inpatient on the 24th?

8      A    Further discomfort for the patient,

9  possible further bacterial colonization, which I

10  can't prove because no cultures were done, of course,

11  and just delay in him getting proper treatment for

12  some 48 hours.

13      Q    But he was admitted the subsequent day or

14  the next day, correct?

15      A    He was admitted the next day and then had

16  surgery the day after that.

17      Q    So in your opinion, by not admitting him on

18  the 24th just delayed his wound healing?

19      A    His contributed to, I think, an overall

20  delay in poor healing eventually.

21      Q    Other than what we discussed with regard to

22  Dr. Sakaguchi's failure to or failure to take a

23  culture and by not admitting him as an inpatient, do

24  you have any other opinions with regard to Dr.

25  Sakaguchi's care?

43

1      A    No.

2      Q    And with regard to our discussions with

3   regard to paragraph 4, are all your opinions made to

4   a reasonable medical probability?

5      A    Yes.

6      Q    I'm sorry to jump around, Dr. Halford, but

7   with regard to No. 1, you indicated that originally

8   you did not find any entry with regard to giving

9   antibiotics prior to surgery.  And then later on when

10  you looked at it, you realized that there was an

11  entry by Sanchez Martinez?

12     A    I didn't see a specific order for it in the

13  computerized record nor a computerized statement that

14  it had been given.  It's just a progress note which I

15  said was odd.

16     Q    Okay.  But when did you see the progress

17  note with regard -- was that during your initial

18  review?

19     A    I'm missing that one when I first reviewed

20  these records.  That's why I qualified that statement

21  at first.

22     Q    And do you recall when you saw that

23  statement, you know, when you reviewed the records

24  again?

25     A    After you pointed it out in your summary

44

1    judgment.

2         Q    Okay.  So I think that was last year,

3    Mr. Dubin, 2006, correct, somewhere around then?

4                   MR. DUBIN:  The papers were --

5                   THE WITNESS:  About a month ago.

6    BY MR. CHING:

7         Q    Oh, about a month ago you got them?

8         A    Right.

9         Q    Okay.

10        A    Correct.

11        Q    With regard to paragraph 5 now, that

12   discusses giving Dakin's solution or applying Dakin's

13   solution to Mr. Milnes's wound, correct?

14        A    Correct.

15        Q    And you stated that your review of the

16   medical records indicated that Mr. Milnes was

17   allergic to bleach?

18        A    Correct.

19        Q    Now, was that information based on

20   Mr. Milnes's statements or was it based on what other

21   doctors had diagnosed him with?

22        A    I don't remember.

23        Q    And you state in paragraph 5 that the

24   Dakin's solution resulted in an intense reaction and

25   further delayed his wound healing in addition to

45

1  other side effects, correct?

2       A    Yes.

3       Q    Now, with regard to wound healing, is it

4  your opinion today that the Dakin's solution

5  application delayed his wound healing?

6       A    Yes.

7       Q    And what is that based upon?

8       A    I'll cite a reference from American College

9  of Surgery, the ACS surgery text principles and

10  practice from 2006.  And this is paragraph cited

11  about basic surgical and perioperative

12  considerations.  And it mentions that there are a

13  number of solutions that should never -- and never is

14  a key word to remember -- should never be placed in a

15  wound or on a wound.  Half percent solution of sodium

16  hypochlorite Dakin's solution has been demonstrated

17  to be toxic to fibroblasts, to impair neutrophil

18  function and to slow epithelialization in open

19  wounds.

20            And that reference is another paper I'll

21  submit which talks about topical antimicrobial

22  toxicity which pretty much confirms that this is a

23  bad solution to put in a wound anyway let alone if

24  you're allergic to it, which is just a double whammy.

25  So this material impairs healing, delays healing,

46

1    more than helps, and it should not have been used.

2        Q    Now, what is Dakin's solution normally

3    usually used for?

4        A    It was used in World War I for killing

5    bacteria before antibiotics were invented.  So it's

6    used to kill bacteria in a wound, but the trade off

7    is it impairs healing.  It has toxic side effects to

8    the natural healing of a wound which includes this

9    thing called fibroblast migration and

10   epithelialization and neutrophil function which are

11   the white cells coming in to do their work.  So the

12   trade off is not worth using it.  And in fact, this

13   standard said it should never be put in a wound.

14       Q    Did you have the opportunity to review

15   Dr. Eron's report?

16       A    Yes.

17       Q    And it said that Dr. Eron opined that the

18   Dakin's solution did not affect wound healing?

19       A    Yes.

20       Q    And I assume you disagree with that

21   opinion?

22       A    I disagree with that opinion.

23       Q    Did you have an opportunity to review the

24   studies that he cited to?

