cc: BMK

GARY VICTOR DUBIN 3181
Dubin Law Offices
55 Merchant Street, Suite 3100
Honolulu, Hawaii 96813
Telephone: (808) 537-2300
Facsimile: (808) 523-7733
E-Mail: gdubin@dubinlaw.net

Attorney for Plaintiff
Kevin Milnes



FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

AUG 09 2007

at __ o'clock and __ min __ M.
SUE BEITIA, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| KEVIN MILNES,<br><br>        Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>        Defendant. | CIVIL NO. 02-00365 BMK<br><br>PLAINTIFF KEVIN MILNES' FINAL PRETRIAL STATEMENT;<br>EXHIBITS "A" AND "B"; CERTIFICATE OF SERVICE<br><br>DATE:    August 14, 2007<br>TIME:    9:00 a.m.<br>JUDGE:  Barry M. Kurren<br><br>Trial Date: September 24, 2007 |

### PLAINTIFF KEVIN MILNES' FINAL PRETRIAL STATEMENT

COMES NOW Plaintiff KEVIN MILNES ("Milnes"), by and through his attorney, Gary Victor Dubin, and pursuant to Local Rule 16.6 hereby submits his Final Pretrial Statement.

### A. Party

This Pretrial Statement is being submitted on behalf of Plaintiff Kevin Milnes.

### B. Jurisdiction and Venue

Jurisdiction is based upon the Federal Government being a party; jurisdiction and venue are conceded by the parties.

ORIGINAL

## **C. Substance of Action**

On Sunday afternoon, June 13, 1999, Milnes returned with his wife to Honolulu from the Mainland, and about 1:00 a.m. the next morning he awoke, vomiting, with convulsions and fever. That morning, Monday, June 14, 1999, he went to the VA clinic and was placed in ambulatory care and X-rayed.

Later that afternoon on June 14, 1999, Milnes was transferred to the emergency room at Tripler ER by ambulance, where he was x-rayed and that evening was given a CT scan; the diagnosis was "gall bladder failure," after which they assured him and his wife that nothing would happen overnight and she should go home; she left.

While at the emergency room, no antibiotics were administered to Milnes, and he was given no ultrasound testing.

On the following day, Tuesday, June 15, 1999, at approximately 11:20 a.m., Milnes was transferred to Ward 6B1 at Tripler; Dr. Lim showed up at approximately 1:20 p.m., had Milnes sign a release form, told him they would perform surgery on him at about 3:00 p.m. that day and the laparoscopic procedure would be the primary option used to remove his gall bladder.

At that time, Milnes requested pain medications, but was given ice cubes instead. he was given no antibiotics (*e.g.,* "Zosyn") on June 15, 1999, although the Tripler June 15, 1999, and June 16, 1999, "Order List" shows that Zosyn was ordered for him, then "CANCELLED;" Zosyn never again was ordered for him until the morning of June 16, 1999.

At approximately 2:00 p.m. that day, June 15, 1999, the nurse came and catheterized Milnes, and another nurse placed an IV port on him, but no fluid. A few minutes later he was put in a rolling stretcher to be taken to surgery, but at approximately 3:30 p.m. he was left in the hallway; he began to ask the nurses if they had forgotten about him, and he was told by the nurses that the primary leader of the

2

"Gold Team" was tied up with other surgeries; the Government's own document production in this case shows that the surgery took place on June 16, 1999.

Finally, Dr. Lim, an intern, showed up and told the nurses to put Milnes back to Ward 6B1 and that nothing would be done until a sonogram was first performed.

Milnes asked Dr. Lim why the surgery was being delayed, because several physicians and the radiologist had already confirmed his inflamed gall bladder, and Dr. Lim replied that Dr. Cirangle was busy, and meanwhile ordered a sonogram, but the sonogram tech would not be back until 7 a.m. the next morning, Wednesday, June 16, 1999, whereupon Milnes again asked for pain medications and was denied. Prior to June 16, 1999, Milnes had had no ultrasound testing.

On that day, June 15, 1999, Milnes was given no antibiotic either, only ice chips. He was unable to sleep due to the very severe pain. He called his wife and advised her that no surgery would be done on June 15, 1999.

On Wednesday, June 16, 1999, at approximately 6:30 a.m., Milnes reminded the nurse to take him down to the Radiology Department, which was done at approximately 7:00 a.m. on June 16, 1999, which according to the technician showed that Milnes was even in worse shape since the initial CT scan taken on June 14, 1999, and that he was about to blow.