25       A    I didn't review the study, but I saw it

47

1   when I read the title of it.  It didn't talk about

2   Dakins even being in that study; so I'm not sure

3   where he got that information.  I can tell you this

4   is like the Bible for surgery, this ACS surgery text.

5   And for them to say never put it in a wound, I've got

6   to believe it.

7                        (Exhibit No. 6 was marked for

8                         identification.)

9                        (Exhibit No. 7 was marked for

10                        identification.)

11  BY MR. CHING:

12      Q     Now, you also stated in your letter that

13  the Dakin's solution caused an intense reaction?

14      A     Yes.

15      Q     Now, what kind of reaction are you

16  referring to in your letter?

17      A     The patient said it was very painful, and

18  it burned when it was applied and they noticed

19  redness on the margins of the wound; so the solution,

20  you understand, is put into a wet dressing and then

21  that wet dressing touches not only the inside of the

22  wound, but the outside skin.  And it got -- it was

23  noted to be red at least from what I could read in

24  the records.

25      Q     And you said the patient indicated that

48

1   when they put the bleach on or the Dakin's solution

2   on, it burned?

3       A    I think so, yes.

4       Q    And did it indicate how long it took for it

5   to burn, was it immediate?

6       A    It was pretty much immediate which I would

7   expect since this is a toxic material anyway, and

8   he's allergic to it on top of that.

9       Q    And based on your records, does it indicate

10  that he applied this Dakin's solution to his wound

11  more than once?

12      A    It appeared it was ordered as part of his

13  wet to dry dressing three times a day.  So it

14  continued on for a number of days, I believe.

15      Q    So I think it started in the hospital,

16  correct?

17      A    Correct.

18      Q    And then it continued while he went home?

19      A    I think so.

20      Q    And I believe it ended when Dr. Sarango --

21      A    Changed it to the sodium chlorite.

22      Q    Yes.  Now, would this burning reaction have

23  any symptoms?  For example, redness in the skin,

24  irritation or anything?

25      A    Yes.  As mentioned, he did have redness of

49

1    the skin and the symptom of burning.  And I know that

2    your experts felt it was due to the tape, but I would

3    disagree and say it's due more to this than the tape

4    reaction.

5         Q    Did you review Dr. Eron's report with

6    regard to the timing of symptoms occurring?

7         A    Yes, being four to five days.

8         Q    And do you agree or disagree with that?

9         A    I disagree.  I would think if it's toxic

10   and you're reacting to it, you'll see an immediate

11   reaction since it's material the body is reacting to

12   immediately.

13        Q    Now, Doctor, when you have patients and

14   they apply topical solutions and it burns, do you

15   tell them to report it to you right away if

16   discomfort occurs?

17        A    If it's a major burning sensation, yes.  If

18   it was just minor from the sensitivity of the wound,

19   I could handle that.  But this isn't just a saline

20   dressing.  This is a solution that's quite toxic in

21   and of itself.

22        Q    So I believe in your letter you described

23   the reaction of being "intense," quote, end quote?

24        A    According to the patient, he noted it as

25   that.

50

1      Q    And there's nothing in the records

2   indicating that he reported, you know, this reaction

3   to his healthcare providers prior to meeting with

4   Dr. Sarango on July 6, correct?

5      A    I don't know.  I'd have to research that.

6   I don't remember seeing that.

7      Q    Do you agree or disagree with Dr. Eron's

8   opinion that the peak symptoms should have occurred

9   approximately on July 10 or July 11 with regard to

10   the Dakin's solution?

11      A    I disagree.

12      Q    And your basis for that is?

13      A    It's a toxic material that he's allergic

14   to, and you're going to get an immediate reaction

15   when it touches tissue that's vulnerable.

16      Q    Dr. Halford, with regard to paragraph 5,

17   are your opinions made to a reasonable medical

18   probability?

19      A    Yes.

20      Q    Now, Dr. Halford, did Mr. Milnes's weight

21   also affect the ability of his wound to heal?

22      A    Probably.

23      Q    I realize, and I don't know if you reviewed

24   Dr. Lim's report, but it mentioned that based on some

25   type of scale that he was obese?

51

1        A    Yes.

2        Q    And then that would affect the ability for

3   a scar to heal?

4        A    Yes.

5        Q    Do you agree or disagree with that?

6        A    I agree.

7        Q    Would that also be a cause for -- strike

8   that.  Would his obesity also be a cause of the

9   inability of the scar to -- strike that.

10            Would his obesity also be a cause of a

11  failure of his wound to heal?

12                 MR. DUBIN:  Objection.  Vague and

13  ambiguous.

14                 THE WITNESS:  I think it was a minor

15  contributing factor.  I might mention from this,

16  since you brought up the subject of healing again,

17  from this article No. 5 Principles of Surgery by

18  Schwartz under dehiscence, they state many patient

19  characteristics may contribute to a fascial

20  dehiscence, but generally it's caused by technical

21  factors that means the way they sewed it together.