At approximately 9:00 a.m. on June 16, 1999, Milnes was given and he signed a release form again with Dr. Lim, the intern, who informed him again about the laparoscopic procedure, and around 10:30 a.m. that morning the orderly came to transfer Milnes to the operating room.

At approximately 11:30 a.m. that morning, June 16, 1999, they gave Milnes for the first time pain medication. The surgery lasted for four hours, until approximately 4:00 p.m., after which Milnes spend several hours in Intensive Care and was transferred

3

back to Ward 6B1; the surgery took place the afternoon of June 16, 1999, by the "Gold Team" as memorialized in Ward 6B1's "Shift Care Report."

Dr. Cirangle "doctored" the medical records to make it appear that Milnes' surgery was done right away on June 15, 1999, to cover up his negligence, as shown when his "Operative Report" revised as of August 19, 1999, is compared to the above-referenced "Order List" and "Shift Care Report".

Milnes was finally given antibiotics after the surgery, but his infection remained acute, lasting for three years (up until March 2002), and he was still in pain and his high fever and nausea still continued, as gangrene began to appear.

After the June 16, 1999, surgery, Milnes was given no baths for four days and stunk, before being released despite his deteriorating condition. A blow-up sensation inside him, no painkillers, no antibiotics, a gangrenous condition, the drainage bulb not working properly -- all of which logically led to the wound dehisce six days later, when Milnes returned to the Emergency Room on June 24, 1999, with his intestines literally hanging out, yet was sent home again with no antibiotics or pain killers, as shown by the Emergency Room record, on which the date of his surgery was altered by hand to state "15 June 99."

When Dr. Lim learned of his condition, he became so concerned that he called Milnes at home at about 11:00 p.m. the evening of June 24, 1999, asking him to report to Tripler the following day for further hospitalization, which Milnes did.

After another hospitalization on June 25, 1999, and two more surgeries, Milnes was discharged from Tripler for the second time with no antibiotics. Despite the Government's after-thought contentions, Milnes never left the hospital against the advice of Tripler personnel, nor did he ever disobey instructions from the hospital, and whatever he applied to his wound while at the hospital was at the instructions of hospital personnel.

4

The treatment given Milnes at the hospital, however, did not work. Finally. Dr. Cordts intervened, replacing Dr. Cirangle, applying a Vacuum Assisted Closure ("VAC") machine to Milnes' gangrenous wound during his third hospitalization of July 8, 1999, to July 20, 1999.

Unfortunately, it took another two and one-half years for the wound to close and eighty-three infected stitches to be removed (the last having been removed by Dr. Wang at Queens in August 2006).

Milnes still has problems even today with granulomous disease, lower intestinal discomfort, and hiatus hernia from the dehisce, and he has never been able to resume normal bowel movements, unable to leave home for long periods; the scar on his abdomen even scares him; he has no sex life; he has already spent almost $100,000 at Stanford, California, and at Omaha, Nebraska, trying unsuccessfully to get medical advice and help; he has been unable to work full-time since for now six years.

On May 25, 2005, Milnes' counsel secured the expert report of Dr. Peter Halford, who confirmed in numbered paragraph 1 of his expert report that there was no documentation in the Tripler records originally showing that the antibiotic Zosyn, ordered, had actually been administered before the surgical procedure the following day, which Dr. Halford affirms if true was "a breach of the standard" of care, and upon subsequently receiving the Government's document production in this case, as referenced in Paragraph 35 above, we now know that to be true.

Dr. Halford also concluded in numbered paragraph 2 of his expert report that if the Tripler medical records had been altered to make it appear that the surgery had actually taken place on June 15, 1999, when in fact the surgery took place on June 16, 2007, which we know from the Government's own document production, as referenced above it in fact did take place on June 16, 1999, notwithstanding Dr. Cirangle's attempt

5

to make it look like it took place the day before, as referenced above, that would represent "an egregious breach of medical case standards" according to Dr. Halford.

Dr. Halford also found in numbered paragraph 3 of his expert report that in the absence of any culture reports being found in the Tripler records, that not having attempted to identify "what bacteria one is attempting to eliminate to be certain your selection [of an certain antibiotic] is correct" would be another violation of the "standard of care" in this case, as Zosyn, for instance, is a "penicillin antibiotic" useful in combating only certain types of infections.