22                 Patient characteristics that

23  contribute to fascial dehiscence should sensitize the

24  surgeon to take precautions using mass closure or

25  anterior fascial retention sutures, which may not

52

1    prevent dehiscence but may prevent evisceration.

2                    Malnutrition, low protein levels,

3    morbid obesity, malignancy, uremia, diabetes,

4    coughing and infection are contributory factors.  And

5    then in the next paragraph they say local factors

6    increase wound disruption include hemorrhage,

7    infection, excessive suture material and poor

8    technique.

9                    So I just mentioned all these things

10   because there's a myriad of factors that cause a

11   wound to fall apart.  And it's still my opinion

12   infection played a major role here and the minor ones

13   were his size, his coughing, his smoking.

14       Q    But you said his smoking was about

15   20 percent, correct?

16       A    I would guess it's 20 percent.

17       Q    So then that's not minor?

18       A    Well, it's 20 percent, but it's not

19   100 percent like they imply.

20       Q    Yeah.  With regard to his obesity, if you

21   have to give a percentage to it with regard to the

22   failure of the wound to heal, what number would you

23   give?

24       A    I already used up 100 percent.

25       Q    Yes.  I mean, do you want to revise that?

53

1          A     Probably.  He wasn't morbidly obese.  He

2   was probably 30 pounds, 40 pounds overweight; so I'd

3   say probably about 5 percent.

4          Q     Maybe at the end of this deposition we'll

5   just do the math over again.

6          A     Okay.

7          Q     I was going to ask you about a few more

8   things.  There's indications in the medical records

9   that he may have been driving during that period.

10  You know, after his surgery.

11         A     Yes.

12         Q     Do you usually recommend that somebody who

13  undergoes this type of surgery not drive after?

14         A     I actually don't.  I let them drive after

15  they're out of the hospital if it's not uncomfortable

16  even with a right subcostal incision.  If they're

17  comfortable getting in and out of a car and they have

18  automatic transmission, they don't use a clutch and

19  they're comfortable, I don't keep them driving for

20  several weeks.

21         Q     There's also indications in the records

22  that Mr. Milnes may have been carrying heavy objects?

23         A     Correct.

24         Q     Now, do you usually, you know, warn your

25  patients who undergo this type of procedure not to

54

1  carry heavy objects?

2      A    Yes.  I usually say don't lift more than 25

3  pounds or if you're going to have to do that, use

4  your legs rather than your abdominal muscles to do

5  the lift.

6      Q    And the reason for that is?

7      A    You put undue stress on the incision.

8      Q    I'm just kind of wrapping up now.  If you

9  had to -- now, I'm going to ask you to do some new

10  math now to allocate the delay in the wound healing.

11  I know we discussed some numerous factors, you know,

12  between the infection, the coughing, the smoking and

13  the obesity.  How would you allocate the percentages?

14      A    Excuse me while I write these down.

15  Infection, smoking, weight, coughing.  What else did

16  we mention?  Technique, suture material?

17      Q    Yeah, technique, suture material.

18      A    I'd say infection, 60 percent; smoking,

19  20 percent; weight, 10 percent; coughing, 5 percent;

20  technique, 5 percent.

21              MR. CHING:  Dr. Halford, I have no

22  further questions at this time.

23              MR. DUBIN:  Can you look at No. 6?  We

24  didn't cover No. 6.

25              MR. CHING:  Oh, okay.  I'll go back

55

1   and cover No. 6.  I thought I covered -- I thought we

2   did cover that with regard to, you know, heavy

3   lifting and if it was true, you know.

4   BY MR. CHING:

5       Q    Let's go to paragraph No. 6.  In there you

6   made mention of the records of the Tripler Army

7   Medical Center indicated that he lifted a TV set

8   weighing 60 pounds.  And isn't it correct,

9   Dr. Halford, that Mr. Milnes denied lifting anything

10  that heavy?

11      A    Yes.

12      Q    Okay.  And then you indicate that by

13  fabricating this, the shift blame, this is a breach

14  of medical and ethical care standards?

15      A    Yes.

16      Q    And what's the standard of care or the

17  standard you're referring to?

18      A    Just to be honest.

19      Q    And did that affect his wound healing?

20      A    No.

21      Q    And then your last sentence, it's hard for

22  you to believe that someone could lift over 25 pounds

23  in the first two weeks after a major abdominal

24  incision.  Is that still your opinion?

25      A    I would think that it would hurt so bad,

56

1    you wouldn't be able to do it anyway.

2       Q    And if this was true, I guess if somebody

3    wanted to lift that much weight, you would tell them

4    to use their legs, I guess?