Dr. Halford, furthermore, found in numbered paragraph 4 of his expert report that according to the June 24, 1999, Emergency Room report, since Milnes' "wound was largely dehisced," he should have been admitted on June 24, 1999, to the hospital, and not the next day, "especially with a dehiscence of this degree," the delay allowing "for increased bacteria colonization" and "increased risk of evisceration," another standard of care violation.

Dr. Halford additionally identified in his numbered paragraph 5 of his expert report yet another "definite negligent action" in the ordering of Dakin's solution for treating Milnes' wound, knowing that Milnes was "allergic to bleach," well documented in his Tripler records, resulting "in an intense reaction," and further delaying his "wound healing let alone the side effects" that Milnes had to put up with.

Finally, Dr. Halford found in his numbered paragraph 6 of his expert report evidence that there was an attempt at Tripler to place "entries in the medical record" attempting "to shift blame" to the patient "for all of his complications," which is "a breach of medical ethics and care standards" as well, concluding, for instance, that "it is hard for me to believe that someone could lift anything over 25 lbs in the first two weeks after a major abdominal incision," as the Government has contended.

## D. Undisputed Facts

The parties admit their capacities and that Milnes was treated at Tripler; no other facts are undisputed.

## E. Disputed Factual Issues

As to liability, the Government claims that there was no medical malpractice committed at Tripler in the treatment of Milnes. Milnes disagrees.

As to damages, Milnes seeks damages for medical malpractice. Set forth in Exhibit "A" is an itemization of his medical-related expenses from 1999 through 2006 (still increasing) paid by him directly, totaling at least $394,687.28.

Unable to work full-time since the surgery, his lost wages total at least $322,400.00, calculated at $31/hour times 8 hours a day times five days a week times 52 weeks each year times 5 years.

Additionally, Milnes seeks at trial pain and suffering damages of at least five times the total of his medical expenses and lost wages, which total $717,087.28, times five which equals $3,585,436.40.

The Government contends that Milnes was at least partially responsible for his damages due to smoking and overweight, and that he was unable to work in any event due to his confessed back problems.

Milnes on the other hand contends that his back problems were a minor aspect of his inability to work, and that indeed the Government rated his back problem as minor, as shown in Exhibit "B" and it therefore is estopped from now claiming that it alone was the cause of his lost wages.

### F. Relief Prayed

Milnes seeks a fair and just amount for his general and special damages (see above) in the amount of $3,585,436.40 or as the Court deems just and proper.

### G. Points of Law

This is an ordinary medical malpractice case, dependent upon the evidence adduced at trial. No contested points of law are known to Milnes.

### H. Previous Motions

The Government was successful in pretrial practice in removing claims against the Veteran's Administration from the case, as controlled by other, administrative procedures.

The Government was also successful in limiting the scope of the standard of care issues to whether cultures were taken as to Milnes' infection and whether the use of Dakin's solution was below the standard of care – and whether in each case they contributed to and caused Milnes' damages.

### I. Witnesses To Be Called

Milnes will call to testify at trial, in addition to himself, his wife who witnessed many of the events surrounding his illness, hospitalization, and treatment, as well as his damages.

Milnes will also call to testify his expert, Dr. Halford, who will testify as to the various violations, *supra*, of the standard of care, and causation – within the scope of his expert report as explained in his oral deposition taken by the Government.

### J. Exhibits, Schedules, Summaries

The parties likely will provide the Court with joint trial exhibits containing Milnes' Veteran's Administration and Tripler pertinent medical records and related correspondence, together with Milnes' itemization of his damages, *supra*, with his supporting receipts, and the resumes of all testifying experts and their intended exhibits.

### K. Further Discovery or Motions

The parties have agreed to extend the discovery cut-off for the taking of one additional deposition from a Mainland witness, and are completing the exchange of documents.

### L. Stipulations

No stipulations are contemplated by Milnes.

### M. Amendments, Dismissals

None.

### N. Settlement Discussions

The parties have been unable to reach agreement on settlement terms. Milnes is willing to participate in mediation.

### O. Agreed Statement

Unlikely.

### P. Bifurcation, Separate Trials

Not feasible.

### Q. Reference to Master or Magistrate

Not appropriate

### R. Appointment and Limitation of Experts

The parties have identified their experts already.

### S. Trial

This is a bench trial, already scheduled.

### T. Estimate of Trial Time

Plaintiff anticipates the need for three trial days, depending upon the length of Defendant's cross-examination.

### U. Claims of Privilege or Work Product

None known.

### V. Miscellaneous

None.

DATED: Honolulu, Hawaii; August 7, 2007.

GARY VICTOR DUBIN
Attorney for Plaintiff