5       A    If you're going to lift 20 pounds or more,

6    I don't think anyone could lift 60 pounds without

7    having major discomfort even with just doing a leg

8    lift.

9       Q    Okay.  But if you have evidence that the

10   healthcare provider who made reference to Mr. Milnes

11   lifting this amount of weight is being dishonest?

12      A    Correct.

13      Q    And was it Dr. Sarango who made that

14   statement, I believe?

15      A    I don't recall.

16      Q    Okay.

17      A    It was somewhere in the medical record.  I

18   don't know who in particular said it.

19      Q    So you don't have any opinions with regard

20   to the person who made the statement whether he's

21   honest or dishonest in general?

22      A    No, I don't.

23      Q    Okay.

24                           EXAMINATION

25   BY MR. DUBIN:

57

1      Q     Let me just go to these percentages.   These

2    are percentages based on what?

3      A     My educated opinion.

4      Q     To what extent is it based on, the record

5    or your general view assuming that there was smoking,

6    for example?

7      A     State that again.

8      Q     Well, these are what, probabilities?

9      A     These are percentages of likelihood.   These

10   various things contributed to this wound falling

11   apart, and I think it's still more probable than not

12   the major contributor was infection.   And then the

13   others follow in the order of importance.   I think

14   smoking did play a role, but not a major role and

15   certainly his weight and his coughing and the way

16   they closed it with their technique.

17     Q     Well, let's say if someone had smoked and

18   they were 30 or 40 pounds overweight and they were

19   coughing, would that have caused the problem we had

20   here without infection?

21     A     Sure.  I mean, if you were operating on a

22   clean organ with no infection and this happened, then

23   the cause of the dehiscence would be totally those

24   reasons and the infection wouldn't have been a role

25   at all.

58

1    Q    But could smoking cause the problem?

2    A    In and of itself?

3    Q    In and of itself?

4    A    Just the wound dehiscence?

5    Q    Yes.

6    A    No, I think it's got to be combined with

7  some other factors smoking plus coughing, distension,

8  technique of suture use.

9    Q    Now, could infection cause the problem

10  itself without the other factors?

11    A    Yes.

12            MR. DUBIN:  Okay.  Thank you.

13            FURTHER EXAMINATION

14  BY MR. CHING:

15    Q    Just one last question.  Are you making any

16  opinions today that Tripler Army Medical Center was

17  negligent with regard to or strike that.

18            Are you making any opinions that the

19  standard of care was breached with regard to the

20  suture used at Tripler Army Medical Center?

21    A    No, I'm just giving technique a percentage

22  point because it's mentioned in the cite -- the paper

23  I cited as being one of the major reasons for

24  dehiscence occurring.

25            MR. CHING:  Okay.

59

1              MR. DUBIN:  Wouldn't that bring you to

2    101 percent?

3              THE WITNESS:  No, it's 100.

4              MR. CHING:  We're all done.  Mr.

5    Dubin?

6              MR. DUBIN:  That's all.  Thank you.

7         (Deposition concluded at 11:27 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

60

1          I, PETER A. HALFORD, M.D., do hereby

2    certify that I have read the foregoing pages 1

3    through 59, inclusive, and corrections, if any, were

4    noted by me; and that same is now a true and correct

5    transcript of my testimony.

6          DATED:  Honolulu, Hawaii,_____.

7

8

9          _____.

            PETER A. HALFORD, M.D.

10

11

12   Signed before me this _____

13   day of _____, 2007.

14

15   _____

16

17

18

19

20

21

22

23   Case:  KEVIN MILNES  vs.  UNITED STATES OF AMERICA
     Civil No.:  02-00365 BMK
24   Deposition Dated:  June 19, 2007
     Taken By:  Myrla R. Romero
25   JUN 2 7 2007

61

1            C E R T I F I C A T E

2  STATE OF HAWAII              )
                                )  SS:
3  CITY AND COUNTY OF HONOLULU  )

4            I, MYRLA R. ROMERO, Notary Public, State of

5  Hawaii, do hereby certify:

6            That on Tuesday, June 19, 2007, at

7  10:09 a.m., appeared before me PETER A. HALFORD,

8  M.D., the witness whose deposition is contained

9  herein; that prior to being examined he was by me

10  duly sworn;

11            That the deposition was taken down by me in

12  machine shorthand and was thereafter reduced to

13  typewriting under my supervision; that the foregoing

14  represents, to the best of my ability, a true and

15  correct transcript of the proceedings had in the

16  foregoing matter.

17            I further certify that I am not an attorney

18  for any of the parties hereto, nor in any way

19  concerned with the cause.

20            DATED this 26th day of June, 2007, in

21  Honolulu, Hawaii.

22

23

24  MYRLA R. ROMERO, CSR NO. 397
    Notary Public, State of Hawaii
25  My Commission Exp:  1-27-20091